# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH ORTOLANI, Individually and On Behalf of All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>        v.<br><br>PLUG POWER INC., ANDREW MARSH, and PAUL B. MIDDLETON,<br><br>                     Defendants. | **Case No.**  1:26-cv-165 (MAD/DJS)<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph Ortolani ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Plug Power Inc. ("Plug Power" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Plug Power securities

between January 17, 2025 and November 13, 2025, both dates inclusive (the "Class Period"),
seeking to recover damages caused by Defendants' violations of the federal securities laws and to
pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the
"Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its
top officials.

2.    Plug Power provides hydrogen fuel cell turnkey solutions for the electric mobility
and stationary power markets in North America and Europe, including hydrogen storage and
production equipment or the delivery of hydrogen fuel, and develops infrastructure such as
hydrogen production plants.

3.    At all relevant times, Plug Power represented that it is "committed to building a
network [of hydrogen production plants] across the United States".

4.    Supporting Plug Power's operations and building out a network of hydrogen
production plants required significantly more capital than the Company had available.
Accordingly, as of early 2021, Plug Power began the process of applying for a loan through the
U.S. Department of Energy's ("DOE") Loan Program's Office ("LPO"). On January 16, 2025, in
the closing days of former U.S. President Joe Biden's administration, Plug Power announced it
had "closed a $1.66 billion loan guarantee" from the U.S. DOE's LPO (the "DOE Loan"), a multi
draw term loan facility by way of a series of advances subject to the achievement of certain
conditions. Plug Power said that the DOE Loan "will help finance the construction of up to six
projects to produce and liquefy zero- or low-carbon hydrogen at scale throughout the United
States," and further stated that the first project to benefit from this financing would be its green
hydrogen plant located in Graham, Texas.

5.    Approval and funding of disbursements under the DOE Loan were subject to the satisfaction of certain conditions precedent, including, but not limited to, evidence of satisfaction of certain technical and performance related conditions precedent, adequate project funding, reports from certain technical consultants and advisors, and the receipt of certain errata financial models demonstrating compliance with the financial covenants set for in the DOE Loan.  Further, the DOE Loan advances could only be used to pay for eligible costs associated with the qualifying projects, *i.e.*, the construction of six projects to produce and liquefy zero- or low-carbon hydrogen at scale for which DOE granted the DOE Loan.

6.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had materially overstated the likelihood that funds attributed to the DOE Loan would ultimately become available to Plug Power, and/or that Plug Power would ultimately construct the hydrogen production facilities necessary to receive those funds; (ii) as such, Plug Power was likely to pivot toward more modest projects with less commercial upside; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.    On October 7, 2025, Plug Power issued a press release and filed a current report on Form 8-K with the SEC announcing that Defendant Andrew Marsh ("Marsh") would step down from his role as the Company's Chief Executive Officer ("CEO"), "effective as of the date [Plug Power] files its [2025] Annual Report", and that Sanjay Shrestha would step down from his role as the Company's President, "effective as of October 10, 2025[.]"  Plug Power concurrently announced the appointment of Chief Revenue Officer Jose Luis Crespo to both roles.  The abrupt

departure of two key executives just one month before the expected issuance of Plug Power's financial and operating results for the third quarter plainly did not bode well for the Company.

8.     On this news, Plug Power's stock price fell $0.26 per share, or 6.29%, to close at $3.87 per share later that day.

9.     Then, on November 10, 2025, Plug Power issued a press release reporting its financial results for the quarter ended September 30, 2025, and filed a quarterly report on Form 10-Q with the SEC that reported the same.  That same day, Plug Power held a related conference call to discuss those results.  During the call, Defendants announced that they expected to generate more than $275 million in liquidity after signing a nonbinding letter of intent (the "Nonbinding LOI") to monetize their electricity rights in New York and one other location in partnership with a major U.S. data center developer, and that "[a]s a result, we have suspended activities under the DOE loan program, allowing us to redeploy capital".  This represented a significant pivot for Plug Power.  Defendants had not previously discussed the possibility of suspending activities under the DOE Loan and during the Class Period, and, just eight months earlier, had specifically advised analysts that they should "not expect revenue from that segment [*i.e.*, data center power generation] of any size over the next two to three years".

10.     On this news, Plug Power's stock price fell $0.09 per share, or 3.39%, to close at $2.53 per share on November 11, 2025.

11.     Then, during market hours on November 13, 2025, *The Washington Examiner* reported that Plug Power "confirmed . . . that it suspended activities" on "its plans to construct six facilities to produce and liquefy zero or low-carbon hydrogen, putting at risk" the $1.66 billion DOE Loan it closed in January.

12.     On this news, Plug Power's stock price fell $0.48 per share, or 17.58%, over the following two trading sessions, to close at $2.25 per share on November 14, 2025.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Plug Power is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18.     Plaintiff, as set forth in the attached Certification, acquired Plug Power securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant Plug Power is a Delaware corporation with principal executive offices located at 125 Vista Boulevard, Slingerlands, New York 12159.  The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "PLUG."

20.     Defendant Marsh has served as Plug Power's CEO at all relevant times.

21.     Defendant Paul B. Middleton ("Middleton") has served as Plug Power's Chief Financial Officer at all relevant times.

22.     Defendants Marsh and Middleton are sometimes referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Plug Power's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Plug Power's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Plug Power, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     Plug Power and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Plug Power provides hydrogen fuel cell turnkey solutions for the electric mobility and stationary power markets in North America and Europe, including hydrogen storage and production equipment or the delivery of hydrogen fuel, and develops infrastructure such as hydrogen production plants.

26.     At all relevant times, Plug Power represented that it is "committed to building a network [of hydrogen production plants] across the United States".

27.     Supporting Plug Power's operations and building out a network of hydrogen production plants required significantly more capital than the Company had available. Accordingly, as of early 2021, Plug Power began the process of applying for a loan through the U.S. DOE's LPO.

### Materially False and Misleading Statements Issued During the Class Period

28.     The Class Period begins on January 16, 2025, in the closing days of former U.S. President Joe Biden's administration, when Plug Power announced that it had "closed" the $1.66 billion DOE Loan, a multi draw term loan facility by way of a series of advances subject to the achievement of certain conditions.  Plug Power said that the DOE Loan "will help finance the construction of up to six projects to produce and liquefy zero- or low-carbon hydrogen at scale throughout the United States," and further stated that the first project to benefit from this financing would be its green hydrogen plant located in Graham, Texas.  Plug Power also stated that approval and funding of disbursements under the DOE Loan were subject to the satisfaction of certain conditions precedent, including, but not limited to, evidence of satisfaction of certain technical and performance related conditions precedent, adequate project funding, reports from certain technical

consultants and advisors, and the receipt of certain errata financial models demonstrating compliance with the financial covenants set for in the DOE Loan.  Further, the DOE Loan advances could only be used to pay for eligible costs associated with the qualifying projects, i.e., the construction of six projects to produce and liquefy zero- or low-carbon hydrogen at scale for which DOE granted the DOE Loan.

29.    On March 3, 2025, Plug Power issued a press release reporting its financial results for the fiscal quarter and year ended December 31, 2024.  In this press release, among other items, the Company provided an update on its "Liquidity Planning" measures including the DOE Loan. Plug Power stated that while the DOE Loan would cover only part of the investment required to complete its Graham, Texas hydrogen plant, it "anticipate[d] culminating the process" to secure the remaining required funding and "kicking off the project in the coming months", stating in relevant part:

> Department of Energy (DOE) Loan Update: Plug recently closed the $1.66 billion DOE Loan Guarantee program.  Plug has invested over $250 million in the project to date.  To complete the project, Plug estimates an additional required investment of approximately $600 million.  Of this additional investment, the DOE loan is targeted to cover approximately $400M.  ***To cover the investment amount outside the DOE loan, Plug has targeted a process of working with project finance and potential equity investors.  The Company has made progress aligning with interested parties and anticipates culminating that process commensurate with kicking off the project in the coming months. Construction is expected to take approximately 18 months once its engineering, procurement, and construction (EPC) contractor is mobilized. This remains an important project for the future and is expected to benefit the Company and the U.S. market once completed***, but the Company will be prudent about the timing of mobilizing the project to ensure third-party funding given this project is not correlated to near-term sales and margin goals.[1]

30.    On March 4, 2025, Plug Power held a conference call concerning its financial results for the fiscal quarter and year ended December 31, 2024 (the "FY 2024 Earnings Call").

---

[1] All emphases herein added unless otherwise indicated.

During the FY 2024 Earnings Call, the DOE Loan was the subject of multiple analysts' questions. In response to one such question, Defendant Marsh provided an update on conversations with the DOE after the change in administrations, including his personal involvement in such conversations, and timing of construction of the Graham, Texas hydrogen plant associated with the DOE Loan, stating in relevant part:

> ***There has been discussions with the DOE and we're pleased at a working level***. The individuals we have been dealing with have remained at the DOE. So we're not going through the process of reeducating the team. I think that's a big positive. . . . ***We have had regular conversations with the DOE over the past month. I personally will be spending time with them this week***. So from an engagement point of view, and look, we're in very, very red districts. We're in Texas where we're looking to build this. And I can tell you the local political teams, political folks in that region are strong supporters of this and are reaching out to make sure that this loan is executed on the deal that we came to. . . . ***I would expect that construction of this project will most likely happen in the fourth quarter and that you can say 18 months to 24 months before it's completed***.

31.     In response to another analyst question during the FY 2024 Earnings Call, Defendant Middleton represented that the Company did not face any significant additional "obstacle[s]" to receiving funds associated with the DOE Loan, characterizing remaining steps as "the bureaucracy of crossing the T's and dotting the I's", stating in relevant part:

> There's not new conditions. The loan was finalized in early January. The only thing that we have to do is, and ***it's approved, the way it works is the loan itself has been papered, documented and approved. Everything's there.*** To apply the first project, which is Texas, there's some specific things that we have to put in place in terms of like direct agreements between the DOE and the EPC contractors. An example is just one microcosm example. ***So those are things that we're working on. We're really close.***

> And they're not necessarily additional conditions that make it — any obstacle is just really — unfortunately, the parties that work on these things that we're working with have done many other deals with the DOE, so they're used to working with the DOE on these kind of ancillary agreements. ***And so it's more just, I would say, for lack of better words, the bureaucracy of just putting crossing the T's and dotting the I's and putting all those residual components in place to officially kick-off Texas as a project underneath that structure***.

32.     Also during the FY 2024 Earnings Call, an analyst asked Defendants "how are you looking at data center backup power generation" and how Defendants "see Plug benefitting from that in 2025?"  In response, Defendant Marsh stated "I don't see it as a benefit in 2025" and "I would not expect revenue from that segment of any size over the next two to three years":

> ***To be direct, I don't see it as a benefit in 2025***.  Our view is that, when it comes to hydrogen, one of the biggest challenges to make sure that you can support long duration outages and that requires a great deal of hydrogen storage on site.  We think that business opportunity is a '28, '29 opportunity.  Really to be successful, we really think you need hydrogen pipelines that you can store hydrogen in.  And there are some data centers in Europe that could make sense in the future.  ***But I would not expect revenue from that segment of any size over the next two to three years***.

33.     On March 19, 2025, Plug Power announced the pricing of an underwritten registered offering to a single institutional investor, of 46.5 million shares of common stock together with an accompanying warrant, and pre-funded warrants to purchase 138,930,464 shares of common stock (the "Offering").  Plug Power announced the Offering yielded gross proceeds of ***$280 million*** before underwriting discounts and commissions and other offering expenses payable by Plug Power, ***rising to $651 million*** if the warrants are exercised in full.

34.     On May 12, 2025, Plug Power held a conference call concerning its financial results for the fiscal quarter ended March 31, 2025 (the "Q1 2025 Earnings Call").  During the call, Defendant Marsh stated that the Offering proceeds were intended to cover "the rest" of the capital expenditures necessary to construct the Graham, Texas facility, and represented confidence that the Graham, Texas project was "contracted, obligated, and we believe secure".  During his prepared remarks, Defendant Marsh stated:

> On capital, we've taken some important steps to ensure financial flexibility***. In March, we raised $280 million in equity***, bolstering liquidity while reducing risk in a volatile market.

We followed that with a $525 million structured financing facility, part of which was used to retire convertible debt. ***Combined with the $1.66 billion Department of Energy loan guarantee, these moves provide a strong foundation to support our infrastructure goals***. That said, I want to be forthright. With the change in administration, we're actively working with the DOE to advance the loan process. ***The underlying program is contracted, obligated and we believe secure and we continue to engage closely with the administration***.

35.    Later, in response to an analyst's request to "remind us how much you have already spent on Texas" and "how much what [sic] the CapEx looks like", Defendant Marsh again reaffirmed the connection between the Offering and the Graham, Texas facility, stating:

We've spent $250 million. The CapEx is $800 million. The DOE loan is for approximately $400 million. ***And we've been working with an equity investor for the rest***. So we've already spent $250 million over $800 million, is about 37%.

36.    Later during the Q1 2025 Earnings Call, in response to an analyst's request for an "update on how the hydrogen production facilities are operating", Defendant Marsh represented that the Texas facility was "a real focus of the business" and that "we need to get Texas started by year's end":

So I think how many tons was it, 300 tons out Georgia in April? Yes. So Georgia is beginning to run without too much management involvement, Colin. It turns on and runs every day. Louisiana, boy, it's probably I think what I've been most impressed with is, look, it's our third time around. It's a much cleaner design than Georgia and Tennessee. We really have learned how to build plants, which is really important for Jose in building out the electrolyzer market. So we're quite pleased with the progress we're seeing at all three sites. ***I think the question is we need to get Texas started by year's end and I think that's a real focus of the business***.

37.    On June 9, 2025, Plug Power issued a press release touting that Defendant Middleton had purchased 650,000 shares of the Company's common stock on the open market and tied this purchase to Defendant Middleton's purported "confidence in Plug's operational progress, including the ramp-up of hydrogen production plants". Specifically, the press release stated:

This latest investment follows a previous purchase earlier this month, reinforcing Mr. Middleton's continued belief in Plug's long-term strategy, strong financial trajectory, and leadership in building a vertically integrated hydrogen ecosystem.

11

"This additional investment reflects my strong conviction in Plug's strategy and long-term value creation. As we execute and gain market traction, I continue to see meaningful upside and believe Plug remains one of the most compelling growth opportunities in the energy sector."

***Middleton's open-market purchase underscores executive confidence in Plug's operational progress, including the ramp-up of hydrogen production plants***, commercialization of GenEco electrolyzers, and growing demand for GenDrive fuel cell solutions across material handling and industrial markets.

"This is a transformative moment for our business and our industry. I believe deeply in Plug's ability to lead this energy transition—and I'm proud to continue investing in that future," he added.

38.    On August 11, 2025, Plug Power held a conference call concerning its financial results for the fiscal quarter ended June 30, 2025 (the "Q2 2025 Earnings Call"). Defendant Marsh again assured analysts that "we remain confident in our ability to begin construction on DOE supported projects before the end of the year", stating in relevant part:

On the DOE loan, we continue to work constructively with the loan program office to align with evolving priorities. ***We remain confident in our ability to begin construction on DOE supported projects before the end of the year***, accelerating the expansion of our hydrogen generation network.

39.    Also during the Q2 Earnings Call, an analyst asked Defendant Marsh specifically "to give an update on your plans for the Texas facility". In response, Defendant Marsh stated:

***So, we're looking to commence construction by the end of this year for Texas***. If you start thinking about Texas, we have a lot of -- we have the power from our 310 megawatt deal with NextEra at very competitive electricity prices. We've already -- we already have the water available at the site, as we work very closely with the local community in establishing the availability of water. We have the equipment for Texas. ***We're working very closely with the DOE***. I got to tell you, we met with Greg Beard, who heads the DOE loan program. And I walked away very, very impressed with his knowledge of the energy market and what we're looking to accomplish. I think that we are looking at working with the DOE to finalize their support for taxes with the new Trump administration, which quite honestly has been very supportive of this project. ***And we're looking to, a good chance we'll look to bring a partner in by the mid-fourth-quarter***.

40.    The statements referenced in ¶¶ 29–32, 34–39 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had materially overstated the likelihood that funds attributed to the DOE Loan would ultimately become available to Plug Power, and/or that Plug Power would ultimately construct the hydrogen production facilities necessary to receive those funds; (ii) as such, Plug Power was likely to pivot toward more modest projects with less commercial upside; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

41.    Defendants likewise violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Plug Power to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants failed to disclose, *inter alia*, the true likelihood that the funds attributed to the DOE Loan would ultimately become available to Plug Power, the true likelihood that Plug Power would ultimately construct the hydrogen productions facilities necessary to receive those funds, and the true likelihood Plug Power would pivot to more modest projects with less commercial upside.  Defendants' failure to disclose the foregoing issues violated Item 303 because these issued represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### The Truth Begins to Emerge

42.    On October 7, 2025, Plug Power issued a press release and filed a current report on Form 8-K with the SEC announcing that Andy Marsh would step down from his role as the

Company's CEO, "effective as of the date [Plug Power] files its [2025] Annual Report", and that Sanjay Shrestha would step down from his role as the Company's President, "effective as of October 10, 2025[.]"  Plug Power concurrently announced the appointment of Chief Revenue Officer Jose Luis Crespo to both roles.  The abrupt departure of two key executives just one month before the expected issuance of Plug Power's financial and operating results for the third quarter plainly did not bode well for the Company.

43.    On this news, Plug Power's stock price fell $0.26 per share, or 6.29%, to close at $3.87 per share later that day.

44.    Then, on October 8, 2025, Plug Power issued a press release announcing it had entered into an agreement inducing the immediate exercise of the entirety of its outstanding warrants issued in the Offering to a single institutional investor.  Plug Power announced that this agreement yielded gross proceeds of ***approximately $370 million***.  In consideration for the immediate exercise of the Offering warrants, Plug Power granted the investor new warrants to purchase a total of 185,430,464 million shares of common stock with an exercise price of $7.75, representing a premium of approximately 100% to Plug Power's last closing stock price on October 7, 2025.  Plug Power stated that it would receive approximately $1.4 billion in gross proceeds if the new warrants are fully exercised on a cash basis.  In contrast to Defendants' earlier statements connecting Offering proceeds to capital expenditures necessary to construct the Graham, Texas facility, as alleged *supra* ¶ 34–35, Plug Power stated it intended to use proceeds from the new warrants "for working capital and general corporate purposes."

45.    On this news, Plug Power's stock price fell $0.21 per share, or 5.72%, to close at $3.66 per share later that day.

46. Then, on November 10, 2025, Plug Power issued a press release reporting its financial results for the quarter ended September 30, 2025, and filed a quarterly report on Form 10-Q with the SEC that reported the same. That same day, Plug Power held a conference call concerning its financial results for the quarter ended September 30, 2025. During this conference call, Defendants announced that they expected to generate more than $275 million in liquidity after executing the Nonbinding LOI that purportedly would monetize their electricity rights in New York and one other location in partnership with a major U.S. data center developer, and that "[a]s a result, we have suspended activities under the DOE loan program, allowing us to redeploy capital". This represented a significant pivot for Plug Power. In response to an analyst question, Defendant Marsh stated that the transaction to provide backup power to data centers had "been far along", contradicting his statements that analysts should not expect revenue "at any size" from data center backup power generation in 2025, as alleged *supra* ¶ 32:

> Yes. I think it's -- we've taken a step back. ***And first, I want to -- want to make a note, we expect this transaction will close in the first quarter. It's been far along. So we think it's mid-first quarter when this closes.*** This will provide the liquidity on the balance sheet which part of Project Quantum Leap has been about. And Plug next year is going to be sitting there with a strong balance sheet, which will have a complementary improvement to our income statement.
>
> So it's really about liquidity to start. And the second item that's driven a good deal of this is -- and I touched on in my opening remarks about not only our relationship with a large industrial gas company but relationships with people who are going to build hydrogen plants who want our electrolyzers. So we looked at the world and said, we know how to do a combination of sourcing competitive hydrogen and generating competitive -- generating hydrogen to balance those two out.
>
> As part of this program, ***we've been exploring with our product management team and development team, opportunities to provide levels of backup power using hydrogen to support the data center deployments***. It will make sense in some applications. ***And so that is a real, real focus that Jose and the team will continue to be engaging in next year***.

47.     On this news, Plug Power's stock price fell $0.09 per share, or 3.39%, to close at $2.53 per share on November 11, 2025

48.     Then, during market hours on November 13, 2025, *The Washington Examiner* reported that Plug Power "confirmed . . . that it suspended activities" on "its plans to construct six facilities to produce and liquefy zero or low-carbon hydrogen, putting at risk" the $1.66 billion DOE Loan it closed in January.

49.     On this news, Plug Power's stock price fell $0.48 per share, or 17.58%, over the following two trading sessions, to close at $2.25 per share on November 14, 2025.

50.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

51.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Plug Power securities, Defendants enriched themselves by closing the Offering for gross proceeds to the company of ***$280 million, rising to $651 million*** once warrants issued in the Offering were exercised in full.

52.     Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Indeed, at all relevant times, Defendants repeatedly emphasized their commitment to hydrogen plant construction and consistently provided updates on purported discussions with the DOE concerning the DOE Loan.  Defendant Marsh specifically stated he was "***personally***" involved in such

discussions, as alleged *supra* ¶ 30. As such, Defendants were aware of the true likelihood they would complete hydrogen plants necessary to receive liquidity associated with the DOE Loan, including the Graham, Texas hydrogen plant. Yet Defendants failed to disclose that they were considering alternative sources of liquidity. Defendant Marsh specifically refuted that Plug Power would generate revenue "of any size" from data center backup power generation "over the next two to three years", as alleged *supra* ¶ 32, before stating in November that the Nonbinding LOI had "***been far along***" before the Company announced its execution, as alleged *supra* ¶ 46. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Plug Power securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Plug Power securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by Plug Power or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Plug Power;

- whether the Individual Defendants caused Plug Power to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Plug Power securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

59.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Plug Power securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Plug Power securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

60.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Plug Power securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Plug Power securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Plug Power securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Plug Power's finances and business prospects.

66.    By virtue of their positions at Plug Power, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Plug Power, the Individual Defendants had knowledge of the details of Plug Power's internal affairs.

68.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Plug Power. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Plug Power's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Plug Power securities was artificially inflated throughout the Class Period. In

ignorance of the adverse facts concerning Plug Power's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Plug Power securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

69.    During the Class Period, Plug Power securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Plug Power securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Plug Power securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Plug Power securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

72.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.    During the Class Period, the Individual Defendants participated in the operation and management of Plug Power, and conducted and participated, directly and indirectly, in the conduct of Plug Power's business affairs.  Because of their senior positions, they knew the adverse non-public information about Plug Power's misstatement of income and expenses and false financial statements.

74.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Plug Power's financial condition and results of operations, and to correct promptly any public statements issued by Plug Power which had become materially false or misleading.

75.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Plug Power disseminated in the marketplace during the Class Period concerning Plug Power's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Plug Power to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Plug Power within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

participated in the unlawful conduct alleged which artificially inflated the market price of Plug Power securities.

76.     Each of the Individual Defendants, therefore, acted as a controlling person of Plug Power.  By reason of their senior management positions and/or being directors of Plug Power, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Plug Power to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Plug Power and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Plug Power.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiff hereby demands a trial by jury.

Dated: February 2, 2026

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff Joseph Ortolani*