UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JERRY L. JASKOT, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>   v.<br><br>PLUG POWER INC., ANDREW J. MARSH, PAUL B. MIDDLETON, and JOSE LUIS CRESPO,<br><br>           Defendants. | Case No. 1:26-cv-0165 (MAD) (DJS)<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 9

III.    PARTIES ......................................................................................................... 10

IV.    RELEVANT NON-PARTY EXECUTIVE ..................................................... 12

V.    FORMER PLUG EMPLOYEES WHO CORROBORATE THE ALLEGATIONS ....... 12

VI.    RELEVANT STATUTORY BACKGROUND ............................................... 16

VII.    SUBSTANTIVE ALLEGATIONS ................................................................. 19

        A.    Plug and Its Lofty Plans to Develop an End-to-End Hydrogen Ecosystem Fueled by the Company's Own Network of Liquid Green Hydrogen Plants ................... 19

        B.    Pre-Class Period Construction of Plug's Green Hydrogen Production Plants ..... 25

        C.    The Cost to Build Georgia Solidified Plug's Dire Need for Outside Funding ..... 29

        D.    Plug Resets Growth Initiatives to Align with Funding of $1.66M DOE Loan..... 33

        E.    Plug and Its Management Knew DOE Would Not Fund the New York Plant..... 39

                1.    Notification of Interested Parties Under the DOE NEPA Process ........... 39

                2.    The DOE's Preparation of an EA for the Texas Project ........................... 40

                3.    Internal Communications with the DOE Regarding Plug's Hydrogen Plants to be Covered by the DOE Loan ................................................... 40

        F.    Plug Abandons Construction Work at the New York Plant ................................ 45

        G.    DOE's Limited Commitment to Cover Costs for the Texas Plant Necessitated Additional Funding Secured Before Any DOE Fund Advancements ................. 48

        H.    Administration Change Further Jeopardized Plug's Receipt of Funds Under the DOE Loan ........................................................................................................ 51

        I.    Plug Secretly Negotiates the Sale of Its Real Property as well as its Electricity Rights for Texas and New York to a Data Center Developer............................. 56

        J.    The Truth Slowly Leaks Out.............................................................................. 59

VIII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 64

i

IX.     LOSS CAUSATION ........................................................................................... 89

X.     ADDITIONAL FACUTAL ALLEGATIONS PROBATIVE OF SCIENTER ............... 93

     A.     Defendants Had Actual Knowledge and/or Access to Adverse Information ....... 94

     B.     Defendants Held Themselves Out as Knowledge ................................................. 97

     C.     Plug's Recorded Impairment Charges Indicative of Scienter ............................ 100

     D.     Suspicious Departures of Critical Company Executives Indicative of Scienter . 107

     E.     Defendants' Motive and Opportunity to Commit Fraud ..................................... 108

XI.     PRESUMPTION OF RELIANCE ................................................................... 112

XII.     NO SAFE HARBOR PROTECTION ............................................................. 114

XIII.     PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................... 115

XIV.     CLAIMS FOR RELIEF ................................................................................. 117

XV.     PRAYER FOR RELIEF ................................................................................. 121

XVI.     DEMAND FOR TRIAL BY JURY ............................................................... 121

Court-appointed Lead Plaintiffs Sipko de Ruiter, Jerry L. Jaskot, and Eugene Malloy (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege in this complaint for violations of the federal securities laws (the "Complaint"), the following based upon personal knowledge as to themselves and their own acts, and upon facts obtained through the investigation conducted by and through their attorneys, which included, among other things, review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, media reports, presentations, investor call transcripts, stock charts, and other publicly available information issued by or about Plug Power Inc. ("Plug" or the "Company"), industry guidance and regulations, expert reports and advisories, interviews with former employees of Plug, and other information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## I.    <u>NATURE OF THE ACTION</u>

1.    Plug promised investors a national network of green hydrogen production plants and told them a $1.66 billion federal loan guaranteed by the Department of Energy ("DOE") would "finance the development, construction, and ownership of up to six green hydrogen production facilities," starting with the projects already underway in New York and Texas. But by the first day of the Class Period, Plug knew the DOE loan would never fund its flagship New York plant because Plug itself had withdrawn this project from the loan application eight months earlier and the DOE had already characterized Plug's public statements on the subject as "inaccurate and misleading" and asked Plug to correct them publicly.

1

2.     Plug did not correct them. Instead, Defendant Middleton, Plug's Chief Financial Officer since 2014, told investors that Plug had merely "slowed investment in the follow-on hydrogen facilities in Texas and New York until we find the right financing solution," and that its capital strategy was to "work with the DOE to secure the DOE $1.6 billion project financing facility." And Defendant Marsh, Plug's Chief Executive Officer since April 2008, followed up by telling investors that "once the DOE loan is finalized, [we will] move ahead more aggressively, especially in our Texas activity."

3.     That framing was false in three respects. *First*, the Company's investments in New York had not been "slowed", but rather, Plug had suspended construction of the plant's critical infrastructure in December 2023, and by October 2024 the county in which this facility was to be built had recorded in its own files that Plug had "abandoned that work." *Second*, no "financing solution" was coming from the DOE for this project because Plug had withdrawn the development of the New York plant from its application for Federal financial support in or around June 2023. *Third*, in Texas, Plug's term sheet with the DOE, finalized in January 2024, conditioned all funds released on Plug first demonstrating "adequate project funding" that it did not have and could not obtain, even as Defendants repeatedly assured investors that their search for equity partners for its follow-on facilities was "separated completely from the activity with the DOE."

4.     Twenty months later, Plug suspended the DOE loan program and sold both plant sites to a data center developer for roughly $210 million combined. A promised 500 ton per day ("TPD") national network of self-generated liquid green hydrogen ended with just two 15 TPD plants reaching production start-up and a real estate transaction. This marked a very different outcome than the one Plug investors were initially led to believe was in progress.

5. Plug's material change in strategy represented a last-ditch effort by its management team to avoid bankruptcy. This reality traces back to the underlying fact that Plug historically lost money on every molecule of fuel it sold. A significant share of its revenue came from long-term contracts to supply hydrogen to customers' on-site fuel cell systems, but Plug could not produce enough itself; it bought from third parties at high cost and resold at a loss, sustaining negative margins on the business. Construction of its own liquid hydrogen plants dispersed across the country was supposed to be the cure. In September 2019, Plug committed to generating in-house at least half the hydrogen its customers purchased by 2024, and by 2021, it had promised the buildout of thirteen hydrogen plants generating 500 TPD by 2025.

6. The promise did not survive construction. Of the five announced sites, Plug's plans to build a 15 TPD plant in Pennsylvania were abandoned within months and its plans to build a 30 TPD plant in California never advanced past "permitting through prospecting." Plug's plant in Georgia, built to 30 TPD capacity, was to reach production in early 2023 but did not produce until January 2024 and only at 15 TPD. The Company's joint venture facilities in Louisiana slipped through five successive targets and arrived at production start-up sixteen months late. The Texas plant buildout lost six months to contractor negotiations. And the target completion of the New York facilities slipped again and again, always for the same stated reason: stalled energization of the site's electricity substation, which Plug called the "gating" item for production start-up.

7. Worse yet, capital expenditures associated with the buildout of Plug's hydrogen plants moved the other way. In January 2021, Defendant Marsh told analysts to budget "$40 million" for every ten TPD to be generated at each facility. In January 2023, the figure was "$8 million to $9 million a ton." The actual cost for the completed cornerstone Georgia plant, as Marsh acknowledged in March 2025, came out to roughly $23 to $24 million per ton.

3

8. By the third quarter of 2023, the Company's balance sheet was exhausted: a $3.8 billion accumulated deficit, $110.8 million in unrestricted cash, and a going concern warning that Plug's resources "will not be sufficient to fund its operations through the next twelve months." At the same time, four hydrogen plants remained under construction, and all of them needed money.

9. Plug portrayed the DOE loan as the answer to its financial problems. When Plug announced the Georgia plant's start-up in January 2024, it paired the news with a reset growth plan built on a $1.66 billion federal loan to fund up to six plants, starting with the development of its facilities to be located in New York and Texas. Defendant Marsh told investors the DOE funding "will play a pivotal role in scheduling our forthcoming plants in Texas and New York," and once closed, Plug expected to borrow back the $400 to $500 million already spent at those two sites.

10. Contrary to these public claims, Plug had withdrawn the New York project from its DOE loan application in or around June 2023, as confirmed in writing by the DOE that month. From that date forward, no federal dollar could reach the New York plant meaning Plug would no longer receive reimbursements on what it had already spent and would not receive additional funds to finish what it had started.

11. Plug's contradictory public statements found their way back to the DOE. The Tonawanda Seneca Nation, which had consulted with the agency on Plug's planned New York project since 2021, wrote twice in January 2024 asking how Plug could be promising investors federal money for a project DOE had been told was withdrawn.

12. On February 29, 2024, the DOE answered by stating, in pertinent part, that:

> In response to the concerns you raised regarding the statements made by Plug Power and its facility planned for [New York], the [DOE], Loan Program Office (LPO) views the statements, which implied that DOE funding 'will play a pivotal role in scheduling of forthcoming plants in Texas and New York' as inaccurate and misleading regarding the scope of the proposed Federal financial assistance under review by LPO. LPO has expressed this concern to Plug Power and has requested

4

that Plug Power provide a public statement to clarify that the Federal financial assistance it had requested from LPO will not include support for its facility planned within the STAMP at this time.

13.     Three facts in that letter are difficult to reconcile with good faith. The federal lender regarded Plug's public statements as inaccurate and misleading. It had raised that concern with Plug. And it had asked Plug to tell the public the truth. The same letter confirmed the June 2023 withdrawal of the New York project from the loan application remained in effect.

14.     Plug never issued the statement. Instead, on March 1, 2024, the first day of the Class Period, Defendant Middleton repeated the precise framing the DOE had just condemned, describing New York as merely "slowed . . . until we find the right financing solution" and Plug's strategy as working "with the DOE to secure the DOE $1.6 billion project financing facility." Defendants then did the opposite of clarifying: they steered analysts toward the one project still in the application, promising that "once the DOE loan is finalized, [we will] move ahead more aggressively, especially in our Texas activity." Two weeks later, at the J.P. Morgan Industrials Conference, Middleton described the loan as a "platform structure" whose first project "will be Texas," while saying Plug would temper investment in "Texas and other facilities" until it found "the right capital solution to DOE."

15.     The market never learned otherwise. Analysts continued to ask about the New York project throughout the Class Period because nothing Plug said gave them reason to stop. Even as late as July 7, 2025, Defendant Marsh was still describing a buildout sequence that included New York. Internally, however, the question was settled: CW5, Plug's Operations Controller and later a Director of Finance, states that by mid-2025 the company-wide consensus was that the New York plant was not going to happen and that Plug was spending significant sums storing and maintaining equipment bought for a project it knew was no longer viable.

5

16.     With the New York project out of the Company's DOE application, everything depended on the Texas plant and Defendants knew that the costs were too much to overcome. Plug signed a lump-sum Engineering, Procurement, and Construction contract on July 7, 2023 that, as Defendant Marsh put it, gave Plug "a commitment on what the cost is going to be" to build the Texas plant. And they knew the DOE's terms for covering project costs and how much was offered as of January 22, 2024, when Plug was notified that its finalized term sheet for the funding of the Texas project had gone to the Credit Review Board which included the loan's key financial terms and the conditions that must be satisfied before any money moves.

17.     One of those conditions was evidence of adequate project funding. Plug had sunk roughly $250 million into Texas, needed substantially more to finish, and did not have it. As such, finding an equity partner or alternative debt was not a parallel initiative; it was the gate. Thus, Defendants knowingly misled investors when they represented that Plug was "looking for equity partners, but that is not tied to the DOE loan," and that "activity with equity investors is separated completely from the activity with the DOE." In truth, the DOE loan was contingent upon Plug finding hundreds of millions of dollars in new investor money to satisfy strict funding requirements.

18.     Two former executives described the funding shortfall as obvious from the inside. CW1, Vice President of Sales and Business Development for Energy Solutions until February 2024, stated that the announced loan never matched the scope of the construction program, that Plug lacked both the cash and the credit rating to raise its share elsewhere, and that Defendants' talk of securing the down payment was "smoke and mirrors." CW6, a business development manager and later Director of Energy Solutions Sales, stated that where lenders underwrite to conservative cases, Plug used the most optimistic ones and "massaged the optimistic case numbers

6

a whole lot more"; by 2025, Texas was not viable, and finishing it would have required another $800 million to $1 billion that "Plug did not have."

19.    The November 2024 election further imperiled the loan: the DOE's LPO faced proposed budget cuts and a DOE nominee who had publicly criticized "large government subsidies and mandates" for private projects. No money was ever advanced under the loan. Instead, on January 20, 2025, an executive order paused releases of the appropriated funds at issue, and the DOE began reviewing loans approved in those final days of the prior administration's term. Yet publicly, Defendants claimed they were still having "regular conversations with the DOE" and assured that what remained was merely "the bureaucracy of crossing the T's and dotting the I's."

20.    Four former employees describe a company that had already given up. CW2 recalls Defendant Marsh reporting on the loan at all-hands meetings through 2024 — "we have this many more months" — and the subject going "flat" at the election, after which Defendant Marsh stopped raising it. CW3 recalls Defendant Marsh telling employees that the incoming administration "was not friendly to hydrogen, so that is why they needed to meet the January 2025 deadline," and that "you could tell that they would be doomed if it did not happen." CW4 recalls Defendant Middleton telling a weekly all-employee meeting that Plug had missed a DOE deadline, and language around the March 2025 layoffs that the loan "was in jeopardy; it was not going to happen." CW5 states that while Defendant Marsh publicly called hydrogen a bipartisan issue, internal actions showed management "knew that if this went past the presidential transition, then Plug had no shot at getting the funds."

21.    At the same time, Plug was selling the ground beneath both projects. By September 2024, two data center developers had bid to the county for rights to develop at the same site location as Plug's New York project, offering to take over the substation work Plug had

abandoned. Stream Data Centers ("Stream") likewise sought sixty acres there in January 2025 and untimely won the county's approval in March. That February, Stream also met City of Graham officials about a data center in Young County, Texas and reported that Plug had helped bring it to that location. Internally, CW6 and Plug's Director of Investor Relations spent months in early 2025 executing plans to sell the Texas and New York land to data-center developers on the premises that Plug lacked the money to finish its plants and that Texas lacked demand.

22.     Investors were told none of this but were instead forced to piece it together as news dribbled out into the public domain. First, on October 7, 2025, Plug announced that Defendant Marsh was stepping down as CEO; Sanjay K. Shrestha, Plug's President since November 2024 and former Chief Strategy Officer since April 2019, was stepping down as President within three days; and Defendant Crespo would take on both roles. A month before the annual symposium and third-quarter results, the departure of two key executives signaled a material and imminent change. The stock fell 7.64% in a day.

23.     Then, on November 10, 2025, Plug announced it would generate over $275 million by "monetiz[ing]" its electricity rights "in New York and one other location" with a data center developer — and that it "will suspend activities related to the [DOE] loan program." Defendant Marsh said a new hydrogen supply agreement "reduces the need for near-term self-development of new plants," four months after describing that same agreement as supporting Plug's mission to "build on our already robust and resilient hydrogen network," and conceded the transaction had "been far along." The stock fell 13.65%.

24.     Days later, on November 13, 2025, press reports confirmed Plug suspended work on all six planned facilities, putting the $1.66 billion loan at risk. The stock fell another 16.67%.

25.     On February 26, 2026, Plug announced its agreement to sell the New York site outright for roughly $133 million, including access to a 600 MW substation. The stock fell another 6.28% on this news.

26.     And finally, on July 13, 2026, Plug announced its agreement to sell the Texas project land and its 164 MW of grid interconnection assets for up to $76.5 million. The stock fell 2.69%, closing at $2.17 per share.

27.     Plaintiffs are suing to recover the losses they incurred as a result of Defendants' materially misleading disclosures between March 1, 2024 and July 12, 2026, both dates inclusive (the "Class Period"). These disclosures concealed the reality that Plug knew federal money would never reach New York and that it could not close the gap on Texas, yet Defendants kept both projects on the public ledger and kept the market's expectations attached to them all the while quietly winding both down and preparing to sell the land underneath. As alleged further herein, Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC and should be held liable for the damages they caused.

## II.     JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

30.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Plug is headquartered in this Judicial District,

9

Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

31.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

32.    Lead Plaintiff Sipko de Ruiter purchased or otherwise acquired Plug securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as set forth more fully herein. The certification filed herewith evidencing his transactions in Plug is hereby incorporated by reference herein.

33.    Lead Plaintiff Jerry L. Jaskot purchased or otherwise acquired Plug securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as set forth more fully herein. The certification filed herewith evidencing his transactions in Plug is hereby incorporated by reference herein.

34.    Lead Plaintiff Eugene Malloy purchased or otherwise acquired Plug securities at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud, as set forth more fully herein. The certification filed herewith evidencing his transactions in Plug is hereby incorporated by reference herein.

35.    Defendant Plug is a Delaware corporation with its principal executive offices located at 125 Vista Boulevard, Slingerlands, New York 12159. During the Class Period, Plug common stock traded in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "PLUG."

10

36.     Defendant Andrew J. Marsh ("Marsh") served as Plug's Chief Executive Officer ("CEO") from April 2008 through March 2, 2026, and has been a member of the Board of Directors since April 2008. On March 2, 2026, Mr. Marsh transitioned from serving as a director of the Board and CEO to serving as non-executive Chairman of the Board. In addition, effective March 2, 2026, Mr. Marsh has served as a consultant to the Company in a transitional advisory capacity, providing strategic advisory support to the Board of Directors and the CEO.

37.     Defendant Paul B. Middleton ("Middleton") has served as Plug's Chief Financial Officer ("CFO") and Executive Vice President ("EVP") since 2014 and, since May 2025, has also served as the Company's Chief Accounting Officer.

38.     Defendant Jose Luis Crespo ("Crespo") joined Plug in 2014 as Vice President ("VP") of Business and International Sales. He was promoted to VP of Global Sales in January of 2015 and in 2016 he was named General Manager ("GM") for Hypulsion, the Company's wholly owned European subsidiary. In 2021, Mr. Crespo was named GM of Material Handling and EVP, and in May of 2023, he was named GM of Applications and EVP. In November 2024, Mr. Crespo was appointed to serve as Chief Revenue Officer ("CRO"). Mr. Crespo served as the Company's CRO until March 2026, when he succeeded Defendant Marsh as CEO. On October 7, 2025, Mr. Crespo was appointed as the Company's President and CEO, effective October 10, 2025, and March 2, 2026, respectively.

39.     Defendants Marsh, Middleton, and Crespo are sometimes referred to herein as the "Individual Defendants," and together with Plug, the "Defendants."

40.     The Individual Defendants, because of their positions held with the Company, possessed the power and authority to control the contents of Plug's SEC filings, press releases, presentations to securities analysts, money and portfolio managers, and institutional investors, and

11

other market communications. The Individual Defendants were provided with copies of Plug's SEC filings and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Plug, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

41. Plug is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

42. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Plug under *respondeat superior* and agency principles.

## IV.    **RELEVANT NON-PARTY EXECUTIVE**

43. Sanjay K. Shrestha served as the President of Plug from November 2024 until his abrupt departure announced October 7, 2025, effective October 10, 2025. Mr. Shrestha joined the Company as Chief Strategy Officer ("CSO") and Executive Vice President ("EVP") in April 2019. Mr. Shrestha's role at the Company was expanded when, in January 2021, he was also appointed to serve as GM, Energy Solutions. He maintained his positions as CSO, EVP, and GM, Energy Solutions until his appointment as President in November 2024.

## V.    **FORMER PLUG EMPLOYEES WHO CORROBORATE THE ALLEGATIONS**

44. Confidential Witness #1 ("CW1") worked at Plug from April 2017 through February 2024. CW1 was a Senior Business Development Specialist at the Company from April

2017 through August 2021. CW1 then served as Vice President of Sales and Business Development for Energy Solutions from August 2021 through February 2024. CW1 reported directly to Mr. Shrestha, who in turn reported to Defendant Marsh.

45.    In their role as a Senior Business Development Specialist, CW1 was tasked with leading the development of Plug's hydrogen production plant planned to be located near Graham, Texas. According to CW1, they found the land for this project and participated in the effort to secure the property for the Company. CW1 was also responsible for negotiating the agreement between Plug and Young Energy Systems, which was part of Apex Clean Energy, to provide sources of low-cost renewable electricity to this facility to generate green hydrogen. Similarly, CW1 was responsible for handling the Company's dealings with the City of Graham, acquiring necessary water rights and transmission rights for this project. During their tenure with the Company, CW1 made repeated trips to the area.

46.    In their role as VP of Sales and Business Development, Energy Solutions, CW1 transitioned from project development to a customer-facing position negotiating customer offtake agreements for the green hydrogen to be generated at the Company's plant near Graham, Texas.

47.    Customer offtake agreements refer to the supply agreements executed by and between a producer (like Plug) and its customers for the express commitment to purchasing a set amount of hydrogen before production has begun. It guarantees a future revenue stream for the producer, which helps secure project financing, while locking in supply and pricing for the buyer.

48.    Confidential Witness #2 ("CW2") worked at Plug as a Commercial Specialist, Strategic Operations from August 2021 to March 2025. Before that, CW2 was employed by the Company as an Inside Support Coordinator from July 2020 to August 2021. CW2 previously worked for United Hydrogen Group Inc., which was acquired by Plug in June 2020.

49.     At Plug, a Commercial Specialist focuses on the successful delivery of hydrogen fuel and hydrogen integration opportunities by coordinating the end-to-end tender process. Responsibilities include managing hydrogen infrastructure bids, aligning cross-functional supply and manufacturing targets, optimizing cost-to-serve models, and supporting scale-up initiatives across global green hydrogen and fuel cell deployments.

50.     Confidential Witness #3 ("CW3") worked at Plug for ten years, starting as a Buyer in May 2015. During their tenure with the Company, CW3 also served as a Production Planner, a Senior Production Planner, a Lead Production Planner, and as a Supply Chain Manager. Specifically, CW3 served as a Supply Chain Manager from June 2024 to February 2026. During their tenure, CW3 worked out of Plug's New York office.

51.     At Plug, a Lead or Senior Production Planner coordinates work order releases to the manufacturing floor, resolves enterprise resource planning ("ERP") system obstacles, drives inventory performance and vendor management strategies, and collaborates with cross-functional departments to eliminate roadblocks and meet customer product delivery commitments. A Supply Chain Manager at Plug directs procurement, material flow, and operational efficiency for hydrogen fuel cell and cryogenic infrastructure systems. Their core duties include managing strategic sourcing, optimizing ERP systems, aligning vendor contracts with production schedules, and driving continuous improvement metric.

52.     Confidential Witness #4 ("CW4") worked at Plug from September 2019 to March 2025. When CW4 was first hired by the Company, CW4 worked as a Senior Materials Planner/Buyer from September 2019 to May 2022. CW4 was promoted to a Lead Business Analyst in March 2022 and served in this position until March 2024, at which point CW4 was then promoted to Operations Program Manager, SAP Integration and served in this position until March

14

2025. During their tenure, CW4 reported to Victoria Barrows, Senior Manager, Supply Chain Projects.

53.     An Operations Program Manager at Plug plays a pivotal role in product lifecycle management, supply chain coordination, and manufacturing execution. The role centers on guiding cross-functional hydrogen infrastructure and product development projects from initial design through manufacturing release.

54.     During their tenure as an Operations Program Manager at Plug, CW4 was primarily focused on implementing a new ERP system for the Company. CW4 said that when they left the Company, Plug was in the middle of rolling out its new ERP system, built and sold by SAP.

55.     An ERP system is software that connects a business's core activities—like finance, supply chain, manufacturing, inventory, sales, and Human Resources—into one central hub. It uses a shared database so different teams can see and update real-time information.

56.     Confidential Witness #5 ("CW5") worked at Plug from October 2022 to June 2025. CW5 was an Operations Controller from October 2022 to December 2024 and served as a Director of Finance from November 2024 to June 2025.

57.     During their tenure as a Director of Finance, CW5 primarily focused on the Company's supply chain finance. CW5 said much of what CW5 saw in supply chain finance involved moving equipment and storing equipment originally purchased for Plug's development of green hydrogen plants planned to be located near Graham, Texas and Alabama, New York.

58.     Confidential Witness #6 ("CW6") worked at Plug as a Business Development Program Manager from March 2022 to July 2024 and as Director of Energy Solutions, Sales from June 2024 to June 2025.

15

59.     During their tenure, CW6 primarily focused on the business development and sales of the Company's hydrogen liquefaction systems. CW6 reported to Chris Rial, the former Senior Director of Business Development & Sales.

## VI.    **RELEVANT STATUTORY BACKGROUND**

60.     Under the Title 17 Clean Energy Financing Program, DOE's Loan Program Office (LPO) offers debt financing for large-scale (typically $100 million or more) projects in the United States that support clean energy deployment and energy infrastructure reinvestment to reduce greenhouse gas emissions and air pollution. Title 17 was created by the Energy Policy Act of 2005 and was mostly recently amended by the Infrastructure Investment and Jobs Act of 2021 and the Inflation Reduction Act of 2022 (the "IRA").

61.     Through the Title 17 Clean Energy Financing Program, borrowers can access a direct loan from U.S. Treasury's Federal Financing Bank ("FFB") backed by a DOE guarantee. The amount of the LPO-guaranteed loan obligation cannot exceed 80% of eligible project costs (as defined by statute and regulations and determined by LPO).

62.     That said, as explained in the agency-created presentation updated January 22, 2024, and utilized by LPO senior advisor, Steve Boyd, on June 4, 2024, for the Clean Energy States Alliance Membership Meeting 2024, LPO typically offers coverage of 50% to 70% of eligible project costs.

63.     Pursuant to Title 17, LPO can finance projects across technologies and the energy storage value chain that meet certain eligibility and programmatic requirements. Such projects include: the manufacture of energy storage systems for a variety of residential, commercial, and utility scale clean energy storage end uses, and the deployment of residential, commercial, and utility scale clean energy systems for a variety of clean energy and clean transportation end uses.

16

64.     In pertinent part, when the bipartisan Infrastructure Investment and Jobs Act passed in November 2021, $9.5 billion was allocated to hydrogen. And as of March 2024, LPO continued to identify qualifying technology areas of interest for financing under Title 17 to include: (1) compressed air energy storage; (2) hydrogen production and storage; (3) pumped storage hydropower; (4) newer battery chemistries and flow batteries; (5) thermal energy storage; and (6) electrical vehicle bidirectional storage.

65.     Securing an LPO-guaranteed loan is a six-phase process. Phase 1 is the pre-application phase where LPO staff members meet with the potential applicant to discuss project eligibility, the application process, and answer any applicant questions.

66.     Phase 2, the application and review portion of the process, is divided into two parts. Part 1 is the period in which LPO establishes project eligibility and expresses its readiness to proceed. Part 2 is the period in which LPO conducts its programmatic, technical, and financial evaluation of the project.

67.     Thereafter, Phase 3 of the process consists of LPO's due diligence during which LPO and the applicant engage third-party advisors and negotiate the term sheet.

68.     Phase 4 is the conditional commitment portion of the process, commenced by LPO offering the applicant the approved finalized term sheet for the loan guarantee. LPO defines a conditional commitment as an offer approved by the Secretary of Energy to issue a loan or a loan guarantee to a project on the terms and subject to conditions set forth in a term sheet negotiated between DOE and the applicant. The approved term sheet underlying the conditional commitment contains the key financial and commercial terms of the potential loan or loan guarantee, the conditions that must be satisfied prior to the issuance and funding of a loan or loan guarantee, and the ongoing rights and remedies of DOE under the financing documents. When the applicant

17

receives a conditional commitment, the term sheet has been approved by DOE, the Office of Management and Budget ("OMB"), and in some cases, the Treasury Department.

69.    An article published by the DOE, on August 2, 2023, entitled, "*Getting to Know LPO: What is a Conditional Commitment and How is it Different from a Loan or Loan Guarantee?*" provides the following regarding the components of an approved term sheet:

> The approved term sheet will specify additional steps the borrower must take to proceed toward financial close on the loan or loan guarantee, which include fulfilling particular legal, technical, commercial, contractual, and financial requirements; completion of satisfactory due diligence, the absence of a material adverse change or material litigation affecting the project, and the negotiation and execution of definitive financing documents acceptable to DOE. These requirements are often referred to as *conditions precedent.*
>
> Conditions precedent often require that the borrower address or mitigate various risks associated with the loan, and they are established by DOE in the term sheet to help ensure the borrower's ability to meet a reasonable prospect of repaying the loan. Examples of some of the types of conditions precedent may include, but are not limited to, requiring the borrower to demonstrate that they have met certain financial or equity obligations, complete the required environmental permitting for the project, or attain engineering or manufacturing performance or quality expectations, among other factors. To protect taxpayer resources, these or other types of conditions are often structured so they have to be met prior to loan closing, and / or prior to first and subsequent advances of loan proceeds.

70.    Phase 5 of the process is the financial close portion. During this phase, LPO and the borrower execute the definitive financing documents to close the loan and, subject to meeting all additional conditions precedent to loan disbursements, funds are advanced to the borrower.

71.    Finally, Phase 6 is the project monitoring phase during which LPO monitors the borrowers project development and acts as a trusted partner for the life of the loan, acting in the best interest of the U.S. government and taxpayers.

18

72.     The image is utilized by the DOE in numerous guidance documents, articles, presentations, and handouts explaining or discussing the application process:



## VII.    SUBSTANTIVE ALLEGATIONS

### A.    Plug and Its Lofty Plans to Develop an End-to-End Hydrogen Ecosystem Fueled by the Company's Own Network of Liquid Green Hydrogen Plants

73.     Founded in 1997, Plug describes itself as creating the first commercially viable market for hydrogen fuel cells. Hydrogen fuel cells are electrochemical devices that combine hydrogen and oxygen to produce electricity and heat without combustion.

74.     Plug delivers its hydrogen solutions and related infrastructure directly and through joint venture partners into multiple industries, including material handling (forklifts), supply chain and logistics, stationary power generation and back up units, on-road electric vehicles, and other industrial applications.

75.     At all relevant times, Plug declared it was in the business of building an end-to-end green hydrogen ecosystem, from production, storage, delivery, to energy generation, to help its customers meet their business goals and decarbonize the economy.

19

76.     Plug's primary end market has historically been its hydrogen fueled Proton Exchange Membrane ("PEM") fuel cell systems providing power to industrial material handling vehicles (forklifts), replacing lead-acid batteries.

77.     In recent years, the Company has focused on expanding the application of its fuel cell systems to include industrial e-mobility solutions that reduce customer reliance on replacement batteries, diesel generators, and the power grid. Such applications include powering on-road electric vehicles, like delivery vans, and producing stationary power systems to support its customers' critical on-site operations in either a backup power or continuous power role.

78.     The application of green hydrogen as an alternative to traditional carbon-heavy power sources is considered to be in its infancy. Accordingly, Plug's customers face numerous challenges in adopting hydrogen technology, including economics and lack of green hydrogen production and infrastructure. As such, in September 2019, Plug laid out a 5-year vertical integration business strategy to provide customers with a full-service hydrogen solution.

79.     To support the market adoption of hydrogen, Plug sought to develop an ecosystem of vertically integrated products and services, including: (i) PEM electrolyzers that use clean electricity to split water into hydrogen and oxygen, which allow customers, such as refineries, producers of chemicals, steel, and fertilizer, and commercial refueling stations, to generate hydrogen gases on-site; (ii) hydrogen liquefaction systems which provide efficient and reliable liquid hydrogen generation to customers while also minimizing parasitic losses like heat leak and seal gas losses; (iii) cryogenic solutions, including liquid hydrogen storage tanks, delivery trailers, vaporizers, portable equipment, and integrated control systems, which provide customers hydrogen distribution solutions, including on-road delivery; (iv) Plug's own production of liquid green hydrogen via its own electrolyzers and liquefaction systems to supply hydrogen fuel to its

20

customers; and (v) Plug's aftermarket maintenance and on-site service program for its fuel cell systems, as well as its hydrogen storage and dispensing products.

80.    At all relevant times, Plug generated revenue from: (i) sales of its fuel cell systems, stationary backup power units, and related infrastructure including on road storage, hydrogen liquefaction systems, and electrolyzers; (ii) services performed on fuel cell systems and related infrastructure; (iii) sales of hydrogen purchased from third parties or generated at Plug's production plant(s); and (iv) monthly payments made pursuant to long-term contracts with customers for access Plug's vertically integrated platform combining the Company's full suite of hydrogen fueling, delivery, generation, storage, and dispensing systems, as well as aftermarket maintenance and on-site service.

81.    At all relevant times, a significant portion of Plug's revenue was generated from long-term contracts for the purchase and delivery of hydrogen fuel to power customers' on-site fuel cell systems. Historically, Plug has been unable to produce enough hydrogen on its own to fulfil customer demand. This shortfall required Plug to purchase hydrogen from third-party suppliers at high cost and resell it to customers at a loss, creating sustained negative margins on its fuel delivery business.

82.    To address sustained losses driven by Plug's reliance on third party hydrogen suppliers and to better support its operations for growth, Plug's 5-year plan included the goal to generate in-house at least half of the hydrogen purchased by Plug's customers by 2024.

83.    On June 23, 2020, Plug completed its acquisition of United Hydrogen Group Inc. ("United Hydrogen"). At the time, United Hydrogen possessed a 6.4 tons-per-day ("TPD") liquid hydrogen plant in Charleston, Tennessee (the "Tennessee Plant") which Plug planned to expand

21

to 10 TPD. At the time, Plug described United Hydrogen as the only company to have built a large-scale liquid hydrogen plant.

84.    As Defendant Marsh explained during a "Special Call" held on June 23, 2020 to discuss the Company's recent acquisition activity, "[l]iquid hydrogen is the only way to transport hydrogen for distances over 100 miles cost effectively and also really the only way to store large quantities of hydrogen [ ] in many, many locations." With this acquisition, Marsh claimed that Plug acquired a "delivery network of liquid tankers, gas trailers … and probably more important internal [liquefaction] capabilities with logistics software drivers and others, to really deliver hydrogen to our customers."

85.    Thereafter, Plug hosted its annual symposium on September 24, 2020. During this event, the Company announced plans to build five new green hydrogen production facilities across North America with the overall stated goal of all five plants operational by 2024 with a total capacity of 100 TPD of liquid green hydrogen. At this time, the Company claimed it had already started the design phase for the first two plants with expected completion by the end of 2022. Completion of the Company's new liquid green hydrogen plants would position Plug to be one of the first green hydrogen generation networks in the country.

86.    By 2021, the Company's plans ballooned to targets of 500 TPD of liquid green hydrogen by 2025 based on its expanded goal to build thirteen operational plants by 2025.  By the year end, Plug had announced the locations and build order for five liquid green hydrogen plants beginning with New York and Pennsylvania, followed by Georgia and Texas, and then California.

87.    *First*, on February 25, 2021, Plug announced plans to build North America's largest green hydrogen facility in Western New York, specifically, Alabama, New York, at the Genesee County Science, Technology and Advanced Manufacturing Park ("STAMP") site (the "New York

22

Plant"). Plans for the New York Plant included an initial liquid green hydrogen production capacity of 45 TPD (later expanded to 75 TPD in late 2022). To generate liquid hydrogen at this facility, Plug planned to employ its own hydrogen liquefaction systems and PEM electrolyzers powered by clean electricity generated from Niagara Falls pursuant to its contract with New York Power Authority ("NYPA"), through the substation Plug was to build in partnership with National Grid.

88.    *Second*, on March 30, 2021, Plug announced plans to build a liquid green hydrogen production facility in South Central Pennsylvania which would produce up to 15 TPD (the "Pennsylvania Plant"). According to Plug, the Pennsylvania Plant would also utilize Plug electrolyzers and liquefiers powered by 100% renewable energy from Brookfield Renewables Holtwood hydroelectric facility.

89.    *Third*, on June 10, 2021, Plug announced plans to build a liquid green hydrogen plant in Camden County, Georgia near the city of Woodbine (the "Georgia Plant"). According to Plug, the Georgia Plant was expected to produce up to 15 TPD of liquid green hydrogen using Plug's electrolyzers and liquefiers powered by 100% renewable energy, with the potential to be expanded to 30 TPD. When announced, the hydrogen supply produced at this facility was intended to fuel Plug's transportation applications, including material handling and electric vehicle fleets.

90.    *Fourth*, on June 22, 2021, Plug announced its plans to build a liquid green hydrogen plant on an unincorporated tract of land in Young County, Texas located between FM 209 and FM 61, west of the city of Graham, Texas (the "Texas Plant"). When announced, the plan for the Texas Plant was to produce 45 TPD of liquid green hydrogen utilizing Plug's electrolyzers and liquefiers, powered by a 345 MW wind farm located in the area. As later learned, raw water for Plug's electrolyzers was to be supplied by the City of Graham via an approximately 8-mile-long waterline which was installed by the city to the site's property line.

23

91.    *Finally*, on September 20, 2021, Plug announced its plans for its fifth liquid green hydrogen plant in Fresno, California (the "California Plant"). The plans for the California Plant included an initial liquid green hydrogen production capacity of 30 TPD. According to the Company, the California Plant would be the largest facility of its kind on the West Coast.

92.    Shortly thereafter, on January 19, 2022, investors learned that Plug's plans for the Pennsylvania Plant had been abandoned. That day, Plug hosted a "Special Call" to, as Defendant Marsh explained it, "provide[] investors an opportunity to precisely hear our goals for 2022 and gain some insight into our execution strategy." During his prepared remarks, Defendant Marsh discussed Plug's "energy business" touting, in pertinent part, "[w]e've announced 4 plants, these plants are in New York, Georgia, Texas and California. Our goal is to generate 500 tons of green hydrogen per day in the U.S. by 2025. Building the first nationwide [network] and by 2028, have 1,000 tons per day of green hydrogen globally. Two of the plants are under construction in New York and Georgia as I speak."

93.    During the same call, Defendant Marsh was later asked for "clarification on the green hydrogen plant[s]" Plug planned on building out, with one analyst noting, "[y]ou mentioned 4 in New York, Georgia, Texas, California. What about the one in Pennsylvania? Didn't you have a 15-ton per day facility using Brookfield Holtwood facility? Or is that still in the works?" Defendant Marsh responded by stating, in pertinent part, that "we found about that facility is we couldn't expand it to as large as we want to go. For example, in New York, we're 45 tons a day today. We have the ability to expand to 75 tons. In Georgia, we have the ability to expand. In Texas, I think we could easily get to 75 tons. We decide[d] that since our inability to grow the renewable electricity at the site that it wasn't as attractive. So we put that to aside[.]"

24

94. Then, on April 28, 2022, Plug announced plans to construct a liquid green hydrogen plant in St. Gabriel, Louisiana (the "Louisiana Plant"). The Louisiana Plant, which was to be a 50/50 joint venture ("JV") with Olin Corporation, was planned to produce up to 15 TPD of liquid green hydrogen.

95. To date, Plug has yet to announce further planned liquid green hydrogen plants to join its North American network. Further, Plug's previously announced California Plant was last reported on in November 2023, at which point Plug represented that, as of September 30, 2023, it had yet to progress past the "permitting through prospecting" phase of pre-construction planning. Consequently, at all relevant times, the only Plug generated hydrogen plants reported to have entered the construction phase were the New York, Georgia, Texas, and Louisiana Plants.

**B.      Pre-Class Period Construction of Plug's Green Hydrogen Production Plants**

96. From 2022 through 2023, Plug reported it was in various planning and construction phases across its announced North American network of new liquid green hydrogen plants.

97. **<u>The Georgia Plant</u>**. Plug broke ground on the Georgia Plant on August 10, 2021. At all relevant times, the Georgia Plant was lauded as critical to Plug's vertical integration strategy. Plug further identified the Georgia Plant as the template for its additional facilities to be built across the United States, such as Texas and New York, meaning the Georgia Plant's success was critical not only to Plug's near-term margins but also to the viability of its broader build-out plan.

98. On March 1, 2023, Plug reported in its fourth quarter and full year 2022 financial and operational results (the "FY2022 earnings release") that, commissioning (the final stage of the construction phase) at the Georgia Plant had started as planned. Specifically, Plug stated: "Essentially all of the major equipment has been installed, including transformers, power distribution control, rectifiers, Plug's electrolyzers, liquefier, and storage. We continue to commission multiple different components on the 15TPD liquid plant."

25

99.     In the FY2022 earnings release, Plug told investors that commissioning to full production usually takes between 3 to 6 months to complete. As such, Plug informed the market it was targeting hydrogen production at the Georgia Plant by end of March 2023/early second quarter 2023. This did not come to pass, however, as the Georgia Plant remained in the commissioning phase throughout all of 2023. It was not until January 23, 2024 that Plug announced the Georgia Plant had started production of liquid green hydrogen, and only at a capacity of 15 TPD.

100.     **The Louisiana Plant**. On May 9, 2023, Plug announced that the Louisiana Plant reportedly broke ground in first quarter of 2023 with the goal of completing the commissioning phase and production start-up before year-end 2023. Given the similar layout and design of the Louisiana Plant to Plug's Tennessee Plant (as opposed to the Georgia Plant), the Louisiana Plant was given a similar schedule as the expansion of Plug's 10 TPD Tennessee Plant.

101.     Likewise, on August 9, 2023, Plug reported continued progress on the Louisiana Plant with Plug and Olin collaborating on engineering, procurement, and construction ("EPC") activities made during the second quarter of 2023. Despite this, Plug now claimed that with "[k]ey construction and commissioning activities [ ] continu[ing] to take place for the remainder of 2023[,] [w]e are looking to produce in Q1 2024."

102.     On November 9, 2023, Plug reported construction of the Louisiana Plant continued with site grading and that the facility was mobilizing for installation of the liquefaction package that month. At this time, Plug also reported that the commissioning plan had been developed to ensure a smooth process from construction through commissioning and production start-up.

103.     Just as with the Georgia Plant, on February 6, 2024, Plug announced that it had pushed the initial production timeline for the Louisiana Plant once more. Specifically, Plug pushed

26

the target to operations starting in the third quarter of 2024. Then, on May 9, 2024, Plug vaguely declared only that the "Louisiana plant is on track for completion and first production in 2024."

104.    As later revealed, commissioning at the Louisiana Plant was delayed throughout the second and third quarters of 2024. Specifically, on August 8, 2024, Plug announced that commissioning for the Louisiana Plant was now expected to commence in September 2024. Then, on November 12, 2024, Plug announced that commissioning was ongoing, and targeted production for the first quarter of 2025. Finally, on April 28, 2025, Plug announced the completion and production start-up of its 15 TPD Louisiana Plant during the first quarter of 2025.

105.    **The New York Plant**. The New York Plant reportedly broke ground on or about October 20, 2021. Thereafter, however, Plug first told investors on August 9, 2022, and further elaborated on November 8, 2022, that construction of the New York Plant was delayed by a year due to permitting delays relating to the substation at STAMP.

106.    On November 8, 2022, however, Plug also announced that most of the permits related to the substation at STAMP were reportedly in place as of September 30, 2022. Further, Plug stated it was collaborating with NYPA and National Grid to energize the STAMP substation in the second half of 2023, which Plug claimed was gating completion of the New York Plant.

107.    On March 1, 2023, Plug announced that as of December 31, 2022, construction planning for the New York Plant purportedly continued. This planning included a year-end 2023 target for commissioning work to begin.

108.    On May 9, 2023, Plug reported it had identified an EPC management company for the New York Plant, allowing for construction to commence. Plug went on to provide that the large cryogenic storage for this facility was on site, construction of a "mini-substation" on-site had begun, and deliveries of other major equipment were expected in the second half of 2023.

27

However, at this time, Plug also told investors that plans to energize the substation at STAMP had been pushed to the first half of 2024.

109.    On August 9, 2023, Plug declared:

Progress in New York continues as we work towards commissioning 74TPD of capacity in the first half of 2024. In the meantime, we have completed work related to on-site storage, all the major long lead time items have been procured, and working with EPC management company and owner's engineer, we have been able to meaningfully optimize CAPEX per ton.

110.    Plug also reported that its collaboration with NYPA and National Grid to energize the substation remained "underway, aligning with our objective to achieve liquid production in the second half of 2024." At the same time, Plug reiterated that "[t]iming of substation energization will largely dictate timing of liquid production."

111.    During an investor conference call held that same day, August 9, 2023, Mr. Shrestha, then-CSO, EVP, and GM of Energy Solutions, reiterated that the timing of production start-up at the New York Plant "all comes down to [the] substation," and representing that:

[A]s it stands right now, that substation is probably going to get energized only in Q3 of 2024. Until the substation is energized, we cannot bring the liquid plant online. We have procured all the long lead time items. This is our electrolyzer. This is our liquefier. So those issues aren't the bottlenecks. Permitting is not the bottleneck.

112.    On November 9, 2023, Plug reported that it continued to work with NYPA and National Grid to energize the substation, which the Company now stated, "remains the gating item to achieve the full 74 TPD capacity in the first half of 2025."

113.    **The Texas Plant**. Plug announced on March 1, 2023, that it had broken ground at the Texas Plant in the fourth quarter of 2022. Also, Plug declared all permits were in place for the Texas Plant and any long lead-time items had been ordered with manufacturing thereof underway. At this time, Plug stated the 345 MW wind farm set to power the Texas Plant was operational. All told, Plug claimed it was on track to begin commissioning by the fourth quarter of 2023.

28

114.    On August 9, 2023, however, Plug announced that as of June 30, 2023, the Texas Plant build out, and subsequent production start-up, had been pushed back by six months due to protracted negotiations around a lump-sum EPC contract. Indeed, during Plug's investor conference call, held on August 9, 2023, Mr. Shrestha responded to inquiries about the timeline for the Texas Plant stating, in pertinent part, that negotiations:

> [T]ook about 6 to 9 months instead of probably a typical 3 to 6 months … So instead of actually kicking off that EPC in the month of March, it is now in the month of July. So that's really what has happened here. So instead of that plant coming online in Q2 of 2024, now it's the second half of 2024.

115.    Subsequently, on November 9, 2023, when discussing recent activities at the Texas Plant, Plug reported that during the third quarter of 2023, "[c]onstruction began at the site with our hydrogen facility EPC contractor, Kiewit. Work is ongoing for on-site grading, access roads, the power transmission line, and on-site substation."

\* \* \* \*

116.    By the start of 2024, the year Plug targeted to have five new fully operational liquid green hydrogen plants, it had: (i) one plant that would initiate production by the end of the month at a 15 TPD capacity (*e.g.*, the Georgia Plant); (ii) one JV 15 TPD plant that was slowly progressing through the final stages of construction and, as later learned, would not be considered operational for another 15 months (*e.g.*, the Louisiana Plant); and (iii) two other plants that were engaged in early construction activities but were impacted by permitting and contract delays with production start-up now targeted for the second half of 2024 and first half of 2025 (*e.g.*, the Texas Plant and New York Plant, respectively).

**C.      The Cost to Build Georgia Solidified Plug's Dire Need for Outside Funding**

117.    To make matters worse, supporting Plug's operational requirements and its build out of multiple fully integrated liquid green hydrogen plants across North America, required

29

significantly more capital than it had initially planned for when it set out to generate its own network of hydrogen supply.

118.    As later represented by Defendant Marsh during an investor conference call, held on March 4, 2025, construction of the Company's template facilities, built in Georgia, ultimately cost Plug around $800 million, with a 10 to 15% contingency, or roughly $23 million to $24 million in CapEx per ton. This was 6x more than Plug's original estimates made in January 2021 and still 3x more than Plug's revised per ton CapEx estimates provided in January 2023.

119.    Indeed, during Plug's investor conference call, held on January 26, 2021, analyst Amit Dayal of H.C. Wainwright & Co, LLC asked about how the market should think about Plug's "CapEx needs over the next 2, 3 years" as it builds out its hydrogen infrastructure. Defendant Marsh responded: "the major CapEx will be associated with the hydrogen plants. And when we think about, just kind of give you the baseline, for every 10 tons, think about $40 million. So that kind of gives you kind of a feel."

120.    During the same call, analyst Moses Nathaniel of Sutton Barclays Bank PLC posed a follow-up question:

> On the green hydrogen side, every ton -- every 10 tons you quoted at $40 million now, or that's about $80 million for 20 tons per day. As of the [September 2020] symposium, we were still at about $100 million for every 20 tons. What sort of changed that is shaving off 20% of your expectation there on the CapEx per ton?

121.    To which Defendant Marsh responded by stating that:

> As we've looked at scaling from a model point of view, Moses, plants -- when you're talking about building multiple plants, we've been able to negotiate contracts at scale, which has helped reduce the cost, plus there's always design innovation, right? And we continued to look at how to drive down our electrolyzer costs, and more of that comes into play. So that's really kind of what allows us to be at that lower number.

122.    Accordingly, roughly seven months before Plug broke ground on its first fully integrated liquid green hydrogen plant, it was estimating the CapEx to be $4 million per ton.

30

123.    As detailed in Section VII.B. *supra*, Plug broke ground on the Georgia Plant in August 2021, with most construction activities occurring at this site during the years of 2022 and 2023. While Plug reportedly broke ground at the New York Plant in October 2021, construction at this site did not commence until the first quarter of 2023. Likewise, construction at the Louisiana Plant also began in the first quarter of 2023. And Plug reportedly broke ground in Texas during the fourth quarter of 2022, with early construction activities occurring throughout the year 2023.

124.    As such, most of the Company's spend on construction activities during the year 2022 was on the Georgia Plant. That year, Plug reported spending $828.6 million in net cash on operating activities, primarily the construction of its hydrogen plants.

125.    During a "Special Call" held on January 25, 2023, analyst Praneeth Satish of Wells Fargo Securities, LLC asked Plug management to "provide an update on your CapEx spending plans for 2023. And then maybe how you see CapEx costs trending for your green hydrogen build-out on a per ton basis."

126.    Mr. Shrestha responded by saying:

So we really – there's no change in terms of how we're looking at that on a per ton basis since what we talked about during our symposium back in October [2022], right? So if anything, all the learnings in Georgia, and as I just touched on sort of doing the turnkey EPC [in Texas and then in New York], we do see a lot of optimization opportunity continuing to drive the CapEx down, right?

So early plans are going to be, obviously, in that $8 million to $9 million a ton range. That's an integrated green hydrogen plant. If you're talking about a by-product hydrogen plant, those numbers will be, again, lower than that in a meaningful manner. But again, I think -- so no real change versus what we've shared with you during our symposium. Paul?

127.    Defendant Middleton then followed up by adding:

Yes. And I think as with last year, the bulk of our CapEx is on green hydrogen. So we do have a couple of key manufacturing facilities that we're investing in. Cumulatively, that'll be 5%, 6%, 7% of our sales, but -- in terms of the CapEx rate. But holistically, I think we think it will be in the billion range again this year in terms of the total dollars we're spending on that proposition. We think that we can't

31

go fast enough given those opportunities and the economics around it.

128. On November 9, 2023, Plug recorded $863.9 million in net cash used for operating activities during the nine months end September 30, 2023. As of the third quarter of 2023, the Company had an accumulated deficit of $3.8 billion and only had $110.8 million in unrestricted cash and cash equivalents. At this time, Plug issued a "going concern" notice reporting that "[i]n light of the Company's projected capital expenditure and operating requirements under its current business plan, the Company is projecting that its existing cash and available for sale and equity securities will not be sufficient to fund its operations through the next twelve months from the date of issuance of this Quarterly Report on Form 10-Q."

129. And again, at this time, Plug still had more to spend on all four hydrogen plants under construction and did not expect the Georgia Plant to be operational until the end of the year; the Louisiana Plant towards the end of the first quarter of 2024; the Texas Plant in the second half of 2024; and the New York Plant in the first half of 2025.

130. Consequently, by the end of 2023, Plug and its executive management team had lost significant credibility with analysts and investors with regards to Plug's ability to fund its existing operating requirements as well as its anticipated capital expenditure due to the rampant inefficiencies, significant delays and materially overrun costs to construct its hydrogen plants.

131. As such, when the Company finally announced the operation of the Georgia Plant, on January 23, 2024, Plug and its executive management team also told investors they had reset its near-term growth outlook, focused on limiting Plug's cash burn by reducing capital expenditure and by securing outside capital, specifically, a $1.66 billion loan from the Department of Energy (DOE) to primarily fund the construction of up to six liquid green hydrogen plants, starting with the already announced and under development facilities to be located in New York and Texas.

32

###### D. Plug Resets Growth Initiatives to Align with Funding of $1.66M DOE Loan

132. Plug initiated the DOE application process to support the development of its network of liquid green hydrogen plants as early as 2021. Indeed, during an investor conference call, held on June 22, 2021, analyst Craig Edward Irwin of ROTH Capital Partners, LLC asked Defendants about "the DOE loan guarantees you're applying for. …Can you maybe talk to us about the process? Where you are in the process?"

133. Defendant Marsh responded by saying Plug was "about halfway through Phase 2" and represented that "when we're looking at this, it's just not for one project. It's actually, the application is looking at 3 or 4 projects to deploy across North America to support all our networks. So we're looking to do it at stages, but our thought process is somewhere between $500 million to $1 billion of support to build out these networks with low-cost loans."

134. By January 25, 2023, Defendant Middleton represented to investors and analysts that Plug was "knee-deep in collaborating with [DOE] now with industrial due diligence, financial due diligence," *i.e.*, Phase 3 of the process, "[a]nd I think it'll be mid-year to third quarter [2023] before something like that potentially closes."

135. Then, on August 8, 2023, during an investor conference call to discuss the Company's financial results for the second quarter of 2023, Defendant Marsh represented that "[p]resently, Plug is in the final stages of the second round of due diligence with the DOE loan program office for $1 billion project financing facilities. We have a term sheet, term sheet framework, and we're working through final process to get this structure approved."

136. During the Question-and-Answer portion of this call, analyst William Chapman Peterson of JPMorgan Chase & Co, noted:

> [I]t sounds like you're moving into next steps with some potential good promising outcome maybe with the DOE loan program office. But I guess what remains to be done? It sounds like you're in the second stage of due diligence. And what would

33

be the timing given you successfully pass that bar?

137.    To which Defendant Middleton responded by saying:

Bill, so there's a couple of things. Well, first and foremost, the good news is we've come together, as Andy [Marsh] alluded in his comments, with an outline of the term sheet that we think will work for us and that they can get passed. And so that's a big hurdle. And they're in the final -- now they're off to new races doing the final due diligence around market studies and technical studies and things that they just got to kind of finish that process.

But I -- and then once we get through that, we'll – there's a little bit of more polishing to finalize the term sheet in a format that they can submit through their process that they've got to go through the government agencies to get approved. So at this point, our best guess is that we would have something approved and be able to announce something hopefully mid-November to early December. We're all -- they are equally motivated to get it done fast as we possibly can. So we've got weekly meetings and efforts to try and push over those final hurdles. So we'll see how it plays, but that's kind of the time line and where we're at in that process.

138.    During the same call, analyst Ameet Ishwar Thakkar of BMO Capital Markets

Equity Research posed the following question:

Just thinking about kind of the cadence of kind of cash needs for the balance of the year. It looks like between kind of cash flow from operations and your CapEx today, you've kind of – you're kind of burned about $1 billion in cash. And I know you guys mentioned maybe $1 billion from the DOE program. Would that be funded all at once and then kind of cover your kind of your Georgia, New York and Texas [indiscernible]. Is that how we should think about it?

139.    To which Defendant Middelton responded, in pertinent part:

The short answer to your question is on the DOE program, we're -- until it's done, it's not done. But the timing of exactly how that will play will be -- to be determined in terms of the inflow. We are actually working, again, as Andy [Marsh] mentioned, with other solutions as well. I think if you look at the next couple of years, there's going to be a combination of debt solutions from corporate debt to project finance, to enhanced ITC financings. And all of those things, you'll see more of -- from us in the coming months as we start to enroll some of those solutions. And so it's going to come from one of those programs in the short term, midterm and long term as we roll all of those solutions out.

140.    During an investor conference call held on November 9, 2023, analyst William Chapman Peterson asked about the Company's potential funding sources to raise capital and shore up its balance sheet raising the following questions:

> So you talked about corporate debt solutions. Can you provide more color on what kind of options, what kind of facilities you're talking about here? On the DOE loan, you're hoping to announce something later this year, but it talks about conditional. What is the conditional on?
>
> And then what -- when can the dollars actually flow? I guess, can you confirm that this is milestone-based? And then finally, I think for these project finance, I guess, of course, when could -- I guess when could these be solidified in order to shore up the position? Really just overall, how should we think about your ability to shore up your kind of cash position in the near term?

141.    Defendant Middleton responded by saying:

> Sure. There's a lot of questions in there, Bill, I'll do my best. First, on the DOE, one, it's a good news, bad news. The fact that they require very detailed long-form term sheet is actually -- although it takes time to work through is extremely helpful because the way the process works is they effectively put the package together and all of their diligent reports have been submitted for the final approval, which once it gets approved, you then have to go and actually put the agreements in place.
>
> But because it's 100 pages of long-form term sheets, and in fact, they've already kind of worked through all those key things. So that should be a much faster process. The framework that we're working on with them is a $1.5 billion platform that would fund our green plants and would fund from construction phase onwards. So -- and it could be as upwards as 80% -- $0.80 on the dollar. That's the framework that we're working on, and we're working very diligently to get that in place.
>
> In addition to that, we've had some expressions of offers for [asset-backed loan] ABL like facilities. We've had some expressions of offers for restricted cash advanced facilities like we used to have with Generate. So there are -- and there's been some -- a number of parties that have expressed interest for project equity on some of our initial plans. So we have a range -- and there's been a number of other ones in different forms. And so we have a range of solutions that we continue to work through, and we just are wrestling through what we think is the best choices and the best options, given the dynamics and what we're trying to accomplish here.
>
> So I think the DOE could be even as early as late as end of Q1 potentially. More likely early Q2, it starts funding and it could actually go back and back lever some of the existing plants like Texas and maybe even New York. And I think some of these other facilities is what we probably levered into is to complement that structure for general working capital and other project capital that we would be

35

advancing on. So hopefully, that helps, Bill.

142. Then, during Plug's "Special Call" held on January 23, 2024, Defendant Marsh detailed Plug's reset near-term strategy when it came to expanding its plant operations stating:

> Our strategy to expand our plant operations will be carefully timed to align with market development and the support we receive from the Department of Energy. On this note, I'm thrilled to announce that Plug Power has finalized the term sheet negotiation with the Department of Energy for a $1.6 billion loan facility. We were notified yesterday that the application has been submitted to the Credit Review Board for their final considerations and issuance of a conditional commitment.

> This funding, when received, will support the development construction and ownership of up to 6 hydrogen production facilities, significantly advancing green hydrogen deployment in the United States. The loan can catalyze our ongoing projects with the planned facilities expected to generate over 200 tons of hydrogen daily.

> We're grateful for our partnership with the Department of Energy and look forward to our continued collaboration which will play a pivotal role in scheduling our forthcoming plants in Texas and New York.

143. Defendant Marsh went on to note, in pertinent part, that while "[a]ddressing the critical issue of cash management and resolving our going concern [previously disclosed in the Company's Form 10-Q for the quarter ended September 30, 2023] is now our foremost priority. Our approach to cash management doesn't imp[act] our growth."

144. During the same call, Defendant Middleton told investors "[w]e've slowed investment in the following hydrogen facilities in Texas and New York until we find the right financing solution. But fortunately, as Andy [Marsh] talked about, the DOE loan program for Plug has crossed a critical milestone with the submission to the Credit Review Board. So we believe this program is on track to enable loan program kickoff and the build-out activities to come forward in the second half of '24."

145.    Defendant Middleton went on to reiterate Plug's near-term growth strategy aligned with improving its own capital position stating, in pertinent part:

> Our near-term capital strategy is very focused: leverage the ATM facility as needed as we continue to develop the varied debt solutions we are evaluating, drive significant improvement in the cash burn by reducing CapEx, reducing inventory investment and improving margins while reducing new platform spending, work with the DOE to secure the $1.6 billion project financing facility, and continue developing varied debt solutions.
>
> The company has received and continues to receive many debt offers, but they are not under terms that are interesting to the company. Part of this was driven from the ongoing interest rate hikes. We won't take bad deals. The ATM program, coupled with reduced cash burn efforts, puts us in a position to be more selective as we continue developing new solutions.

146.    During the Question-and-Answer portion of this Special Call, analyst Aaron Michael Spychalla of Craig-Hallum Capital Group LLC asked Defendants their "overall thoughts on CapEx. I appreciate the kind of commentary on cash preservation. But just how should we think about kind of CapEx here in the next handful of quarters, 2024?"

147.    To which Defendant Middleton responded by stating, in pertinent part:

> [W]e've built largely the CapEx operating capacity we need to deliver in the next couple of years. So we don't expect much at all of an operational investment [*i.e.*, on Plug's manufacturing facilities for its hydrogen fuel cell systems and related infrastructure]. I think Andy [Marsh] quoted a number of roughly about $150 million to complete Georgia, Louisiana and some of the programs we're expecting to -- on Texas and New York to continue moving those forward.
>
> But expect, holistically, a substantial reduction from 2023. I would guess somewhere in the total of $200 million range, probably, that kind of figure for the full year.

148.    During the same call, analyst Sherif Ehab Elmaghrabi of BTIG, LLC posed the follow-up question:

> [Y]ou talked about $200 million of CapEx this year. But with the learnings in hand, can you give us an estimate for the cost of Texas and New York because I imagine a lot of that comes next year. So either on a project basis or a per megawatt basis would be helpful?

37

149. Defendant Marsh responded by saying "a good number for Texas is probably in the $10 million per ton range. And you can remember we can, against the DOE loan, we can borrow 80%." He went on to add, "[o]ne of the items that didn't come up on the call, Paul [Middleton], is that for money we've already spent in New York and Texas, once the DOE loan is officially approved, we'll be able to borrow that money, which is probably somewhere in the $400 million to $500 million range." Mr. Marsh's response prompted Defendant Middleton to follow up by saying, "[y]es, it will count towards the math of our – of the structure."

* * * *

150. Accordingly, during the months leading up to the Class Period, Defendants presented an image to investors that Plug was rounding the corner to an improved balance sheet while maintaining its fundamental growth initiatives. This portrayal was buoyed by claims of numerous debt solutions Plug was purportedly evaluating to fund its refined buildout plans. Buildout plans that, according to Defendants, would be temporarily slowed but not abandoned while they worked to finalize the $1.66 million DOE Loan, which would purportedly cover up to 80% of the total cost to complete its growing network of hydrogen plants, including the estimated $600 to $675 million 75 TPD New York Plant and its $450 million 45 TPD Texas Plant.

151. Unknown to investors at the time was that the New York Plant had been removed from the Company's DOE loan application back in June 2023, and as such, no LPO-backed loans could ever be used to complete this property. As for the Texas Plant, based on the January 2024 finalized term sheet submitted for approval by the OMB and Treasury Department, Defendants knew the key financial and commercial terms offered by LPO, including the amount offered and the conditions it would need to satisfy prior to loan closure and fund advancement. As a result, in contradiction to Defendants' continued public representations and/or material omissions, they

knew from the start that the DOE Loan offered would not cover any portion of the New York Plant buildout nor would it cover the majority of the significantly higher undisclosed project costs for Texas, meaning securing a supplemental debt solution to fund the remaining costs to construct the Texas Plant was a gating item to receiving the DOE funds.

152. Consequently, by the start of the Class Period, Plug had affirmatively abandoned its construction commitments at the New York site and ultimately canceled the project before the year end. Likewise, when no suitable debt solutions to the DOE Loan materialized by the second half of 2024, and the imminent change in the administration further jeopardized Plug's already improbable chances of ever receiving funds under the DOE Loan, Defendants canceled its plans to build the Texas Plant and began pursuing alternative options for the real property and related assets associated with these projects.

**E.     Plug and Its Management Knew DOE Would Not Fund the New York Plant**

1.     <u>Notification of Interested Parties Under the DOE NEPA Process</u>

153. Early in its planning process for a proposed action, DOE considers how to comply with the National Environmental Policy Act ("NEPA"). All Federal agencies must comply with NEPA, but their procedures vary. For DOE, the agency provides that its appropriate level of review depends on the significance, that is, consideration of the context and intensity of the potential environmental impacts associated with the proposed action.

154. For major Federal actions that may significantly affect the quality of the human environment, NEPA requires preparation of an Environmental Impact Statement ("EIS"). An EIS is a detailed analysis of the potential environmental impacts of a proposed action and the range of reasonable alternatives. Public participation is an important part of the EIS process.

155. When the need for an EIS is unclear, an agency may prepare an Environmental Assessment ("EA") to determine whether to prepare an EIS or to issue a Finding of "No Significant

Impact." An EA is a brief analysis of the project and the proposed action to be taken by the agency.

DOE's procedures provide notification and comment opportunities for host states and tribes. DOE

also may provide notification and comment opportunities for other interested people. DOE then

considers any comments received, makes revisions as appropriate, and issues the EA. If potentially

significant impacts are identified during the preparation of the EA, DOE will prepare an EIS.

2.      The DOE's Preparation of an EA for the Texas Project

156.    On July 3, 2024, DOE, in consultation with other participating Federal agencies,

sent Notice of Intent to Prepare an EA for the Texas Project to various state agencies including,

*inter alia*, the Texas Commission on Environmental Quality, Texas Department of Transportation,

and Texas Historical Commission, and to several Native American tribes located in the area.

157.    On December 6, 2024, the DOE's LPO released a Draft EA for Plug's green

hydrogen production project in Graham, Texas noting, in pertinent part, that:

> Based on this EA, DOE has determined that providing a federal loan guarantee to
> Plug Power to construct and operate a green hydrogen production facility in
> unincorporated Young County, Texas, will not have a significant effect on the
> human environment. Preparation of an environmental impact statement is therefore
> not required. DOE is issuing this Finding of No Significant Impact.

158.    Based on this determination, the state agencies and other interested parties had 30

days to provide additional comments before DOE's publication of the final EA for this project.

159.    Subsequently, on January 15, 2025, DOE published the final EA for the Texas

Project, signed by Todd Stribley, LPO Director, NEPA Compliance Officer on January 10, 2025.

3.      Internal Communications with the DOE Regarding Plug's Hydrogen Plants
        to be Covered by the DOE Loan

160.    Included as Appendix A to the EA for the Texas Project was a copy of the DOE's

correspondence with the agencies and Native American tribes notified of the proposed action.

40

161.    In pertinent part, these previously undisclosed communications reveal that Plug initially began the DOE application process by seeking funds to build the New York Plant but subsequently withdrew this project from its application in or around June 2023. Further, sometime between January 23, 2024, and February 29, 2024, the DOE informed Plug and its management that their public statements made thereafter regarding the DOE's assistance for funding the New York Plant were misleading and inaccurate and explicitly requested that the Company issue a public statement to clarify or correct its prior misrepresentations.

162.    Indeed, according to a January 22, 2024 letter to Mr. Stribley, sent on behalf of the Tonawanda Seneca Nation (the "Nation"), Council of Chiefs, "[i]n 2021, LPO staffers met with the Nation leaders regarding Plug Power's application for funding in relation to the facility planned for the Westen New York Science and Technology Manufacturing Park ('STAMP')."

163.    The same letter noted that in:

April 2023, LPO staffers visited Western New York to tour the proposed Plug Power facility in advance of launching consultations with the Nation required by the National Environmental Protection Agency (NEPA) and National Historic Preservation Act (NHPA). Plug Power rejected the Nation's request to participate in this visit, and LPO staff met separately with the Nation.

164.    Then, according to the Nation, in June 2023, it received a letter from DOE stating:

'This letter is to inform you that Plug Power has withdrawn the development of the Project at the STAMP site from its application for Federal financial support. Therefore, LPO no longer has a Federal action or undertaking associated with the development of the Project at the STAMP site, and will no longer pursue Tribal consultations associated with the Project under the [NEPA] or the [NHPA].'

165.    The Nation's January 22, 2024 letter further expressed concern that, based on recent statements released by Plug and its management:

There can be no doubt that Plug Power intends to use DOE funding for STAMP and that such use constitutes a major federal action under NEPA and an undertaking affecting historic properties under the NHPA. … [LPO] should not allow Plug or any other loan applicant to skirt the environmental and cultural review required by Federal law.

41

166.    In support of the Nation's stated concern, it referred LPO to statements made by Defendant Marsh in the wake of the Company's November 10, 2023 disclosure of a "going concern" notice warning of its potential impending insolvency and expressing "substantial doubt that we will have sufficient capital to fund our operations through the next 12 months." Specifically, the Nation highlighted that, "[i]n the wake of this disclosure, Plug Power CEO Andy Marsh told reporters that he expects a $1.5 billion dollar loan from DOE in mid-2024 and that the loan will make the 'big work really start[] happening, to get [the STAMP] plant online.' (Buffalo News, November 20. 2023)" (alterations in original).

167.    On January 30, 2024, the Nation again wrote to Mr. Stribley regarding Plug's use of the DOE Loan to fund the New York Plant, adding new additional evidence to support these claims including, *inter alia*:

> In addition, on January 23, CEO Marsh repeatedly confirmed to investors in a Q4 earnings call that DOE funding will directly facilitate Plug Power's planned venture at STAMP. … CEO Marsh told investors that DOE funding 'will play a pivotal role in scheduling our forthcoming plants in Texas and New York.' In addition, CEO Marsh informed investors that while Plug Power has 'slowed down investment in … hydrogen facilities in Texas and New York' due to cash shortages, 'for money we've already spent in New York and Texas, once the DOE loan is officially approved, we'll be able to borrow that money, which is probably somewhere in the $400 million to $500 million range.'

168.    On February 29, 2024, Mr. Stribley sent a response letter to the Nation. In pertinent part this letter stated:

> In response to the concerns you raised regarding the statements made by Plug Power and its facility planned for [STAMP], the [DOE], [LPO] views the statements, which implied that DOE funding 'will play a pivotal role in scheduling of forthcoming plants in Texas and New York' as inaccurate and misleading regarding the scope of the proposed Federal financial assistance under review by LPO. LPO has expressed this concern to Plug Power and has requested that Plug Power provide a public statement to clarify that the Federal financial assistance it had requested from LPO will not include support for its facility planned within the STAMP at this time.
>
> In addition, LPO confirms that the response letter provided to you on June 21, 2023,

42

stating Plug Power has withdrawn the development of the Project at the STAMP site from its current application for Federal financial support is still accurate. Should DOE ultimately decide to provide Federal financial support to Plug Power for its other development projects outside of the STAMP site, LPO's project monitoring and funding disbursement protocols and procedures ensure that Federal financial support is used for specific projects.

169.    Accordingly, unbeknownst to investors throughout the Class Period was the fact that Plug had already withdrawn the New York Plant from its loan application to the DOE. As a result, the Company would not be able to recoup any of those costs already spent on the New York Plant nor could it apply any potential future funds received to the construction of this site.

170.    And despite receiving explicit warning from the DOE's LPO staffers that their earlier statements were inaccurate and misleading, Defendants never issued the recommended public statement clarifying that the DOE Loan would not include support for the New York Plant. Instead, Defendants made statements throughout the Class Period that were materially misleading regarding the potential sources of capital for the New York Plant.

171.    For example, on March 1, 2024 (the first day of the Class Period), one day after Mr. Stribley's letter explicitly identifying Plug's statements that "implied that DOE funding 'will play a pivotal role in scheduling of forthcoming plants in Texas and New York' as inaccurate and misleading," Defendant Middleton repeated his remarks made during the Company's January 23, 2024 Special Call that Plug had "*slowed investment in the follow-on hydrogen facilities in Texas and New York until we find the right financing solution*" followed by his representations that Plug's "near-term capital strategy is very focused: drive significant improvement in the cash burn by … *tempering new platform spending, work with the DOE to secure the DOE $1.6 billion project financing facility while developing complementary follow-on project financing solutions*" (emphasis added).

43

172. Further, rather than "provide a public statement to clarify that the Federal financial assistance it had requested from LPO will not include support for its facility planned within the STAMP," as explicitly requested by the DOE, during the same March 1, 2024 call, Defendants merely tried to (and did) focus analysts' and investors' immediate attentions on the Texas Plant going forward by declaring that "*once the DOE loan is finalized, [we will] move ahead more aggressively, especially in our Texas activity*" (emphasis added).

173. Two weeks later, on March 14, 2024, Defendant Middleton, on behalf of Plug, presented at the J.P. Morgan 2024 Industrials Conference. During the conference, Defendant Middleton similarly represented that because Plug's DOE Loan was designed as "a platform structure," once it received conditional commitment, it would "*apply the first project to that application … which will be Texas, everything we've done was model[ed] off of Texas for them*" (emphasis added).

174. During the same conference, Defendant Middleton was asked about the Company's "near-term funding needs" based on its "current cash position" and "what options do you have for further funding between strategics, equity, debt, anything else … if you need them?" To which he responded by representing, in pertinent part:

> Last year, we spent close to $700 million in CapEx. This year, we're targeting probably just north of $200 million. And the $200 million is kind of finished in Georgia and turning on the facility in Louisiana, the new hydrogen facility. *And then from there forward, Texas and other facilities, we believe we won't – we're going to temper the investment and the growth there until we get to a point where we find the right capital solution to DOE, combination of the parties*. So from a CapEx standpoint, that comes down dramatically.

(Emphasis added).

175. As a result, throughout the Class Period, investors and analysts alike remained in the dark as to the true nature of Plug's business and prospects of improving its cash position by securing outside funding to support its growth initiatives, including the New York Plant.

**F.      Plug Abandons Construction Work at the New York Plant**

176.    Worse yet, review of the agenda materials and minutes from the Genesee County Industrial Development Agency d/b/a Genesee County Economic Development Center ("GCEDC") – STAMP committee meetings held throughout 2024 revealed that, by the start of the Class Period, Plug had not just "slowed" investments in the New York Plant but had ceased all efforts to move this facility forward. Further, before the year end 2024, Plug affirmatively abandoned its contractual commitments related to the development of the STAMP substation, identified by Defendants as the gating item to production start-up at this site, before effectively canceling the project altogether and selling the related assets.

177.    Indeed, on May 24, 2024, Timothy Ehmann, VP – Substations at O'Connell Electric Company, Inc., sent a letter to the GCEDC noting, "[p]er you[r] request, O'Connell Electric proposes the following engineering activities to progress to help maintain timely Stamp 345kV switchyard engineering progress to keep the interconnection dates from slipping further day for day pending the Plug suspension of work."

178.    According to the GCEDC STAMP Committee's meeting minutes from June 5, 2024, the county board approved O'Connell's "prepared proposal to complete the design and engineering and review of the high side of the substation (NYPA) that is related to the control house and installation of the control base." The reasons given for utilizing O'Connell for this work were as follows: (1) they were already on-site doing work for another entity (*e.g.*, Plug); (2) the project cannot withstand the delay that an Request for Proposal (RFP) process would entail; (3) a second electrical firm would lead to confusion and finger pointing about any work quality or timeliness issues; and (4) they are familiar with NYPA specifications and their engineering team since they have been working on this project with them.

179.    Then, on August 29, 2024, O'Connell, at the request of GCEDC, sent a second letter, this time proposing to complete the STAMP substation and switchyard "from the current suspended condition." The letter, in pertinent part, provided a brief recap of the history of the project including, *inter alia*:

- The STAMP NYPA Switchyard and National Grid Substation EPC contract were procured in 4th Qtr 2020, the project was awarded [to Plug] Jan 2021 and completion was intended for December 2022.

- Engineering approvals and equipment lead times to a fall 2022 construction start. National Grid engineering progressed on schedule and NYPA lagged. Construction continued thru December 2023 when it was suspended by Plug Power, the transformer (qty 2) delivery and dress-out continued thru January 2024 to ensure transformer integrity. Most of the major equipment was received on site 3Q and 4Q 2023 and preserved for extended storage due to the Plug suspension.

180.    Accordingly, based on the contents of this letter, the reported delays in the energization of the STAMP substation, detailed in Section VII.B., the self-described gating item for production at the New York Plant, were led by Plug itself and its conscious decision to stall and then suspend construction, before ultimately abandoning the project altogether.

181.    On September 4, 2024, the GCEDC approved the term sheet of an Asset Purchase Agreement with Plug for the equipment purchased by the Company for the STAMP substation. When describing this item for discussion by the County Board, the GCEDC STAMP committee meeting minutes explained that:

During the initial construction of the substation Plug (Yellowtail) had acquired certain component parts that have not been installed yet. These assets need to be transferred to the GCEDC in order for it to complete the substation construction in a manner that NYPA and National Grid would accept dedication of it upon completion. …Any funds to pay for the 'Reimbursement Amount' [ ] will come from other companies locating at STAMP and paying for their share of the substation on a per MW basis.

46

182. Then, on October 30, 2024, the GCEDC approved O'Connell's substation contract with the agreement specifically noting that Plug had originally retained O'Connell to perform the work on the STAMP substation, "but has now abandoned that work."

183. Based on Defendants' failure to correct prior inaccurate and misleading statements regarding the potential for DOE funding to support the buildout of the New York Plant and their failure to disclose material adverse information concerning the abandonment of critical work at this facility, throughout the Class Period, investors and analysts alike continued to believe that this project remained on Plug's list for growing its network of liquid green hydrogen plants, as evident by the continued inquiries about the build out of the New York Plant.

184. For example, on July 7, 2025, Plug held a "Special Call" to discuss the recent passage of the "One Big Beautiful Bill", solidifying the Section 45V Clean Hydrogen Production Tax Credit and Section 48E Investment Tax Credit, during which analyst Christopher J. Dendrinos of RBC Capital Markets asked if this bill changed Plug's "development strategy or the pace at which you go at" or its "thinking about that, call it, self-generation build-out" as it "relates to the planned build-out of Texas and then maybe New York in the future."

185. Defendant Marsh responded by stating, in pertinent part:

> ***I don't feel rushed. But also the certainty for the next 3 plants for -- when you start looking at the equipment we own, we have most of our equity components that we've already spent. And I think what you'll probably see is that probably don't change our plans.*** We're probably commencing construction of Texas before the year's end. … ***I'll commence construction of one plant this year. And probably there's a good possibility a second one in '26*** and maybe a third in '27, depending upon how market demand is. And quite honestly, the 48E language is very, very helpful for market demand.

(Emphasis added).

186. The accounts of CW5, Plug's former Operations Controller from October 2022 to December 2024 and a Director of Finance from November 2024 to June 2025, confirm that by the

47

time they left Plug in June 2025, company-wide employee consensus was that the New York Plant was not going to happen. To make matters worse, CW5 said Plug was spending a significant amount of money to store and maintain equipment that had been purchased for the New York Plant when they knew the project was no longer viable.

### G.    DOE's Limited Commitment to Cover Costs for the Texas Plant Necessitated Additional Funding Secured Before Any DOE Fund Advancements

187.    Following Plug's undisclosed withdrawal of the New York Plant from its application with the DOE in or around June 2023, Plug proceeded with the process, focused solely on receiving funding for the Texas Plant under the loan's platform structure.

188.    As part of Plug's early construction activities for this site, and in support of the DOE's due diligence, or Phase 3 of the application process, on July 7, 2023, Plug executed a lump-sum EPC contract for the Texas Plant. As Defendant Marsh explained it on January 23, 2024, this lump-sum EPC contract provided Plug with "a commitment on what the cost is going to be" for the complete construction of the Texas Plant.

189.    And by January 22 2024, Defendants knew the key financial terms and main conditions of the DOE Loan when they received notification that Plug's finalized term sheet had been submitted to the Credit Review Board for their final considerations and issuance of a conditional commitment following completed term sheet negotiations. As detailed in Section VI *supra*, a finalized term sheet negotiated between DOE and the applicant (like Plug) provides the key financial and commercial terms of the potential loan to be guaranteed by the DOE. In pertinent part, the finalized term sheet submitted for conditional approval also contains the conditions that must be satisfied prior to the issuance and funding of any executed loan agreement.

190.    Consequently, while Plug had already put roughly $250 million of its own cash into the Texas Plant by the end of 2023, Defendants knew Plug would need to funnel even more money

into the project to reach production start-up based on the known lump-sum costs to construct this facility and the limited financial commitment to be offered by the DOE as presented in the finalized term sheet. Moreover, as of January 22, 2024, Defendants also knew that a condition precedent to receiving funds under the DOE Loan was evidence of adequate project funding. Plug, however, did not have the money available on its balance sheet. As a result, Plug needed to secure an equity partner or alternative debt solution to fund the remaining project costs before any funds would be advanced under the DOE Loan.

191. The Class Period began against this backdrop of material non-public information. Notwithstanding the material adverse issues which were known to Defendants as detailed herein, throughout the first half of the Class Period Defendants repeatedly told investors that Plug was "***looking for equity partners, but that is not tied to the DOE loan***" and that the "***activity with equity investors is separated completely from the activity with the DOE***" (emphasis added).

192. Defendants continued to make such statements following the Company's May 14, 2024 announcement that it had received a conditional commitment for the up to $1.66 billion loan guarantee from the DOE's LPO to "finance the development, construction, and ownership of up to six green hydrogen production facilities."

193. CW1, Plug's former VP of Sales and Business Development for Energy Solutions from August 2021 to February 2024, viewed Plug's announcement of the $1.66 billion DOE Loan skeptically because, according to CW1, Plug still needed to fund a large share of each project. CW1 noted that the total guarantee was intended to support several facilities. CW1 said the announced loan amount did not match the scope of the construction program.

194. CW1 repeatedly identified the Company's ability to provide its share of the project cost as an obstacle to receiving funding under the DOE Loan. CW1 went on to add that Plug lacked

49

both the cash and the credit rating needed to obtain that money elsewhere. In CW1's view, Defendants' statements about working to secure the money for the down payment was smoke and mirrors. They knew they were never going to come up with that, CW1 said. CW1 said Plug's liquidity problems were already obvious before CW1 left in February 2024.

195.    Then, on January 23, 2025, Plug issued a press release and Current Report filed with the SEC on Form 8-K, signed by Defendant Middleton, announcing, in pertinent part:

> As previously disclosed, on May 14, 2024, the [DOE] issued a conditional commitment letter to Plug [ ] and Plug Power Energy Loan Borrower LLC (the 'Borrower'), a wholly owned indirect subsidiary of the Company, for a loan guarantee of up to $1.66 billion through the DOE's Loan Programs Office (the 'DOE Loan Program') to finance the development, construction, and ownership of up to six green hydrogen production facilities [ ].

> On January 16, 2025, (i) the Borrower, the DOE, acting by and through the Secretary of Energy, and the Federal Financing Bank (the 'FFB') entered into a Note Purchase Agreement (the 'FFB Note Purchase Agreement') in respect of which, among other things, the DOE provided a guarantee of (x) the Borrower's obligations to repay term loan borrowings and capitalized interest (such loans and capitalized interest, collectively, the 'Guaranteed Loan') provided by the FFB to the Borrower and evidenced by an initial future advance promissory note (the 'FFB Promissory Note') …

> The FFB Promissory Note provides for an initial extension of the Guaranteed Loan, subject to the achievement of certain conditions, in an aggregate maximum principal amount of up to $387,598,647.06 and an aggregate maximum amount of capitalized interest of up to $26,807,693.17 to finance the development, construction, and ownership of a Facility in Young County, Texas [ ].

> ****

> The approval and funding of any disbursements of the Guaranteed Loan will be subject to the satisfaction of conditions precedent, including, but not limited to, evidence of satisfaction of certain technical and performance related conditions precedent, adequate project funding, reports from certain technical consultants and advisors, and the receipt of certain financial models demonstrating compliance with the financial covenants set forth in the DOE Loan Guarantee Agreement.

196.    Following this announcement, Plug issued a press release on March 3, 2025, providing additional detail on the finances of the Texas Plant representing, in pertinent part, that:

> Plug has invested over $250 million in the project to date. ***To complete the project,***

> *Plug estimates an additional required investment of approximately $600 million. Of this additional investment, the DOE loan is targeted to cover approximately $400M. To cover the investment amount outside the DOE loan, Plug has targeted a process of working with project finance and potential equity investors.*

(Emphasis added).

197.    The accounts of CW6, however, indicate that these estimates were unrealistic based on then-current market conditions further hindering actualized interest in the project and Plug's prospects for securing supplemental project finance or equity investors on favorable terms.

198.    CW6, Plug's former Business Development Program Manager from March 2022 to July 2024 and Director of Energy Solutions Sales from June 2024 to June 2025, explained how project analysis would normally include low, base and high cases, along with additional scenarios. According to CW6, banks would focus on the lower cases. In CW6's assessment, Plug instead used the most optimistic cases. CW6 said, Plug took the top ones, then it massaged the optimistic case numbers a whole lot more, and it ignored all the other cases that might exist.

199.    CW6 said the economics for the Texas Plant might have appeared reasonable years earlier, but by 2025, the situation was different. CW6 said that by the time they left in June 2025, the Texas Plant did not appear viable under the current market conditions. According to CW6, even with the DOE loan, the Texas project's economics were poor. CW6 said it would have been another $800 million Plug was going to have to commit, or maybe even closer to another $1 billion dollars. We all know Plug did not have the money, CW6 said.

**H.    Administration Change Further Jeopardized Plug's Receipt of Funds Under the DOE Loan**

200.    The Company's financial situation went from bad to worse when, on November 5, 2024, former president Donald J. Trump was elected to serve a second term.

201.    The DOE's LPO emerged as one of former President Joe Biden's most powerful tools for greening the U.S. economy, making billion-dollar deals to, for example, restart a nuclear

51

power plant in Michigan, fund lithium mining in Nevada, and build factories for churning out electric vehicle components in Ohio and Tennessee.

202. Under President Trump, however, the DOE's LPO faced an uncertain future based on his expressed proposal to cut the office's budget once in office and on his pick of Chris Wright to lead the DOE, a former fracking executive who had publicly criticized the use of "large government subsidies and mandates" to fund private projects.

203. As detailed above, while Plug closed its $1.66 billon loan guarantee with the DOE's LPO on January 16, 2025, the funds available under this agreement for the Texas Plant had not yet been advanced to the Company due to outstanding conditions precedent.

204. Worse yet, Plug's $1.66 billion DOE Loan was one of sixteen pending conditional commitments for loans or loan guarantees amounting to $25 billion the DOE's LPO raced to close in the final days of former U.S. President Joe Biden's administration.

205. Shortly thereafter, on January 20, 2025, President Trump signed the Unleashing American Energy Executive Order, which paused the release of federal funds appropriated under the IRA and Infrastructure Improvement and Jobs Act, including DOE loans and grants. The DOE subsequently began reviewing the billions of dollars that were approved under the Biden administration, particularly those loans and grants that were approved in the final days (like here).

206. The Company's January 23, 2025 press release, announcing its recent execution of the DOE Loan, made a point to note that:

> The loan guarantee will help finance the construction of up to six projects to produce and liquify zero- or low-carbon hydrogen at scale throughout the United States. Plug's Graham, Texas, green hydrogen plant, the first to benefit from this financing, will create hundreds of high-quality jobs. Powered by an adjacent wind farm, Plug's green hydrogen production plant will utilize the company's electrolyzer stacks manufactured at its factory in Rochester, N.Y., and its liquefaction and storage systems built at its facility in Houston.
>
> The hydrogen economy is strengthening America's energy independence, and

52

securing U.S. leadership in clean energy innovation. Most importantly, the industry is a vital step toward bolstering the resilience of our energy grid and reducing reliance on foreign energy sources. By aligning with national security priorities, this initiative ensures the U.S. remains a global leader in cutting-edge energy technology and economic growth.

207.   For the next eleven months, Defendants repeatedly touted their "regular conversations with the DOE" highlighting that Plug operates in "very, very red districts" including the planned Texas Plant, and represented that Plug did not face any significant additional "obstacle[s]" to receiving funds associated with the DOE Loan, characterizing remaining steps as "the bureaucracy of crossing the T's and dotting the I's".

208.   The accounts of multiple former employees, however, indicate that internally Defendants portrayed the opposite. Their non-public statements and actions told Plug insiders that the Company's failure to satisfy the conditions necessary to receive funds under the DOE Loan before the administration change essentially sealed its fate that it would never get the money.

209.   CW2, a Commercial Specialist at Plug from August 2021 to March 2025 and an Inside Support Coordinator from July 2020 to August 2021, referred to the DOE Loan as a major internal topic at Plug. CW2 recalled that employees heard repeated updates about the loan in all-hands meetings from Defendant Marsh, specifically. CW2 recalled employees hearing comments like, "we have this many more months" until the loan money came through. CW2 said that the loan was discussed mostly in 2024, leading up to the election. Then, CW2 said, the discussion stopped around the time of the election. CW2 explained it as, all of a sudden, discussions about the DOE Loan just went flat, Defendant Marsh stopped bringing it up in the all-hands meetings.

210.   CW3, who held various roles at Plug during their nearly 10-year tenure from May 2015 to February 2026, recalled that Plug management was working urgently on the DOE Loan before the presidential transition. Like CW2, CW3 recalled that employees heard repeated updates about the DOE Loan from Defendant Marsh during company-wide weekly meetings, usually held

on Thursday at its New York office. According to CW3, during an all-hands meeting, Defendant Marsh said that funding would not be available for the renewable hydrogen market after the change in administrations. CW3 added that Defendant Marsh told Plug employees that the Trump administration was not friendly to hydrogen, so that is why they needed to meet the January 2025 deadline to get the funding good to go before the administration change.

211.    CW3 also identified Defendant Middleton as a leader of the Company's DOE Loan effort. According to CW3, Plug had a core group of individuals that were on the DOE Loan and "Paul [Middleton] was definitely leading it," CW3 said. CW3 said the deadline to get the funding before the changeover appeared to be a serious concern for management. According to CW3, you could tell that they would be doomed if it did not happen, that it would not be great for Plug's future. Like CW2, CW3 recalled that Plug management provided much less information about the DOE Loan after the new administration took office in January 2025. According to CW3, not a lot of information continued about it after that point.

212.    CW4, a former employee of Plug from September 2019 to March 2025, also described weekly company meetings attended by all employees, including Defendants Marsh and Middleton. CW4 recalled repeated questions raised by employees during the weekly meetings regarding the DOE Loan, where the loan stood, and the Company's standing on completion of the loan. During one such weekly meeting, towards the end of 2024 or early 2025, CW4 recalled Defendant Middleton mentioning that Plug had missed a deadline for the DOE Loan. Then, CW4 recalled that, around Plug's mass layoff in March 2025, there was also verbiage or something being said around that time that the DOE Loan was in jeopardy; it was not going to happen.

213.    According to CW5, Plug's former Director of Finance from November 2024 to June 2025 and Operations Controller from October 2022 to December 2024, the internal actions

54

and statements made by Plug management did not match Defendant Marsh's public statements during the Company's earnings call that hydrogen was not a partisan issue and that people from both parties supported it. CW5 said internally, there were different actions being taken that would suggest that they knew that if this went past the presidential transition, then Plug had no shot at getting the funds.

214.    On March 19, 2025, Plug announced the pricing of an underwritten registered offering to a single institutional investor, of 46.5 million shares of common stock together with pre-funded warrants to purchase 138,930,464 shares of common stock and accompanying warrants to purchase 185,430,464 shares of common stock (the "Offering"). Each share offered and sold together with an accompanying common warrant carried a combined offering price of $1.51, and each pre-funded warrant being offered and sold together with an accompanying common warrant carried a combined offering price of $1.509, which was equal to the combined offering price per share of each share and accompanying common warrant less the $0.001 exercise price of each pre-funded warrant. The Underwriters agreed to purchase each share with an accompanying common warrant from the Company at a combined price of $1.4458 and each pre-funded warrant with an accompanying common warrant at a combined price of $1.4449.

215.    Subsequently, on May 12, 2025, when presenting at the Company's investor conference call to discuss its financial results for the first quarter of 2025, Defendant Marsh represented that, with the Company's Offering, it had sufficient funds to cover the remaining costs to build out the Texas Plant stating, in pertinent part:

> On capital, we've taken some important steps to ensure financial flexibility. ***In March, we raised $280 million in equity***, bolstering liquidity while reducing risk in a volatile market. We followed that with a $525 million structured financing facility, part of which was used to retire convertible debt. ***Combined with the $1.66 billion Department of Energy loan guarantee, these moves provide a strong foundation to support our infrastructure goals***.

216.    According to CW5, the Company's March 2025 Offering was the result of Plug's depleted cash reserves and because it was struggling to fund payroll and was not paying vendors. CW5 believed the Offering was just a capital injection more than funding for the Texas Plant. Moreover, as described in detail below, at this point Plug had already abandoned all efforts to progress this project forward and was exploring alternative options for the real property and other related assets associated with the Texas Plant.

**I.    Plug Secretly Negotiates the Sale of Its Real Property as well as its Electricity Rights for Texas and New York to a Data Center Developer**

217.    As 2024 came to a close with no supplemental funding secured for the Texas Plant, the DOE Loan was in jeopardy based on Plug's inability to demonstrate adequate project funding and the heightened risk that no funds would ever be advanced under the new administration, and the New York Plant effectively abandoned with no prospects of outside funding for support, Plug secretly began exploring alternative options for the assets associated with these facilities.

218.    From early 2025, CW6 worked with Kevin O'Brien, Director of Investor Relations, to develop a proposed strategic pivot for the Company to sell off the Texas and New York land. CW6 said they spent months developing a plan for Plug to move away from large hydrogen production plants, like the ones it was planning on building in Texas and New York, and to sell the land for those projects to data-center developers.

219.    CW6 said the proposal was well developed, with the support of the Investor Relations team. According to CW6, with their support, CW6 had Plug's internal numbers from its Investor Relations team to compare. CW6 said they modeled different ways Plug could receive returns, including discounted hydrogen or additional financial returns with normally priced hydrogen. They developed multiple price/revenue models and scenarios, CW6 said.

220.    CW6 said the proposal was based on several conclusions including that Plug did not have enough money to complete its planned projects and the Texas Plant did not have enough demand. CW6 gave an overview of the hydrogen industry and said that by 2024 and 2025, tailwinds turned into headwinds for hydrogen. Large projects that had once been viewed as a slam dunk began to grind to a halt, CW6 said. Potential customers who initially called about liquefiers began asking whether Plug wanted to buy their hydrogen equipment.

221.    As such, CW6 proposed selling the Texas land to a data-center developer because the site already had power and water. CW6 said Plug had an asset in the land; it could sell the land. CW6 recalled thinking, there is a data-center developer who would love to have water and power ready to go in Texas. CW6 viewed this as especially valuable because those are major obstacles to new data-center construction. CW6 said even a well-funded company such as Meta could wait years before it could build a data center without those resources in place. CW6 also proposed selling the New York site for similar reasons.

222.    According to CW6, CW6 and Mr. O'Brien also contacted the Plug employee responsible for commercial development of the Texas Plant, Chris Alexander. They asked whether a buyer might be interested in the land. According to CW6, Mr. Alexander said he had in fact spoken with more than one data-center developer interested in the Company's land. CW6 said, they certainly told him, and Mr. Alexander certainly understood, that Plug could get a lot of value out of that land, and at that time, it did not look like the Company was building Texas anyway.

223.    According to CW6, they first presented the devised plan to Defendant Crespo while he was still serving as CRO. CW6 said that Mr. Crespo directed CW6 to Mr. Shrestha. CW6 then presented the plan to Mr. Shrestha in May 2025. CW6 said their supervisor, Chris Rial, was supportive of CW6's plan. According to CW6, Mr. Rial reviewed the slide decks prepared by CW6

57

and provided feedback. Once the plan was complete, Mr. Rial joined CW6, Mr. O'Brien and the Investor Relations team for the meetings with Defendant Crespo and Mr. Shrestha.

224. By September 2024, two data center developers had submitted bids to the GCEDC, including offers to pick up the substation work in exchange for a spot at STAMP and access to some of the remaining hydroelectricity.

225. On January 9, 2025, Stream Data Centers ("Stream") entered the running submitting a letter to the GCEDC expressing "strong interest in acquiring 60 acres of land located in [STAMP] for the development of a cutting edge, state-of-the-art data center." Stream also offered to complete the construction of the STAMP substation.

226. On March 6, 2025, the GCEDC unanimously approved Stream's proposal to construct a 900,000 square foot data center at the STAMP site.

227. According to an article published by the *Olney Enterprise*, on February 27, 2025, around the same time as Stream's submission to the GCEDC for approval of its bid to build at the STAMP site, in February 2025, Stream also met with City of Graham officials and County Judge Win Graham to discuss locating a new data center in Young County, Texas. The article noted that according to Judge Graham, Stream had said Plug had played an important role in attracting the data center to that specific location near Graham, Texas. He added that Stream had told city officials it planned to purchase significant amounts of hydrogen from Plug.

228. Then, on August 26, 2025, Stream sent a letter to the GCEDC advising that the company had "identified an opportunity to secure additional capacity and increase the scale of the Project, such that the Project will increase both in terms of power consumption and the useable square footage of the Facility." The letter further indicated the company's plan to submit an

58

amended application such that it would not be proceeding with the plans and specifications as contemplated and approved by GCEDC in the final resolution dated March 6, 2025.

229.    As later revealed on February 26, 2026, the "opportunity to secure additional capacity and increase the scale of" Stream's planned data center at the STAMP site was the deal between Stream and Plug where Plug agreed to sell its real property and related assets located at the STAMP site, originally designated to be the location of the Company's New York Plant.

230.    Likewise, on October 9, 2025, *KFDX* and *Texoma Fox* reported that Stream's complex in Young County, Texas was drawing strong concern from residents. In pertinent part, while there had been no formal proposal yet, the article identified that Stream was considering an 850-acre development off road FM 61 – the same area and location of the Company's Texas Plant.

231.    As later revealed on July 13, 2026, the location of Stream's Young County data center included the Company's 66 acres of real property and associated 164 MW of grid interconnection assets, originally designated to be the location of Plug's Texas Plant.

### J.    The Truth Slowly Leaks Out

232.    On October 7, 2025, Plug issued a press release and filed a current report on Form 8-K with the SEC announcing that Defendant Marsh would step down from his role as CEO, "effective as of the date [Plug] files its [2025] Annual Report", and that Mr. Shrestha would "step down as President of the Company, effective October 10, 2025." Plug concurrently announced the appointment of CRO, Defendant Crespo, to both roles.

233.    The abrupt and unexpected departure of two key executives just one month before the Company's scheduled annual symposium and expected issuance of its financial and operating results for the third quarter of 2025 signaled a material and imminent change in Plug's business, growth strategy, and/or operations. On this news, Plug's stock price fell 7.64% in a single day.

234.    Then, on November 10, 2025, during pre-market hours, Plug issued a press release

entitled, "*Plug Power to Generate Over $275 Million Through Monetization of Electricity Rights

and Operational Efficiencies; Supports Major U.S. Data Center Build-Out*," announcing the

Company's expected liquidity improvement through "a combination of asset monetization, release

of restricted cash, and reduced maintenance expenses." The press release went on to provide:

> As part of this initiative, Plug has signed a non-binding Letter of Intent to monetize its electricity rights in New York and one other location and collaborate with a U.S. data center developer. The project developer is actively expanding its data center platforms across the country, and Plug will work with them to explore providing auxiliary and back-up power solutions utilizing Plug's advanced fuel cell technology.
>
> This collaboration highlights Plug's growing presence in the rapidly expanding data center sector, where the need for reliable, low-carbon energy continues to accelerate. Plug's fuel cell systems are ideally suited to provide resilient, zero-emission power to critical infrastructure and high-uptime facilities.
>
> In connection with this initiative, Plug will suspend activities related to the Department of Energy loan program and reallocate capital toward higher-return opportunities across its hydrogen network. The company's recently executed hydrogen supply agreement with a global industrial gas leader provides competitively priced, long-term hydrogen supply - reducing the near-term need for self-developed generation in the near term.

235.    That same day, November 10, 2025, Plug issued a press release reporting its

financial results for the quarter ended September 30, 2025 ("3Q25") and filed a quarterly report

on Form 10-Q with the SEC that reported the same. During after-market hours, Plug also held an

investor conference call to discuss its 3Q25 financial results (the "3Q25 Earnings Call").

236.    During the 3Q25 Earnings Call, Defendant Marsh admitted that "[t]his initiative

[wa]s directly linked to our new global hydrogen supply agreement with one of the world's leading

industrial gas companies." Worst yet, contrary Defendant Marsh's public assertions just four

months earlier, he now went on to declare the supply agreement "a major strategic milestone that

60

reduces the need for near-term self-development of new plants. As a result, we have suspended activities under the DOE loan program…"

237. Indeed, almost four months earlier to the day, on July 9, 2025, when Plug announced the "new multi-year enhanced supply agreement with a leading U.S.-based industrial gas company and longtime hydrogen partner through 2030," Defendant Marsh was quoted as saying, "*[t]his expanded agreement supports our mission to build on our already robust and resilient hydrogen network in the U.S.*" (emphasis added).

238. In response to an analyst question, Defendant Marsh also revealed that the announced deal had "been far along", contradicting his earlier statements that analysts should not expect revenue "at any size" from the data center sector in 2025:

> Yes. I think it's -- we've taken a step back. ***And first, I want to -- want to make a note, we expect this transaction will close in the first quarter. It's been far along. So we think it's mid-first quarter when this closes.*** This will provide the liquidity on the balance sheet which part of Project Quantum Leap has been about. And Plug next year is going to be sitting there with a strong balance sheet, which will have a complementary improvement to our income statement.
>
> So it's really about liquidity to start. And the second item that's driven a good deal of this is -- and I touched on in my opening remarks about not only our relationship with a large industrial gas company but relationships with people who are going to build hydrogen plants who want our electrolyzers. So we looked at the world and said, we know how to do a combination of sourcing competitive hydrogen and generating competitive -- generating hydrogen to balance those two out.
>
> As part of this program, ***we've been exploring with our product management team and development team, opportunities to provide levels of backup power using hydrogen to support the data center deployments***. It will make sense in some applications. And so that is a real, real focus that Jose and the team will continue to be engaging in next year.

(Emphasis added).

239. On this news, Plug's stock price fell precipitously from an opening price of $2.93 per share on November 10, 2025, to a closing price of $2.53 per share on November 11, 2025, representing a 13.65% decline.

240.    While the Company's revelations represented a significant shift in its growth strategy, the market continued to be misled as Defendants failed to disclose that Plug's so-called "monetization of electricity rights and operational efficiencies" also included the sale of the Company's real property designated to be the New York Project, and ultimately the Texas Project as well, effectively terminating Plug's plans to build additional hydrogen plants.

241.    Indeed, while Defendants revealed Plug would "suspend activities related to the Department of Energy loan program" to support its near-term efforts for self-developed hydrogen generation, they maintained that "Plug will continue to evaluate strategic hydrogen production and power infrastructure projects that align with its long-term cost roadmap…"

242.    Then, during market hours on November 13, 2025, *The Washington Examiner* reported that Plug had "confirmed . . . that it suspended activities" on "its plans to construct six facilities to produce and liquefy zero or low-carbon hydrogen, putting at risk" the $1.66 billion DOE Loan it closed in January.

243.    On this news, Plug's stock price fell 16.67%, from an opening price of $2.70 per share on November 13, 2025, to closing price of $2.25 per share on November 14, 2025.

244.    Subsequently, on February 26, 2026, during after-market hours, Plug announced it had entered into definitive agreement with Stream, pursuant to which Plug agreed to sell its real property and related assets located in Alabama, New York (*e.g.*, the New York Plant site). The press release further indicated that, "[t]his transaction allows Plug to unlock value from existing assets and maintain focus on hydrogen production and fuel cell deployment. Two additional initiatives are expected in 2026, with anticipated aggregate proceeds of more than $275 million."

245.    On this news, Plug's stock price fell 6.28% over a single trading day. The market price of Plug common stock, however, remained artificially inflated as Defendants continued to

conceal that Plug's so-called "monetization of electricity rights and operational efficiencies" also included the sale of the Company's real property designated to be the Texas Plant.

246. For example, on March 2, 2026, BTIG issued an analyst report following the Company's announcement of its financial results for the fourth quarter of 2025. In pertinent part, the report noted "[l]iquidity remains a key focus for management, and PLUG announced the sale of its New York green hydrogen site to a data center developer for ~$133M last month (closing in early 2Q26), which includes access to a 600MW electrical substation. Looking ahead, PLUG aims to generate over $275M of incremental liquidity in 1H26 *through the monetization of its electricity rights across two more assets*" (emphasis added).

247. Then, on July 13, 2026, during pre-market hours, Plug issued a press release announcing the two additional transactions with Stream, advancing the Company's previously announced, "strategic infrastructure optimization initiatives." In pertinent part, Plug revealed that it had signed a definitive agreement to sell its Graham, Texas project, comprised of real property and associated 164 MW of grid interconnection assets for up to $76.5 million, with $50 million to be paid at closing and up to $26.5 million based on the load capacity that will be confirmed in the final interconnection agreement with the Texas utility.

248. According to the Company, the sale was also expected to enable the release of approximately $14 million of cash collateral currently supporting letters of credit/security payments, following the transfer of the applicable interconnection-related obligations and security arrangements to Stream.

249. On this news, Plug's stock price fell $0.06 per share, or 2.69%, over a single trading day to close at $2.17 per share on July 13, 2026.

250.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

251.    As provided more fully below, Defendants made a series of materially false and misleading statements during the Class Period. Unless otherwise noted herein, statements made by Defendants that are not emphasized in bold and italics, are included in this Section for context.

*March 1, 2024*

252.    The Class Period begins on March 1, 2024. On that date, Plug held a conference call with analysts and investors to discuss its financial results for the quarter and fiscal year ended December 31, 2023 (the "4Q23 Earnings Call"). During Defendant Middleton's prepared remarks for the 4Q23 Earnings Call, he focused on Plug's plans for 2024 providing, in pertinent part, that:

> Turning our focus to '24. We know we must significantly improve margin and cash flow, and we see this as an opportunity to reset. …
>
> … We're managing the timing of deployments in certain new platforms with enhanced focus on cash and profitability.
>
> ***We'll continue the nurturing effort on these platforms, but focus on escalating the cost curves before we ramp sales efforts***. Now that we've commissioned the new hydrogen facilities in Georgia and Tennessee, we will use these plans to drive margin improvement and fuel costs. … ***And we've slowed investment in the follow-on hydrogen facilities in Texas and New York until we find the right financing solution***.
>
> ****
>
> Our near-term capital strategy is very focused: drive significant improvement in the cash burn by reducing CapEx, reducing inventory investment, improving margins and ***tempering new platform spending, work with the DOE to secure the DOE $1.6 billion project financing facility while developing complementary follow-on project financing solutions.*** Leverage the ATM facility as needed as we continue to develop the varied debt solutions we are evaluating and continuing to develop varied debt opportunities.

64

253.    The foregoing statements identified in ¶252, emphasized in bold and italics, were materially false and misleading when made because, as detailed in Section VII.E., Plug had already withdrawn the New York Plant from its loan application to the DOE in or around June 2023, and as a result, the Company could not apply any potential future funds received to the construction of this site.  As a result, these statements were materially false and misleading as to the scope of the proposed Federal financial assistance available to support the buildout of Plug's network of liquid green hydrogen plants.

254.    In addition, as detailed in Section VII.F. *supra*, at the time these identified statements were made Plug had not just "slowed" investments in the New York Plant but had ceased all efforts to move this facility forward, and as a result, Defendant Middleton's representations that the Company would "continue the nurturing effort on these platforms" and was merely "tempering new platform spending" were materially false and misleading when made.

255.    During the Question-and-Answer portion of the 4Q23 Earnings Call, Defendants were pressed about Plug's anticipated capital expenditures during the coming year. More specifically, Defendants were asked outright when spending on the New York and Texas Plants would resume following finalization of the DOE Loan term sheet:

> **Skye Landon of Redburn (Europe) Limited**: In the base case, my first question is the 70% cash burn reduction guidance, does this assume any CapEx for new hydrogen projects in Texas or New York during 2024? Or are these projects now in the base case of 2025 start?
>
> **Defendant Middleton**: Yes. And I guess a couple of things. One, on the hydrogen investments we have in the current plan, is predominantly the retention and finalization of the Georgia plant that we've completed. It's the funding for the Louisiana program we have with Olin that we're developing and building and rolling out. And it's kind of residual projects that we had opened at the end of last year that we're paying now for given extended terms for some of the vendor program. On Texas and New York, we already had spent a lot of money.
>
> ***We've kind of retailed and tempered that in the near term until we turn on the right financing solutions. But given the money that we've spent, it puts us in a***

65

*good position that as we launch those the new solution that we've launched would fund the majority, if not all of that incremental spend.* So as we turn that on in the second half or into next year, we expect the majority of that to be covered with new financing.

\* \* \* \*

**Amit Dayal of H.C. Wainwright & Co, LLC**: Just one quick one from me on the DOE loan, right? So given the focus on the operational and margin improvements versus aggressive sales growth for 2024. And based on just your comments a little bit earlier, should we assume that the 2024 execution plan is not really dependent on this coming through for you in 2024 of this facility.

Just that would help basically give us a sense of what the cash needs just overall for the business that you can support with the available resources?

**Defendant Marsh**: Yes. So Amit, operationally, we're not dependent upon the DOE loan for '24. We will, *once the DOE loan is finalized, move ahead more aggressively, especially in our Texas activity and that because we've already made significant investments in Texas,* we see opportunities even have some capital coming from the DOE to support that activity.

So we look at it -- a lot of the -- *when you think about 80/20*, we feel a good deal, *for example, in Texas, we've already made the capital investments*.

256.    The foregoing statements identified in ¶255, emphasized in bold and italics, were materially false and misleading when made because, as detailed in Section VII.E., they failed to disclose that the New York Plant had already been removed from the Company's DOE loan application in or around June 2023, and as such, no LPO-backed loans could ever be used to complete this property nor could Plug recoup on the money already spent on this project. Further, according to CW1, Plug lacked both the cash and the credit rating needed to obtain that money elsewhere. As a result, these statements were materially false and misleading as to the source and scope of financial assistance available to support the buildout of Plug's New York Plant.

257.    In addition, as detailed in Section VII.F. *supra*, at the time these identified statements were made Plug had not just "tempered" investments in the New York Plant but had ceased all efforts to move this facility forward, and as a result, Defendant Middleton's

66

representations that the Company would "move ahead more aggressively, especially in our Texas activity" were materially false and misleading because theyomitted material information concerning the current state of affairs of Plug's business activities and growth strategy.

258.    Likewise, Defendants' representations that the DOE Loan would cover "about 80/20" of the project costs or "fund the majority, if not all of that incremental spend" created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.G. *supra*, the finalized term sheet outlining the key financial terms of the DOE Loan indicated that the amount to be offered for the Texas Plant was significantly less than 80% of the project costs. According to CW1, before they left Plug in February 2024, it was known internally that Plug still needed to fund a large share of each project under the loan facility. CW1 said the announced loan amount did not match the scope of the construction program. As a result, these statements were materially false and misleading as to the scope of the proposed Federal financial assistance available to support the buildout of Plug's network of liquid green hydrogen plants.

*March 14, 2024*

259.    On March 14, 2024, Defendant Middleton, on behalf of Plug, presented at the J.P. Morgan 2024 Industrials Conference. During the conference, William Chapman Peterson of JPMorgan Chase & Co. pushed Defendant Middleton to comment on the DOE Loan to which he responded, in pertinent part:

> So that application has been filed by the DOE, and they're working through that statutory process to get it approved.
>
> After 2 years of collaboration to get to that point, to that milestone for that application to be submitted, we're pretty confident that the 200-page package that they developed has been kind of balanced out with all the agencies that have to be approving it. So we think it's just a process of time now. And sequence-wise, that would get -- the way it works is you get what they call a conditional approval. And that's in their words, when the federal government is committing the money to the

67

program officially, and then you have to take that and put it into an actual loan document. ***And then you -- for us, because it's a platform structure, we apply the first project to that application***.

And we're not waiting and doing all this sequentially. We're actually working on the structure of it all and the permitting and all the things in kind of parallel so we can go fast on the heels of approval. But timing-wise, we think -- we expect the conditional approval. We believe and hope it will be by the end of March. And then we think it will take kind of 60, 90 days to get to the papering of the loan. ***And then in parallel the first project, which will be Texas, everything we've done was model off of Texas for them.*** And that would be a Q3 event that would unlock that capital enable us to start accelerating that development.

260.    The foregoing statements identified in ¶259, emphasized in bold and italics, were materially false and misleading when made because, as detailed in Section VII.E. *supra*, not "everything" Plug did for the DOE Loan was "model[ed] off of Texas". Indeed, Plug initially began the DOE application process by seeking funds to build the New York Plant but subsequently withdrew this project from its application in or around June 2023 due to increasing protests by local Native American tribes and, as such, no LPO-backed loans could ever be used to complete this property. As a result, these statements were materially false and misleading as to the scope of the proposed Federal financial assistance available to support the buildout of Plug's network of liquid green hydrogen plants consisting of just the New York and Texas facilities at this time, and they omitted material information concerning the current state of affairs of Plug's business activities and growth strategy.

*May 9, 2024*

261.    On May 9, 2024, Plug held a conference call with analysts and investors to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Marsh provided an update on the Company's "significant strides" made in "scaling up our operations" noting "[o]ur hydrogen generation network has been – particularly has seen substantial growth." He went on to add, in pertinent part:

The production facilities in Georgia, Tennessee are currently performing at full capacity and we're eagerly anticipating the completion of our new plant in Louisiana. This addition will not only boost our production capacity by 15 tons per day but also significantly reduce our dependency on third-party hydrogen suppliers.

***Building on this momentum, we are planning the development of up to 6 additional hydrogen plants across United States.*** This expansion is critical for meeting the demand for green hydrogen as industry and transport sectors seek sustainable energy solutions. The strategic placements of these plants will help mitigate logistical challenges, reducing the cost of hydrogen delivery and enhancing our competitive edge in the market.

Plug continues to advance the pending loan guarantee from the Department of Energy and awaits the conditional commitment approval announcement. ***This program is expected to bolster the build-out of Plug's liquid hydrogen facilities throughout the United States. Commensurately, the company has started a process with advisors to complement our anticipated DOE projects with project equity investors and project finance partners to finance the build-out of the plants.***

262.    The foregoing statements identified in ¶261, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.F. *supra*, at the time these identified statements were made Plug had already ceased all efforts to move the New York Plant forward, and as a result, they omitted material information concerning the current state of affairs of Plug's business activities and growth strategy. Further, because of Defendants' continued failure to disclose that the New York Plant had already been removed from the Company's DOE loan application in or around June 2023, these statements were materially false and misleading as to the scope of the proposed Federal financial assistance available to support the buildout of Plug's network of liquid green hydrogen plants consisting of just the New York and Texas facilities at this time.

263.    Additionally, as detailed in Section VII.G. *supra*, the finalized term sheet outlining conditions that must be satisfied prior to the funding of the DOE Loan indicated that Plug needed to secure an equity partner or alternative debt solution to fund the remaining project costs for Texas

69

before any funds would be advanced under the DOE Loan. According to CW1, before they left Plug in February 2024, it was known internally that Plug still needed to fund a large share of each project under the loan facility. CW1 said the announced loan amount did not match the scope of the construction program. Further, according to CW1, Plug lacked both the cash and the credit rating needed to obtain that money elsewhere. As a result, these statements materially misrepresented the Company's need for alternative project equity investors and project finance partners to support the complete buildout of the New York Plant and to meet the conditions precedent to receiving DOE funding for the Texas Plant, not just to "complement [its] anticipated DOE projects."

264.    During the Question-and-Answer portion of the 1Q24 Earnings Call, analyst William Chapman Peterson of JPMorgan Chase & Co asked:

On the DOE loan -- conditional loan approval, it looks like this has been shifted out by around 1.5 months. I thought prior expectations were at the end of March. So I guess what is your latest expectation around timing, the feasibility of securing the loan this year? I guess also even especially ahead of a presidential election? And based off the press release, it sounds like you're thinking the DOE, the process could be waiting on additional, I guess, partners or project, equity investors. If you can explain more of why the delay and what the next steps are and what we should assume and think about for the full year -- for the year on this DOE loan?

265.    Defendant Marsh responded by saying:

So Bill, I may have confused you on that writing. *That activity with equity investors is separated completely from the activity with the DOE*. This activity we started as we think about making sure those projects are fully funded. Look, I remain really excited and I can tell you that the conditional commitment application is moving forward. The momentum is good. And boy, we really do hope to share more news soon.

266.    The foregoing statements identified in ¶265, emphasized in bold and italics, were materially false and misleading when made because, as detailed in Sections VII.E. and VII.G *supra*, they failed to disclose that the DOE Loan offered would not cover the New York Plant buildout nor would it cover the majority of the project costs for Texas, and as such, securing a

70

supplemental debt solution or equity investor to fund the remaining costs to construct the Texas Plant was a gating item to receiving the DOE funds. As a result, these statements were materially false and misleading as to the scope of the proposed Federal financial assistance available to support the buildout of Plug's network of liquid green hydrogen plants consisting of just the New York and Texas facilities at this time.

267.    Also, during the 1Q24 Earnings Call, analyst Christopher Michael Senyek of Wolfe Research, LLC followed up seeking, "on a previous question clarifying the DOE loan. You don't need an equity investor for conditional commitment, but would you need investors or partners to reach a financial close?" Defendant Marsh simply answered, "*No*." Mr. Senyek immediately followed up by asking "then can you perhaps remind us on the timing for receipt of proceeds from the DOE loan on receipt of the conditional commitment?" To which Defendant Marsh responded:

> No. Chris, I -- when I look at it, we want to keep you really informed about what's going on and the exciting developments ahead. It's important to recognize we have ongoing progress since – we've really been teaming well with the DOE. And as I said earlier, we're really -- we have great forward momentum. And on all this, we really hope to share more information soon.

268.    The foregoing statements identified in ¶267, emphasized in bold and italics, were materially false and misleading when made because, when viewed in context, it is evident that when Mr. Senyek asked about the Company needing investors or partners to reach a financial close, he was asking whether it needed to have additional funding secured to receive funds from the DOE Loan. Further, as detailed in Section VI *supra*, the DOE's LPO defines the financial close phase of the application process to include the advancement of funds pursuant to the terms of the executed financial documents. As detailed in Section VII.G. *supra*, the finalized term sheet outlining conditions that must be satisfied prior to the funding of the DOE Loan indicated that Plug needed to secure an equity partner or alternative debt solution to fund the remaining project costs for Texas before any funds would be advanced under the DOE Loan. CW1 repeatedly identified

71

the Company's ability to provide its share of the project cost as an obstacle to receiving funding under the DOE Loan. As a result, by flatly responding "No" to the analyst's inquiry of "would you need investors or partners to reach a financial close," Defendant Marsh created the false impression of a state of affairs that materially differed from the one that actually existed.

*November 12, 2024*

269.    On November 12, 2024, Plug held a conference call with analysts and investors to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Marsh made the following announcement regarding Plug's financing deal with Yorkville Capital:

> EDGAR has been down, but today we announced a $200 million convertible deal with Yorkville Capital. Under the terms of this agreement, Yorkville is committed to a long position with a conversion price of $2.90 and is restricted from shorting Plug stock. Our focus remains on minimizing shareholder dilution by partnering with investors who recognize the Company's intrinsic value. Additionally, we continue to explore debt financing and the sale of ITC benefits to further reduce future equity-based funding needs.

270.    During the Question-and-Answer portion of the 3Q24 Earnings Call, analyst William Chapman Peterson of JPMorgan Chase & Co asked:

> I guess to the extent that you can speak to it, how much is left to be done on the DOE loan closing conditions? Is there any sort of long poles, I guess, in particular for Texas? It seems like N[E]PA is going well. But -- or maybe on the capital side, is there any additional capital on top of what you just announced today? Or as the DOE looking at further contingency reserve requirements? Just trying to get a sense of what remains to be done and what timing you're thinking as of now.

271.    Defendant Marsh responded by stating:

> Yes. So Bill, I'm going to let Paul [Middleton] talk about a process we have going on ***looking for equity partners, but that is not tied to the DOE loan***. And I know everybody would like me to provide detail by detail. All I can say to you is that we know -- we don't see any tall pole in the tent. We know how to execute against it. We've worked with the DOE on making sure there's a clear schedule of events. And certainly, the election in some ways, helped to structure a schedule that allows us to get there. I'll let Paul talk about the process. ***We're not dependent upon it, but the process we're using to look to bring in an equity investor also sits side-by-***

72

*side with us at the project level*.

272. Defendant Middleton followed up by stating:

*Yes. We've kicked off, I think we've talked about a parallel process that looking at strategic and project finance funds and others that could be interested in participating in the capital stack for our pipeline*. That's going very well. We've had a number of partners express interest, and we're engaging in those dialogues. Actually, some of those partners will be at our symposium tomorrow to learn more about the company and learn more about what we're doing there.

So I would say the theme is that they look at the commercial proposition of what we're doing in Georgia and what we're forecasting to do out of Texas, and that's very attractive. *In addition to the fact that the DOE is postured with this facility to provide incredibly low-cost capital for the majority of that pipeline*. So that -- those factors in addition to the success of us executing on delivering on Georgia, all bode well and is what's driving a lot of interest in this to move forward. So very encouraged, and we're working hard at bringing all those things to fruition and more to come in the near term.

273. The foregoing statements identified in ¶¶271-72, emphasized in bold and italics, were materially false and misleading when made because, as detailed in Section VII.G *supra*, they failed to disclose that the DOE Loan offered would not cover the "majority of that pipeline", and as such, securing a supplemental debt solution or equity investor to fund the remaining costs to construct the Texas Plant was a gating item to receiving the DOE funds. As a result, these statements were materially false and misleading as to the scope of the proposed Federal financial assistance available to support the buildout of Plug's network of liquid green hydrogen plants.

*November 13, 2024*

274. On November 13, 2024, Plug hosted a "Special Call" during which analyst George Gianarikas of Canaccord Genuity Corp. asked, "you mentioned that you've sort of peaked in terms of your CapEx, at least in the near term. Can you help us understand what that looks like between now and 2030 as well?"

275. Defendant Middleton responded by saying, in pertinent part:

[I]f you look at electrolyzers, stationary, all the different things we're doing today,

73

material handling, the current plants we have, even the current fuel plants, it's probably like 4% of sales. It's not a lot to maintain and sustain that activity. So we have tremendous leverage opportunity. ***If we think about the green hydrogen platform, we've got Texas, which we're extremely confident about the DOE loan funding the majority of that.*** We've got a lot of capital partners that are thinking about participating in that platform. Actually, some of them are here today to talk to us about opportunities there. So that's more CapEx intensive. But Texas is first, and we're going to do that as we lock in those funding capabilities. So I just segment it in those 2 buckets because the base business, including achieving our plan next year and all the numbers we've talked to, is really tied to that nominal level of CapEx.

276. During the same call, analyst Peiwu (Chris) Tsung of Wolfe Research, LLC asked about the DOE Loan stating "[j]ust assuming you're able to sign a financial close [ ] before inauguration[,] [h]ow much of the 80% could you – that's already been spent at Texas be used? Or like how much more CapEx is needed for Texas?"

277. Defendant Middleton responded by saying:

Yes. So we're working through iterative processes with the DOE on the final budgets. And like any projects, they want lots of contingencies in there. So we're kind of working through that. But I think we've -- well, ***I know we've spent, call it, 30% to 35% or more already on that project. So the balance of what's left is the majority of that, if not almost all of it, will be covered by the DOE loan facility***. And then where there's a narrow part of the gap to cover, that's where we're looking at partners and working with people. And that process is pretty robust, and we're pretty far along with that. So we're pretty confident there'll be partners that can step in and cover whatever is left because, again, in that particular project, we've already put so much equity into it that we're in a good position.

278. The foregoing statements identified in ¶275 and ¶277, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.G. *supra*, the finalized term sheet, and subsequent conditional commitment, outlining the key financial terms of the DOE Loan indicated that the amount to be offered for the Texas Plant would not cover the "majority" of the project costs. According to CW1, before they left Plug in February 2024, it was known internally that Plug still needed to fund a large share of each project under the

74

loan facility. CW1 said the announced loan amount did not match the scope of the construction program. Additionally, according to CW6, even with the DOE loan, the Texas project's economics were poor. CW6 explained that by 2024 and 2025, tailwinds turned into headwinds for hydrogen. CW6 said it would have been another $800 million Plug was going to have to commit, or maybe even closer to another $1 billion dollars. As a result, these statements were materially false and misleading as to the scope of the proposed Federal financial assistance available to support the buildout of Plug's network of liquid green hydrogen plants.

*March 3, 2025*

279.    On March 3, 2025, Plug issued a press release reporting its financial results for the fiscal quarter and year ended December 31, 2024 attached as Exhibit 99.1 to a Current Report filed with the SEC on Form 8-K, signed by Defendant Middleton. In pertinent part, the press release provided an update on Plug's "Liquidity Planning" measures stating, in relevant part:

> Department of Energy (DOE) Loan Update: Plug recently closed the $1.66 billion DOE Loan Guarantee program. Plug has invested over $250 million in the project to date. ***To complete the project, Plug estimates an additional required investment of approximately $600 million. Of this additional investment, the DOE loan is targeted to cover approximately $400M. To cover the investment amount outside the DOE loan, Plug has targeted a process of working with project finance and potential equity investors.*** The Company has made progress aligning with interested parties and anticipates culminating that process commensurate with kicking off the project in the coming months. Construction is expected to take approximately 18 months once its engineering, procurement, and construction (EPC) contractor is mobilized. ***This remains an important project for the future and is expected to benefit the Company and the U.S. market once completed***, but the Company will be prudent about the timing of mobilizing the project to ensure third-party funding given this project is not correlated to near-term sales and margin goals.

280.    The foregoing statements identified in ¶279, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.G. *supra*, CW6 confirmed that, by 2025, the Texas Plant costs had ballooned under the then-current market

75

conditions further hindering actualized interest in the project and Plug's prospects for securing supplemental project finance or equity investors on favorable terms. According to CW6, even with the DOE loan, the Texas project's economics were poor. CW6 said it would have been another $800 million Plug was going to have to commit, or maybe even closer to another $1 billion dollars to complete the buildout of this facility. As a result, these statements were materially false and misleading as to the source and scope of the proposed financial assistance available to support the buildout of Plug's Texas Plant.

*March 4, 2025*

281.    On March 4, 2025, Plug held a conference call with analysts and investors to discuss its financial results for the fourth quarter and year ended December 31, 2024 (the "4Q24 Earnings Call").

282.    During the 4Q24 Earnings Call, the DOE Loan was the subject of multiple analysts' questions. In response to one such question, Defendant Marsh provided an update on conversations with the DOE after the change in administrations and on the timeline for restarting construction at the Texas Plant following funds received under the DOE Loan, stating in relevant part:

> There has been discussions with the DOE and we're pleased at a working level. The individuals we have been dealing with have remained at the DOE. So we're not going through the process of reeducating the team. I think that's a big positive. . . . *We have had regular conversations with the DOE over the past month. I personally will be spending time with them this week. So from an engagement point of view, and look, we're in very, very red districts. We're in Texas where we're looking to build this. And I can tell you the local political teams, political folks in that region are strong supporters of this and are reaching out to make sure that this loan is executed on the deal that we came to.* I would expect that construction of this project will most likely happen in the fourth quarter and that you can say 18 months to 24 months before it's completed.

283.    In response to another analyst question during the 4Q24 Earnings Call, Defendant Middleton represented that Plug did not face any significant additional "obstacle[s]" to receiving

funds associated with the DOE Loan, characterizing remaining steps as "the bureaucracy of crossing the T's and dotting the I's", stating in relevant part:

There's not new conditions. The loan was finalized in early January. The only thing that we have to do is, and *it's approved, the way it works is the loan itself has been papered, documented and approved. Everything's there.* To apply the first project, which is Texas, there's some specific things that we have to put in place in terms of like direct agreements between the DOE and the EPC contractors. An example is just one microcosm example. *So those are things that we're working on. We're really close.*

And they're not necessarily additional conditions that make it — any obstacle is just really — unfortunately, the parties that work on these things that we're working with have done many other deals with the DOE, so they're used to working with the DOE on these kind of ancillary agreements. *And so it's more just, I would say, for lack of better words, the bureaucracy of just putting crossing the T's and dotting the I's and putting all those residual components in place to officially kick-off Texas as a project underneath that structure*.

284.    The foregoing statements identified in ¶¶282-83, were materially false and misleading when made because they created an impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.H. *supra*, multiple CWs confirmed that the internal actions and statements made by Plug management did not match Defendant Marsh's public statements that hydrogen was not a partisan issue and that people from both parties supported it. These CWs also confirmed that there were actions being taken internally suggesting that because Plug failed to receive the first advancement under the DOE Loan prior to the presidential transition, it had no shot at getting the funds. Moreover, as detailed in Section VII.I. *supra*, at this point Plug had already abandoned all efforts to progress this project forward and was exploring alternative options for the real property and other related assets associated with the Texas Plant.

77

285.    Also, during the 4Q24 Earnings Call, an analyst asked Defendants "how are you looking at data center backup power generation" and how they "see Plug benefitting from that in 2025?" In response, Defendant Marsh stated:

> ***To be direct, I don't see it as a benefit in 2025***. Our view is that, when it comes to hydrogen, one of the biggest challenges to make sure that you can support long duration outages and that requires a great deal of hydrogen storage on site. We think that business opportunity is a '28, '29 opportunity. Really to be successful, we really think you need hydrogen pipelines that you can store hydrogen in. And there are some data centers in Europe that could make sense in the future. ***But I would not expect revenue from that segment of any size over the next two to three years***.

286.    The foregoing statements identified in ¶285, emphasized in bold and italics, were materially false and misleading when made because they created an impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.I. *supra*, at the time these statements were made, Plug was already analyzing a strategic pivot to selling its real property and related assets associated with the New York and Texas projects to data-center developers.

287.    During the 4Q24 Earnings Call, analyst Andrew Salvatore Percoco asked:

> [C]oming back to the DOE loan for a second. I think in the press release, you guys cited $400 million of coverage from the DOE loan on $600 million of incremental investment. I mean that implies about 2/3 coverage on an advance rate. I think you guys had previously talked about 80% advance rates on the DOE loan. So just curious what the delta is there and if there's been a change in maybe the advance rate assumptions that you're having on that facility?

288.    To which Defendant Middleton responded by saying:

> ***Yes, there's no change. It's up to 80%. And the dynamics on each project will vary based on the size of the plant and other factors. And we also have -- some of that is a decent amount of contingency in those assumptions***. And so obviously, with the learnings that we've had in Georgia and now Louisiana, we hope that -- we feel like that we're in a pretty good position that we won't use all that. So that's, I guess, the dynamic, Andrew, in terms of how it plays.

289.    Mr. Percoco followed up by asking:

> [M]aybe just sticking with CapEx for a second. You quote $250 million that you've

already spent on the project. Another $600 million that you need to spend gets you to about $850 million all-in on a 45 ton per day plant. And if I just do that conversion, it implies like $19 million to $20 million of CapEx per ton per day of production, which I think is actually a little bit higher than Georgia. So just curious. Can you just maybe walk through some of your assumptions there? I guess I would have thought it would be lower than Georgia, just given some of the learnings that you guys have discussed. So any color there would be helpful.

290.    Defendant Marsh responded by stating, "I don't know that the math is right. But Georgia will come in around $800 million with contingency, and the contingency is probably 10%, 15%. *And so there's built-in contingency in that Texas number. So overall, I think before the contingency, it will come in around $700 million*."

291.    The foregoing statements identified in ¶288 and ¶290, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.G. *supra*, CW6 confirmed that, by 2025, the Texas Plant costs had ballooned under the then-current market conditions. According to CW6, even with the DOE loan, the Texas project's economics were poor. CW6 said it would have been another $800 million Plug was going to have to commit, or maybe even closer to another $1 billion dollars to complete the buildout of this facility. As a result, these statements were materially false and misleading as to the scope of the Federal financial assistance available to support the buildout of Plug's Texas Plant.

*May 12, 2025*

292.    On May 12, 2025, Plug held a conference call with analysts and investors to discuss its financial results for the quarter ended March 31, 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Marsh represented that, with the Company's Offering, it had sufficient funds to cover the remaining costs to build out the Texas Plant:

> On capital, we've taken some important steps to ensure financial flexibility. *In March, we raised $280 million in equity*, bolstering liquidity while reducing risk in a volatile market. We followed that with a $525 million structured financing

79

facility, part of which was used to retire convertible debt. ***Combined with the $1.66 billion Department of Energy loan guarantee, these moves provide a strong foundation to support our infrastructure goals***. That said, I want to be forthright. With the change in administration, we're actively working with the DOE to advance the loan process. ***The underlying program is contracted, obligated and we believe secure and we continue to engage closely with the administration***. At quarter end, we held nearly $300 million in unrestricted cash with meaningful additional capacity under the new facility. Our outlook remains unchanged. We do not anticipate raising additional equity in 2025, and we remain committed to that goal.

293.    Later in the 1Q25 Earnings Call, in response to an analyst's request to "remind us how much you have already spent on Texas" and "how much what [sic] the CapEx looks like", Defendant Marsh again reaffirmed the connection between the Offering and the Texas Plant, stating:

We've spent $250 million. ***The CapEx is $800 million. The DOE loan is for approximately $400 million. And we've been working with an equity investor for the rest***. So we've already spent $250 million over $800 million, is about 37%.

294.    The foregoing statements identified in ¶¶292-93, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.G. *supra*, CW6 confirmed that, by 2025, the Texas Plant costs had ballooned under the then-current market conditions. According to CW6, even with the DOE loan, the Texas project's economics were poor. CW6 said it would have been another $800 million Plug was going to have to commit, or maybe even closer to another $1 billion dollars to complete the buildout of this facility. Additionally, as detailed in Section VII.H. *supra*, CW5 confirmed that Plug's March 2025 Offering was the result of its depleted cash reserves and because it was struggling to fund payroll and was not paying vendors, not for the funding for the Texas Plant. As detailed in Sections VII.G. and VII.I. *supra*, CW6 confirmed that as of the time these statements were made Plug did not have enough money to complete its planned projects and was exploring alternative options for the real property and other related assets associated with the Texas Plant.

80

295.    Further, Defendant Marsh's statements that "[t]he underlying program is contracted, obligated and we believe secure" were materially false and misleading because, as detailed in Section VII.H. *supra*, multiple CWs confirmed that the internal actions and statements made by Plug management, including Defendant Marsh, did not match his public statements about the security of the DOE Loan. These CWs also confirmed that there were actions being taken internally suggesting that because Plug failed to receive the first advancement under the DOE Loan prior to the presidential transition, it had no shot at getting the funds.

296.    Then, in response to analyst Colin William Rusch's request for "an update on how the hydrogen production facilities are operating" and "[w]hat you're looking at from a yield perspective versus expectations," Defendant Marsh represented that the construction of the Texas Plant remained a top priority for Plug stating:

> So I think how many tons was it, 300 tons out Georgia in April? Yes. So Georgia is beginning to run without too much management involvement, Colin. It turns on and runs every day. Louisiana, boy, it's probably I think what I've been most impressed with is, look, it's our third time around. It's a much cleaner design than Georgia and Tennessee. We really have learned how to build plants, which is really important for Jose [Crespo] in building out the electrolyzer market. So we're quite pleased with the progress we're seeing at all three sites. ***I think the question is we need to get Texas started by year's end and I think that's a real focus of the business***.

297.    The foregoing statements identified in ¶296, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Section VII.I. *supra* and further supported by the allegations in Section X.C. *infra*, at the time these statements were made, Plug had already abandoned all efforts to progress this project forward and was exploring alternative options for the real property and other related assets associated with the Texas Plant.

81

*July 7, 2025*

298.    On July 7, 2025, Plug held a "Special Call" to discuss the recent passage of the "One Big Beautiful Bill", solidifying the Section 45V Clean Hydrogen Production Tax Credit and Section 48E Investment Tax Credit. During the Question-and-Answer portion of this call, analyst Christopher J. Dendrinos of RBC Capital Markets posed the following question:

> I guess my question just relates to the planned build-out of Texas and then maybe New York in the future. And how are you thinking about that, call it, self-generation build-out? Does this b[ill] change that development strategy or the pace at which you go at?
>
> **Defendant Marsh**: Yes. So Chris, ***I don't feel rushed. But also the certainty for the next 3 plants for -- when you start looking at the equipment we own, we have most of our equity components that we've already spent. And I think what you'll probably see is that probably don't change our plans***. We're probably commencing construction of Texas before the year's end. If you go look at the annual meeting, I actually have a slide there that shows how Texas has been cleared. The electricity is there. We've connected the plant. The water for -- the water line for the electrolyzers is there. I can tell you it's also the fact that there's clarity makes it a lot easier to bring in a potential equity partner side by side with us in the plant.
>
> So I -- we have weekly meetings with the DOE on the loan program. This just makes everything much, much easier. And I think, Chris, ***I'll commence construction of one plant this year. And probably there's a good possibility a second one in '26 and maybe a third in '27, depending upon how market demand is.*** And quite honestly, the 48E language is very, very helpful for market demand.
>
> **Mr. Dendrinos**: Got it. I guess maybe as a follow-up, and I apologize, it might be slightly off topic, but just any extra color you can provide on the status of the DOE loan and those conversations?
>
> **Defendant Marsh**: Sure. So Chris, as I mentioned, we are literally meeting with the DOE weekly. ***I'll be down there either this week or next week to meet with the folks at the Department of Energy. I think our focus will be on how to get the first 3 plants rolling in the next 3 years. And again, policy certainty helps the DOE, too, as they work through these decisions.*** It certainly makes the business case even stronger.

299.    The foregoing statements identified in ¶298, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Sections VII.F. and VII.I.

82

*supra* and further supported by the allegations in Section X.C. *infra*, at the time these statements were made, Plug had already abandoned all efforts to progress the New York and Texas facilities forward and was exploring alternative options for the real property and other related assets associated with the projects. Indeed, at the time these statements were made Plug was already in negotiations with Stream to purchase these assets and, as confirmed by CW6, the Company was nowhere closer to securing funds needed to resume construction of Texas Plant.

*July 9, 2025*

300.    On July 9, 2025, Plug issued a press release via *Globe Newswire* which announced Plug's "new multi-year enhanced supply agreement with a leading U.S.-based industrial gas company and longtime hydrogen partner through 2030" (the "July 2025 Press Release"). In pertinent part, the July 2025 Press Release represented that:

> Plug's diverse and growing customer base, along with ***the continued rollout of new sites, demands the ongoing expansion of its hydrogen solutions and supporting network. While Plug continues to scale its own hydrogen production capacity, current market dynamics and anticipated growth necessitate a mix of hydrogen solutions and strong partnerships to advance the industry***. Strategic supply agreements like this one allow Plug to meet growing application demand while preserving resources and strengthening partnerships across the value chain.
>
> Plug is rapidly expanding its generation network to ensure a reliable, domestically produced supply, with hydrogen plants currently operational in Georgia, Tennessee and Louisiana. Together, these facilities represent 40 tons per day of liquid hydrogen production capacity, ***with additional plants under development to further increase Plug's footprint and support national infrastructure needs.*** Plug is launching over 40 new sites in 2025 and anticipates continued growth in the industry in 2026 onward, expanding the need for more ubiquitous and cost-efficient hydrogen supply.

301.    Defendant Marsh was also quoted in the July 2025 Press Release declaring this contract "a win for Plug" stating, in pertinent part: "***[t]his expanded agreement supports our mission to build on our already robust and resilient hydrogen network in the U.S***."

302.    The foregoing statements identified in ¶¶300-01, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Sections VII.F. and VII.I. *supra* and further supported by the allegations in Section X.C. *infra*, at the time these statements were made, Plug had already ceased all efforts to move its network of liquid green hydrogen plants forward and had already begun exploring alternative options for the real property and other related assets associated with the previously planned green hydrogen plants to be located in New York and Texas. Further, as detailed in Section VII.J. *supra*, Defendant Marsh would later admit that contrary to his public representations identified above, this agreement actually "reduces the need for near-term self-development of new plants."

*August 11, 2025*

303.    On August 11, 2025, Plug held a conference call with analyst and investors to discuss its financial results for the fiscal quarter ended June 30, 2025 (the "2Q25 Earnings Call"). During the 2Q25 Earnings Call, Defendant Marsh again assured analysts that:

> On the DOE loan, we continue to work constructively with the loan program office to align with evolving priorities. ***We remain confident in our ability to begin construction on DOE supported projects before the end of the year***, accelerating the expansion of our hydrogen generation network.

304.    Also during the 2Q25 Earnings Call, an analyst asked Defendant Marsh specifically "to give an update on your plans for the Texas facility." In response, Defendant Marsh stated:

> ***So, we're looking to commence construction by the end of this year for Texas***. If you start thinking about Texas, we have a lot of -- we have the power from our 310 megawatt deal with NextEra at very competitive electricity prices. We've already -- we already have the water available at the site, as we work very closely with the local community in establishing the availability of water. We have the equipment for Texas. ***We're working very closely with the DOE***. I got to tell you, we met with Greg Beard, who heads the DOE loan program. And I walked away very, very impressed with his knowledge of the energy market and what we're looking to accomplish. I think that we are looking at working with the DOE to finalize their support for taxes with the new Trump administration, which quite honestly has been

84

very supportive of this project. And we're looking to, a good chance we'll look to bring a partner in by the mid-fourth-quarter.

305.    The foregoing statements identified in ¶¶303-04, emphasized in bold and italics, were materially false and misleading when made because they created the impression of a state of affairs that materially differed from the one that actually existed. As detailed in Sections VII.F. and VII.I. *supra* and further supported by the allegations in Section X.C. *infra*, at the time these statements were made, Plug had already abandoned all efforts to progress the New York and Texas facilities forward and had already begun exploring alternative options for the real property and other related assets associated with these previously planned hydrogen plants.. Indeed, at the time these statements were made Plug was already in negotiations with Stream to purchase these assets. Roughly two weeks later, on August 26, 2025, Stream sent a letter to the GCEDC advising that the company had "identified an opportunity to secure additional capacity and increase the scale of the Project, such that the Project will increase both in terms of power consumption and the useable square footage of the Facility." Such opportunities to "secure additional capacity and increase the scale of the Project" referred to Stream's purchase of Plug's New York property and related electricity rights.

*November 10, 2025*

306.    On November 10, 2025, Plug issued a press release attached as Exhibit 99.1 to a Current Report filed with the SEC on Form 8-K, signed by Defendant Middleton. The November 10, 2025 press release announced that Plug "expects to generate more than $275 million in liquidity improvement ***through a combination of asset monetization, release of restricted cash, and reduced maintenance expenses***." It went on to provide, in pertinent part:

> As part of this initiative, Plug has signed a non-binding Letter of Intent ***to monetize its electricity rights in New York and one other location*** and collaborate with a U.S. data center developer. The project developer is actively expanding its data center platforms across the country, and Plug will work with them to explore

85

providing auxiliary and back-up power solutions utilizing Plug's advanced fuel cell technology.

\*\*\*\*

In connection with this initiative, ***Plug will suspend activities related to the Department of Energy loan program*** and reallocate capital toward higher-return opportunities across its hydrogen network. The company's recently executed hydrogen supply agreement with a global industrial gas leader provides competitively priced, long-term hydrogen supply - reducing the near-term need for self-developed generation in the near term.

\*\*\*\*

***Plug will continue to evaluate strategic hydrogen production and power infrastructure projects that align with its long-term cost roadmap*** and expanding customer base across mobility, industrial, and stationary power applications.

307.    Also on November 10, 2025, Plug held a conference call with analysts and investors to discuss its financial results for the quarter ended September 30, 2025 (the "3Q25 Earnings Call"). During the 3Q25 Earnings Call, Defendant Marsh repeated Plug's contemporaneous announcement of its "***strategic initiative to monetize our electricity rights in New York and one other location*** in partnership with a major U.S. data center developer," and "***suspended activities under the DOE loan program***."

308.    During the Question-and-Answer portion of the 3Q25 Earnings Call, analyst Sherif Ehab Elmaghrabi posed the question: "on the electricity rights, are those permanently being signed over? Or some years down the road, do you have the ability to come back and use that power to produce green hydrogen?"

309.    Defendant Marsh responded by saying:

We are permanently signing them over. ***It doesn't mean that there couldn't be other relationships established, but we are permanently signing them over.*** And look, as I mentioned before, by showing we can build plants, we dramatically changed the competitive environment for purchasing hydrogen.

And that our goal is to continue to work with these folks and look for opportunities to deploy hydrogen where it makes sense. So -- and look, I think when you look at what this will do for our balance sheet and the fact that we're taking care – we'll

86

take care of a good deal of the debt overload -- overhang. I think it will be -- I think investors will see this is really will be a real good decision for the company long term.

310.    The foregoing statements identified in ¶¶306-07 and ¶309, emphasized in bold and italics, were materially false and misleading when made because they created an impression of a state of affairs that materially differed from the one that actually existed. As detailed in Sections VII.I. and VII.J. *supra*, Plug's so-called "monetization of electricity rights and operational efficiencies" also included the sale of the real property associated with the New York Project, and ultimately the Texas Project as well, effectively terminating Plug's plans to build additional hydrogen plants in the near- and long-term. As a result, Defendants' statements materially misrepresented the Company's existing growth plans.

*February 2, 2026*

311.    On February 2, 2026, Plug held its annual meeting of stockholders (the "2026 Annual Meeting"). During the 2026 Annual Meeting, Teal Vivacqua Hoyos, Plug's Director of Marketing Communications, prompted Defendant Marsh to detail "[w]hat milestones have been achieved in scaling plugs hydrogen production in your U.S. plants?" To which he responded by stating, in pertinent part:

> Yes. I love the plan in Georgia. When I go there, it's kind of remarkable and cost money to build. But between there, the site that we did with O[li]n, which I have to say lots of the learnings from the first hydrogen plant we pushed on to the second hydrogen plant in Louisiana. ***Look, I don't expect to do it this year, but we are thinking about the future.*** And not only ***providing hydrogen and building plants with our sales and partners,*** but how you think about, for example, the space industry, when you kind of look at our deal with recent deal with NASA.
>
> So I'm excited about where the plants could be. ***We have some really kind of interesting thoughts going on with plants and maybe data centers and coupling them together. So there's a lot of fascinating work going on make those plants continue to grow the plants***. …

87

312.   The foregoing statements identified in ¶311, emphasized in bold and italics, were materially false and misleading when made because, as detailed in Sections VII.I. and VII.J. *supra*, Defendants failed to disclose that Plug's so-called "monetization of electricity rights and operational efficiencies" also included the sale of the Company's real property and related assets associated with the Texas Plant – Plug's only other announced location and build order for its North American network of liquid green hydrogen plants. As a result, contrary to Defendant Marsh's representations Plug was not "coupling them together" but rather its undisclosed plans were to sell its real property to the data centers and cease it efforts to build hydrogen plants.

*March 2, 2026*

313.   On March 2, 2026, Plug held a conference call with investors and analysts to discuss its financial and operational results for the fourth quarter and fiscal year ended December 31, 2025 (the "4Q25 Earnings Call"). During the Question-and-Answer portion of the call, analyst Sherif Ehab Elmaghrabi asked about the Company's recent revelation that it had agreed to sell its real property and related assets associated with the New York Plant, posing the following question:

> When you think about a potential hydrogen plant like New York versus the liquidity opportunity that presents, any insight you can share as to how you balance that cash with your hydrogen fuel demand 2 years down the road, 5 years down the road?

314.   Defendant Crespo responded by stating:

> Sherif, thank you for the question. So we have looked very carefully at our hydrogen needs and the potential or the probability or the possibility to monetize the assets like we did, that we're planning to do in New York.

> We mentioned this also in the prior earnings call. What we have been able to do is we have been able to get to an agreement with one of the largest IGCs to provide hydrogen for us at reasonable cost, much better cost than we were getting before. And that added to the current capacity that we have right now, which is about 40 tons a day nominal capacity. And added to the possibility that we have also, and we are discussing with some customers that are planning to do liquefaction to take some offtake from those potential projects. We're comfortable that we have a good path for -- to cover the demand in the next few years based on our projections for growth, especially in the material handling market.

So we found that the capability to be able to monetize those assets was something that it was more valuable for Plug at this moment than making the investment of building a plant in New York. We have not -- *we put all those plans for growth for production on hold at this moment. That doesn't mean that in the future, we may not pick up some of these plans when we are able to show that we can perform financially,* and maybe able to finance these projects in a much more efficient way. But at the moment, monetizing those projects and with the hydrogen availability that we have visibility for, we feel that this is the best solution and the best path forward for Plug.

315. The foregoing statements identified in ¶314, emphasized in bold and italics, were materially false and misleading when made because, as detailed in Sections VII.I. and VII.J. *supra*, Defendants failed to disclose that Plug's so-called "monetization of electricity rights and operational efficiencies" also included the sale of the Company's real property and related assets associated with the Texas Plant. As a result, contrary to Defendant Crespo's representations these efforts did, in fact, mean Plug could not pick up these plans in the future.

## IX.    LOSS CAUSATION

316. At all relevant times, Plug securities traded in an open, well-developed, and efficient market that promptly digested new information regarding Plug from all reasonably accessible public sources and reflected such information in the price of Plug securities.

317. As described above, throughout the Class Period, Defendants made false and misleading statements that misrepresented and/or failed to disclose the adverse facts detailed herein. Defendants' false and misleading statements caused Plug securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiffs and other members of the Class who purchased or otherwise acquired such securities before such the inflation was removed.

318. As detailed herein, the price of Plug securities fell precipitously on high trading volume in response to information released to the public on October 7, 2025, November 10, 2025, November 13, 2025, February 26, 2026, and July 13, 2026. The price of Plug securities fell in

89

response to each such corrective disclosure and/or materialization of a concealed risk by revealing information that removed part of the inflation introduced by Defendants' previous misstatements and material omissions, causing real economic loss to Plaintiffs and other members of the Class who purchased Plug securities during the Class Period at inflated prices.

319.    As detailed more fully above in Section VII.J., investors learned through a series of partial disclosures about the true facts or risks concealed by Defendants' misstatements. Each of these disclosures revealed, for the first time, new information about Defendants' fraud that was previously unknown to the market. Investors had been in the dark about these undisclosed facts or concealed risks, and, thus, as the news was released and investors were able to consider the ramifications for Plug, its business and financial prospects, the price of the Company's securities dropped precipitously, thereby damaging Plaintiffs and other members of the Class who had invested in those securities.

320.    *First,* during pre-market hours on October 7, 2025, Plug announced that Defendant Marsh would step down from his role as CEO, "effective as of the date [Plug] files its [2025] Annual Report", and that Mr. Shrestha would step down from his role as President, "effective as of October 10, 2025[.]" Plug concurrently announced the appointment of Defendant Crespo to both roles. The abrupt and unexpected departure of two key executives just one month before Plug's scheduled annual symposium and expected issuance of its financial and operating results for the third quarter of 2025 signaled a material and imminent change in Plug's business, growth strategy and/or operations.

321.    On this news, Plug's stock price fell $0.32 per share, or 7.64%, from an opening price of $4.19 per share on October 7, 2025, to close at $3.87 per share later that day.

90

322. Defendants later admitted that these departures were directly related to the Company's shift in business strategy and ultimately its abandonment of growing its network of liquid green hydrogen generation in North America.

323. Indeed, during the 3Q25 Earnings Call, Defendant Marsh addressed Plug's contemporaneous announcement to "suspend activities under the DOE loan program" following the recently expanded hydrogen supply agreement and non-binding LOI with a U.S. data center developer to "monetize our electricity rights in New York and one other location" stating, in pertinent part, that "[t]ogether, these actions strengthen our balance sheet, expand our reach into dynamic new markets and reinforces our disciplined approach to capital allocation." To which he immediately followed by stating:

> Finally, I want to touch on leadership. As announced last month, Jose Luis Crespo will become Chief Executive Officer on March 1.
>
> Jose has been instrumental in driving Plug's commercial growth and building our customer relationships worldwide. This transition represents continuity and strategy, not change. The road map we've built together remains in place, focused on growth, profitability and disciplined execution. But also, look, the world changes. It gives Jose the flexibility to resolve -- to evolve our strategy as the hydrogen market mature.
>
> He is the right leader for this next chapter, and I am confident Plug will continue to thrive under his direction. In summary, Plug's progress this quarter demonstrates a company that is executing, improving and building momentum. Our technology, people and strategy are delivering results and the fundamentals of our business have never been stronger.

324. *Second*, on November 10, 2025, during pre-market hours, Plug announced that it expected to generate more than $275 million in liquidity improvement through "a combination of asset monetization, release of restricted cash, and reduced maintenance expenses." The Company went on to reveal that in connection with this initiative, Plug would suspend activities related to the DOE loan, noting its recently executed hydrogen supply agreement had reduced the near-term need for self-developed generation in the near term.

91

325.    On this news, Plug's stock price fell $0.40 per share, or 13.65%, from an opening price of $2.93 per share on November 10, 2025, to a closing price of $2.53 per share on November 11, 2025.

326.    *Third*, during market hours on November 13, 2025, *The Washington Examiner* reported that Plug had "confirmed . . . that it suspended activities" on "its plans to construct six facilities to produce and liquefy zero or low-carbon hydrogen, putting at risk" the $1.66 billion DOE Loan it closed in January.

327.    On this news, Plug's stock price fell $0.45 per share, or 16.67%, from an opening price of $2.70 per share on November 13, 2025, to closing price of $2.25 per share on November 14, 2025.

328.    *Fourth*, on February 26, 2026, during after-market hours, Plug announced it had entered into definitive agreement with Stream, pursuant to which it had agreed to sell its real property and related assets associated with the New York Plant.

329.    On this news, Plug's stock price fell $0.12 per share, or 6.28%, over a single trading day from a closing price of $1.91 per share on February 26, 2026 to close at $1.79 per share on February 27, 2026.

330.    *Finally*, on July 13, 2026, during pre-market hours, Plug announced two additional transactions with Stream, revealing that it had signed a definitive agreement to sell its real property and related assets associated with the Texas Plant.

331.    On this news, Plug's stock price fell $0.06 per share, or 2.69%, over a single trading day to close at $2.17 per share on July 13, 2026.

332.    Each decline in the price of Plug securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or

92

the materialization of risks concealed by the fraud.  The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein. Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiffs and other Class members to suffer economic losses, *i.e.*, damages under the federal securities laws.

## X.    ADDITIONAL FACUTAL ALLEGATIONS PROBATIVE OF SCIENTER

333.    As detailed more fully above, the Individual Defendants received information reflecting the true facts regarding Plug and its operations and business practices and had control over and/or received the Company's materially misleading statements before they were issued to the investing public. Accordingly, the Individual Defendants acted with scienter because at the time they issued public documents and other statements in Plug's name, they knew, or were severely reckless in not knowing, that such statements were materially false and misleading.

334.    Indeed, the ongoing fraud described herein could not have been perpetrated without the knowledge and/or severe recklessness and complicity of personnel at the highest level of Plug, including the Individual Defendants. The Defendants knew such statements would be disseminated to the investing public, knew that investors were likely to rely upon those material misrepresentations and omissions, and knowingly or recklessly participated in the dissemination of such statements and documents to the investing public. Thus, the Individual Defendants were active and culpable participants in the fraudulent conduct alleged herein.

335.    These facts, in conjunction with the additional indicia of scienter alleged below, collectively and holistically support a strong inference that, throughout the Class Period,

93

Defendants knew or, at a minimum, recklessly disregarded, that their statements were materially false and misleading when made.

### A.    Defendants Had Actual Knowledge and/or Access to Adverse Information

336.    The Individual Defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known and/or accessible to them at the time.

337.    As detailed in Section VII.H. *supra*, CWs 2, 3, 4, and 5 each recalled that Plug employees heard repeated updates about the Company's efforts to secure funds under the DOE Loan from Defendant Marsh during company-wide weekly "all-hands" meetings. CW5 recalled that Plug had a call with the DOE's LPO at least weekly and said Defendant Middleton was on all of them. CW3 also identified Defendant Middleton as a leader of the Company's DOE Loan effort.

338.    At all relevant times, Defendants were aware of the key financial and commercial terms of the DOE Loan. As detailed in Section VII.G. *supra*, CW1 identified Plug's ability to provide its share of the remaining project costs as a known obstacle to receiving funding under the DOE Loan before their departure from the Company in February 2024.

339.    According to CW3, during an all-hands meeting, Defendant Marsh said that funding would not be available for the renewable hydrogen market after the change in administrations. CW3 added that Defendant Marsh told Plug employees that the Trump administration was not friendly to hydrogen, so that is why they needed to meet the January 2025 deadline to get the funding good to go before the administration change. CW5 also said internally at Plug, there were actions being taken that would suggest that Defendants knew that if this went past the presidential transition, then Plug had no shot at getting the funds.

340.    CW4 recalled Defendant Middleton mentioning during an all-hands meeting held at the end of 2024 or early 2025 that Plug had missed a deadline for the DOE Loan. Then, CW4

recalled that, around Plug's mass layoff in March 2025, there was also verbiage or something being said around that time that the DOE Loan was in jeopardy; it was not going to happen.

341. As detailed in Section VII.I. *supra*, CW6 describes meeting with Defendant Crespo and Mr. Shrestha directly, in or before May 2025, to pitch the strategic pivot, developed by CW6 with the support of their supervisor and the Investor Relations team and materialized in a slide deck, for Plug to sell off its Texas and New York land it was planning on building in its green hydrogen plants on to data-center developers. CW6 said the proposal was based on several conclusions drawn from internal reports and cash flow models including that Plug did not have enough money to complete its planned projects and the Texas Plant did not have enough demand.

342. In addition, the Individual Defendants were directly provided with and/or had access to numerous internal reports and data that closely tracked the Company's existing capital and capital expenditures. As these internal reports and data materials closely tracked the Company's existing capital and capital expenditures, Defendants clearly knew or deliberately disregarded the estimated costs to build the Texas and New York projects as well as the money (or lack thereof) Plug was investing in moving these sites forward during the Class Period.

343. When reporting Plug's financial results for the fiscal year ended December 31, 2021 on Form 10-K, filed with the SEC on March 1, 2022, the Company explained that, during the third quarter of 2021, it launched a new organizational design, reportedly positioning it to meet the growing demand for its green hydrogen solutions. Plug claimed that its new organizational structure, with one operating and reportable segment, was designed "to help Plug achieve its stated business growth goals, including building five green hydrogen production plants."

344. Additionally, at this time, Plug's CEO "was identified as the chief operating decision maker (CODM). All significant operating decisions made by management are largely

based upon the analysis of Plug on a total company basis, including assessments related to our incentive compensation plans." Plug issued the same statement in each subsequent quarterly and annual report filed with the SEC through 3Q24, filed on November 12, 2024.

345.     In a letter submitted to the SEC on behalf of Plug, dated September 11, 2024 and signed by Defendant Middleton, Plug responded to inquiries about the Company's segment reporting and "the specific revenue categories included in the information regularly provided to [Plug's] chief operating decision maker" providing, in pertinent part, that "we confirmed that the level at which revenue is disaggregated for regular review by the chief operating decision maker ('CODM') is the same as what is presented in the notes to the consolidated financial statements. We have one reportable segment and the CODM is regularly provided with the revenues for these categories of revenue."

346.     Subsequently, when reporting the Company's financial results for the fiscal year ended December 31, 2024, Plug included the following additional information when describing its one operating and reportable segment:

> The information regularly provided to the CODM used to assess performance and allocate resources is the same as the Company's consolidated financial statements. The measure of segment profit or loss used by the CODM in assessing segment performance and how to allocate resources is consolidated net loss which is presented in the consolidated statements of operations. ***The CODM uses net loss in strategic planning, for example, decision making of whether to allocate resources towards strengthening sales channels, investing in research and development, focusing on cost-down initiatives, and/or analyzing company overhead in respect to specific products and service lines***. Net loss is also used to monitor budget versus actual results and is considered in assessments related to company-wide incentive compensation. The significant segment expenses included within the segment measure of profit or loss are total costs of revenue, research and development expense, selling, general and administrative expense, and impairment expense. Other segment items are comprised of restructuring, change in fair value of contingent consideration, interest income, interest expense, other expense, net, realized loss on investments, net, change in fair value of equity securities, loss on extinguishment of convertible senior notes and debt, change in fair value of convertible senior note, loss on equity method investments, income tax benefit and

96

net loss attributable to non-controlling interest, which are presented in the consolidated statements of operations. The CODM is not regularly provided a measure of segment assets.

347. Plug issued the same statement in each subsequent quarterly and annual report filed with the SEC throughout the remainder of the Class Period, including following Defendant Crespo's succession as CEO, effective March 2, 2026.

348. Worse yet, Defendants failed to disclose that they were considering alternative sources of liquidity, including the sale of its real property resulting in the abandonment of plans for Texas and New York plants. During the 4Q24 Earnings Call, Defendant Marsh specifically refuted that Plug would generate revenue "of any size" from the data center sector "over the next two to three years", before declaring on November 10, 2025, that the non-binding LOI with Stream had "***been far along***" before the Company announced its execution.

349. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

### B. Defendants Held Themselves Out as Knowledge

350. Defendants knew investors and analysts were acutely interested in the Company's plans to buildout its network of liquid green hydrogen plants across North America and, more specifically, Plug's ability to secure outside funds through the DOE to complete the construction of its facilities in New York and Texas, because they were repeatedly ask about these critical topics throughout the Class Period. Defendants consistently spoke to those subjects with authority, further indicating that they either had actual knowledge of the subject matters discussed (and thus the truthful information omitted) or were reckless to the likelihood of misleading investors by speaking with authority as to subjects about which they actually were uniformed.

97

351. For example, in addition to certain relevant statements described in Sections VII and VIII *supra*, according to Defendant Marsh's statements made during the Company's "Special Call" on January 23. 2024, Defendants knew the cost of the Texas Project as of the execution of the EPC contract with Kiewit on July 7, 2023. Indeed, during this call, the following exchange took place between an analyst and Defendant Marsh during which he stated that the EPC contract secured a commitment based on what the lump sum cost to construct the project would be:

> **Craig Irwin ROTH MKM Partners, LLC**: I wanted to ask specifically about Georgia. I know it's been painful for you over the last many months, and you spent a lot more money than you wanted to. Can you maybe give us a little color. The money that you sunk into getting that up successfully, right, in production today, how much of that was for design tweaks, design evolution and unforeseen engineering challenges versus money that might recur for additional sites and necessitate some of these price increases that you've talked about? And is it a natural margin uplift on the price increase, I guess, is really the second part of the question?

> **Defendant Marsh:** Yes. So Craig, I think the biggest cost delta and the biggest learnings really had to do with construction cost and managing EPCs. And part of that was really difficult because it was a first of its kind and the EPC was not willing to commit to how much it would cost. And we, during that process, we certainly made design changes.

> But when we look at Texas, for example, we've been able to get [indiscernible] with a commitment on what the cost is going to be. That probably is the major difference between -- and look, I appreciate the fact that EPC didn't want to quote something that was never done before. Now that they can -- now that EPC can see what it takes and how to build it, I think that's important. …

352. Likewise, as of May 2023, Plug reported to have identified an EPC management company for the New York Plant, allowing construction to commence.

353. Defendants' public statements likewise indicated that, as of January 2024, they knew the main conditions of the DOE Loan when they received notification that Plug's application had been submitted to the Credit Review Board for final considerations and issuance of a conditional commitment following the finalized term sheet negotiations with DOE's LPO.

354. Indeed, during the Company's Special Call held that month, Defendant Middleton responded to analyst William Chapman Peterson's inquiries about the DOE Loan, specifically, "what are the exact steps and timing between now and receiving the loan? What is the current review board looking for? Are there any technical milestones to be completed or verified by the DOE?", by representing, in pertinent part, that:

> [T]he reason why this particular milestone is a critical and important one is they've completed, by and large, all their technical diligence, they've done market diligence on the hydrogen market. They've done a lot of diligence on Plug. Andy [Marsh] mentioned the 87-page term sheet that we've had to pull together in addition to all the credit write-ups.

> And so the fact that the package has been submitted, it goes through the Credit Review Board where they kind of assign the rate. I mentioned the statutory program. These are all government-driven aspects of establishing that rate, but there is a max rate that it can be. So they're just working through that. Then the OMB, Office of OMB, and it has to approve it as part of the program. And then there's the treasury, which will actually facilitate the bank. So there's an affirmation that it matches the government rules and programs.

> … But once it gets through that, you get what they call a conditional approval. ***The fact that there's an 87-page term sheet, it's all basically been documented in terms of the agreement, all the caveats. You got to just turn that into an official loan document. But that takes it a long way along that way, and then you basically close and you start funding.***

> And there's been a lot of work done in preparation for what that next phase is, so to expedite that. And there's some additional things we can do to -- with anticipation of success to allow that to go even faster. So we'll keep you updated, but that's kind of the -- in terms of the process and the timing.

355. Moreover, at all relevant times, Defendants represented that they were regularly communicating with the DOE regarding the loan and told investors they knew exactly what needed to be done to receive the funds. As such, Defendants were aware of the true likelihood of whether they would satisfy the conditions precedent necessary to receive funding under the DOE Loan.

356.    On August 8, 2024, Plug held a conference call with analysts and investors to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Middleton provided, in pertinent part:

> [W]e're working closely with the DOE to finalize the $1.7 billion loan facility. We've made tremendous progress. We meet with them regularly and are meeting again in 2 weeks to continue their final due diligence and move the process along. We're extremely clear on the actions and the processes to successfully close this facility. And equally important, the DOE are clear in their interest and support to get this closed quickly. This facility is anticipated to provide immediate liquidity and enable us to accelerate the Texas green hydrogen facility build out.

357.    During the Company's 3Q24 Earnings Call, analyst Christopher Michael Senyek, Wolfe Research, LLC posed the question:

> I wanted to just ask about the DOE loan another way. Just given the pending change in administration, I wanted to get your thoughts on perhaps like the durability of the loan, like do you need to reach financial close in order for it to be considered safe? Or is the conditional commitment -- like can the conditional commitment be canceled?

358.    Defendant Middleton responded, in pertinent part: "…the critical thing for me is that we're really clear on all of the final steps here, and there's a pretty good alignment. And as Andy [Marsh] said, we've got a really good, detailed plan with all the final things that have to happen, and they're really engaged."

### C.    Plug's Recorded Impairment Charges Indicative of Scienter

359.    Following Plug's recorded impairment charges related to its long-lived and finite-lived assets supports Plaintiffs' allegations that, by the start of the Class Period, Defendants had not just "slowed" investments in the New York project but had affirmatively ceased all efforts to advance the development of this facility. Then, beginning in or around the second quarter of 2024, Defendants abandoned construction activities at this site before ultimately canceling the project altogether by the year's end. Similarly, beginning in or around the first quarter of 2025, Defendants considered construction plans for the Texas Plant, as a liquid green hydrogen plant expanding its

network of hydrogen generation, effectively cancelled and began exploring alternative means to leverage the real property and other related assets associated with these properties.

360.    According to Plug's SEC filings, signed and certified by Defendants, the Company evaluates its long-lived assets (including property, plant, and equipment, equipment related to power purchase agreements and fuel delivered to customers, and right of use assets related to operating leases) and finite-lived intangible assets for impairment whenever events or changes in circumstances indicate that the carrying amount of such assets may not be recoverable.

361.    According to Plug, the recoverability of these assets is assessed by comparing the carrying value of such assets to the estimated undiscounted future cash flows expected to result from their use and eventual disposition. If the carrying value exceeds the undiscounted cash flows, an impairment loss is recognized to the extent the carrying value exceeds the estimated fair value.

362.    During the fiscal years ended December 31, 2023 and 2022, Plug recorded an impairment charge of $3.1 million and $0.8 million, respectively, on property, plant, and equipment, leasehold improvements, or finite-lived intangible assets.

363.    For the three months ended March 31, 2024, Plug recorded a total impairment charge of $0.3 million, "primarily related to the Company recording a [ ] impairment charge on long-lived assets." As reported in Plug's financial results for the quarter ended March 31, 2024, filed with the SEC on Form 10-Q on May 9, 2024 (the "1Q24 10-Q"), Plug's property, plant and equipment at March 31, 2024, and December 31, 2023, consisted of the following (in thousands):

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Land | $5,951 | $6,049 |
| Construction in progress | $852,555 | $1,109,896 |
| Hydrogen production plants | $351,390 | $77,107 |
| Building and leasehold improvements | $96,850 | $95,229 |
| Software, machinery, and equipment | $243,198 | $229,352 |
| Property, plant and equipment | $1,549,944 | $1,517,633 |

101

| | | |
|---|---|---|
| **Less: accumulated depreciation** | $(95,953) | $(81,456) |
| **Property, plant and equipment, net** | $1,453,991 | $1,436,177 |

364.    The Company's 1Q24 10-Q went on to provide:

Construction in progress is primarily comprised of construction of three hydrogen production plants. Completed assets are transferred to their respective asset classes, and depreciation begins when an asset is ready for its intended use. Interest on outstanding debt is capitalized during periods of capital asset construction and amortized over the useful lives of the related assets. During the three months ended March 31, 2024 and 2023, the Company capitalized $2.1 million and $2.0 million of interest, respectively.

Depreciation expense related to property, plant and equipment was $11.6 million and $5.5 million for the three months ended March 31, 2024 and 2023, respectively.

365.    Comparatively, the Company's financial report for the fiscal year ended December 31, 2023, filed with the SEC on Form 10-K on February 29, 2024 (the "FY23 10-K"), recorded that "[c]onstruction in progress is primarily compromised of construction of four hydrogen production plants." As a reminder, on January 23, 2024, Plug reported that the Georgia Plant had completed construction and initiated production that month. Consequently, as of the 1Q24 10-Q, the Company's hydrogen plants that were considered to have "[c]onstruction in progress" were the facilities in Louisiana, New York, and Texas.

366.    During the three months ended June 30, 2024, Plug recorded a total impairment charge of $3.9 million, "primarily related to the Company recording a [ ] impairment charge on long-lived assets." During the three months ended September 30, 2024, Plug recorded a total impairment charge of $4.2 million, "primarily related to the Company recording a higher impairment charge on long-lived assets due to the *cancellation* of certain projects during the three months ended September 30, 2024" (emphasis added). In sum, for the first nine months of the fiscal year 2024, Plug recorded a total impairment charge of $8.4 million.

367.    *Then*, for the three months and fiscal year ended December 31, 2024, Plug recorded a total impairment charge of $940.9 million and $949.3 million, respectively. The Company's financial report for the fiscal year ended December 31, 2024, filed with the SEC on Form 10-K on March 3, 2025 (the "FY23 10-K"), provided:

> The increase in impairment was primarily due to impairment charges of $902.2 million resulting from the ASC 360 impairment analysis performed during the fourth quarter of 2024. Of the $902.2 million, $675.5 million was related to property, plant and equipment, $1.6 million was related to equipment related to power purchase agreements and fuel delivered to customers, $145.4 million was related to right of use assets related to operating leases, and $79.7 million was related to finite-lived intangible assets. Additionally, during the fourth quarter of 2024, the Company recorded a $38.3 million impairment charge related to contract assets and other current assets in which the Company determined it would be unable to collect the consideration from a customer contract, impairment charges of $0.3 million related to property, plant and equipment as well as other impairment charges of $0.1 million. Other impairment charges recorded during the year ended December 31, 2024 was $8.4 million, of which $3.0 million related to non-marketable equity securities and $5.4 million related to property, plant and equipment.

368.    To provide context for this massive increase in asset impairment, the Company's FY23 10-K proclaimed, in pertinent part, that:

> [T]he Company paused certain hydrogen production plant projects during the fourth quarter of 2024. This pause, as well as the decrease in cash flow projections, was primarily due to weakening demand in the global hydrogen market. As a result, the Company tested the recoverability of its long-lived assets and finite-lived intangibles by comparing the carrying values against undiscounted future cash flow projections and determined that an impairment existed.

369.    This reasoning, however, does not square up with Plug's prior public declarations made months earlier that it had "paused" investment in the Texas and New York projects back in January 2024, not the fourth quarter 2024. Based on the Company's later disclosures regarding its next big impairment charge made in November 2025, it stands to reason that this impairment charge was the result of Defendants' determination that the purported "construction in progress" at the New York Plant was no longer probable to be completed.

370.    As reported in Plug's 2Q24 10-Q, 3Q24 10-Q, and FY24 10-K, the Company's property, plant and equipment at June 30, September 20, and December 31, 2024, consisted of the following (in thousands):

| | June 30, 2024 | September 30, 2024 | December 31, 2024 |
|---|---|---|---|
| **Land** | $5,706 | $5,845 | $5,597 |
| **Construction in progress** | $891,606 | $930,505 | $502,936 |
| **Hydrogen production plants** | $364,703 | $370,104 | $343,094 |
| **Building and leasehold improvements** | $104,650 | $97,022 | $15,633 |
| **Software, machinery, and equipment** | $252,011 | $249,091 | $40,861 |
| **Property, plant and equipment** | $1,618,676 | $1,652,567 | $908,121 |
| **Less: accumulated depreciation** | $(108,983) | $(118,511) | $(41,792) |
| **Property, plant and equipment, net** | $1,509,693 | $1,534,056 | $866,329 |

371.    During the three months ended June 30, September 30, and December 31, 2024, the Company capitalized $3.1 million, $3.1 million, and $0 of interest, respectively. Depreciation expense related to property, plant and equipment was $13.1 million, $12.6 million, and $5.5 million for the three months ended June 30, September 30, and December 31, 2024, respectively.

372.    Plug's financial reporting for the fiscal year 2025 followed a similar pattern. During the three months ended March 31, 2025, Plug recorded a $1.1 million impairment charge "on long-lived assets due to the *cancellation* of certain projects during the three months ended March 31, 2025" (emphasis added).  During the three months ended June 30, 2025, Plug recorded an impairment charge of $9.4 million "related to the Company's property, plant and equipment."

373.    On November 10, 2025, Plug reported its financial results for the three months ended September 30, 2025, filed with the SEC on Form 10-Q (the "3Q25 10-Q"). In pertinent part, the Company's 3Q25 10-Q provided for the first time that:

104

During 2025, events and circumstances indicated that long-lived assets for certain asset groups were impaired. As a result, management continues to closely monitor the results of the Company's asset groups including the status of hydrogen projects in development and related sources of funding (for example, the Company's loan program with the Department of Energy), recent trends in our business, and our liquidity, in addition to operational initiatives and macroeconomic conditions that may affect the recoverability of the Company's long-lived assets. As such, the current performance of the Company's operations introduces an elevated risk for impairment for our long-lived assets. If the Company does not achieve anticipated improvements in cash flows, additional impairment charges could be required in future periods which could be material to the Company's unaudited condensed consolidated financial statements.

374.    The 3Q25 10-Q went on to provide that:

During the three and nine months ended September 30, 2025, the Company recorded impairment charges of $50.0 million and $60.5 million, respectively, related to the Company's property, plant and equipment. These impairments resulted from construction in progress that are no longer probable to be completed. Refer to Note 7, "Fair Value Measurements," for further information on the fair value methodology utilized.

During the three and nine months ended September 30, 2025, the Company recorded impairment charges of $11.4 million related to prepaid capital expenditures. These amounts related to advance payments for equipment that the Company determined would no longer be deployed related to projects that are no longer probable to be completed.

During the three and nine months ended September 30, 2025, the Company recorded impairment charges of $1.1 million related to finite-lived intangible assets. Refer to Note 7, "Fair Value Measurements," for further information on the fair value methodology utilized. These product lines were de-emphasized as part of our strategic realignment.

375.    In sum, during the first nine months of fiscal year 2025, Plug recorded a total impairment charge of $119.2 million, of which $73 million, or roughly 61%, was specifically related to the Company's long-lived and finite-lived assets that "resulted from construction in progress that are no longer probable to be completed."

376.    *Then*, for the three months and fiscal year ended December 31, 2025, Plug recorded a total impairment charge of $666.2 million and $785.4 million, respectively. In pertinent part, the

105

Company's financial report for the fiscal year ended December 31, 2025, filed with the SEC on

Form 10-K on March 2, 2026 (the "FY23 10-K"), provided that:

> [D]uring the third quarter of 2025 certain product lines experienced changes in their prospective sales pipelines, and the Company identified impairment of its long-lived assets and contract assets during its quarterly impairment analysis.
>
> Asset groups are the unit of account for a long-lived asset or assets to be held and used which represent the lowest level for which identifiable cash flows are largely independent of other groups of assets and liabilities. The decrease in cash flow projections for several asset groups was largely attributed to several factors, including … in November 2025, the Company announced that it has suspended activities associated with the Department of Energy loan program. This pause, as well as the decrease in cash flow projections, was primarily due to weakening demand in the global hydrogen market. As a result, the Company tested the recoverability of its long-lived assets and finite-lived intangibles by comparing the carrying values against undiscounted future cash flow projections and determined that an impairment existed.

377.    The Company's FY23 10-K provided, for the first time, the following table reflecting the category of impairment charges recorded during the years ended December 31, 2025, 2024, and 2023 (in thousands):

| | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2025 | 2024 | 2023 |
| Contract assets | $28,105 | $35,118 | $2,375 |
| Prepaid expenses, tax credits and other current assets | $12,083 | $3,207 | $9,737 |
| Property, plant, and equipment, net | $661,278 | $681,210 | $3,055 |
| Equipment related to power purchase agreements and fuel delivered to customers, net | $23,902 | $1,625 | $219 |
| Right of use assets related to finance leases, net | $2,602 | - | - |
| Right of use assets related to operating leases, net | $8,588 | $145,427 | $4,608 |
| Intangible assets, net | $48,886 | $79,728 | $20 |
| Goodwill | - | - | $249,480 |
| Investments in non-consolidated entities and non-marketable securities | - | $3,000 | - |
| Impairment | $785,444 | $949,315 | $269,494 |

106

378.   As reported in Plug's FY25 10-K, the Company's property, plant and equipment at December 31, 2025 and 2024, consisted of the following (in thousands):

| | December 31, 2025 | December 31, 2024 |
|---|---|---|
| Land | $6,150 | $5,597 |
| Construction in progress | 124,727 | 502,936 |
| Equipment, including hydrogen production plants | 165,510 | 383,955 |
| Leasehold improvements | 8,722 | 15,633 |
| Property, plant, and equipment | 305,109 | 908,121 |
| Less: accumulated depreciation | (24,108) | (41,792) |
| Property, plant, and equipment, net | $281,001 | $866,329 |

**D.  Suspicious Departures of Critical Company Executives Indicative of Scienter**

379.   Defendant Marsh had served as Plug's CEO and director since April 2008. Defendant Marsh specifically stated he was "personally" involved in the Company's discussions with the DOE regarding its LPO-backed loan guarantee.

380.   Mr. Shrestha had served as the Company's CSO and EVP since April 2019, and as GM, Energy Solutions since January 2021 before being appointment President in November 2024.

381.   CW2 said Mr. Shrestha was closely associated with the DOE loan internally. CW2 also said Mr. Shrestha was basically running Plug at the time it was working through the DOE application process and said he was viewed as the face of the Company. CW2 said that after internal discussions about the DOE Loan, led by Company executives, including Defendant Marsh and Mr. Shrestha, went quiet around the administration change, Mr. Shrestha was just gone.

382.   As detailed in Section VII.J. *supra*, on October 7, 2025, roughly one month before Plug announced it had signed a non-binding LOI to monetize its electricity rights in New York and one other location, and as result, would suspend activities related to the DOE Loan, Plug issued a press release announcing that Defendant Marsh would step down from his role as CEO, effective

March 2, 2026, and that Mr. Shrestha would step down from his role as President, effective October 10, 2025. Plug concurrently announced the appointment of Defendant Crespo to both roles.

### E.    Defendants' Motive and Opportunity to Commit Fraud

383.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Plug securities, Defendants enriched themselves by paying themselves significant annual salaries as well as hefty cash bonuses and retention awards.

384.    On March 13, 2025, Jose Luis Crespo, Plug's then-Chief Revenue Officer and future-President (as of October 10, 2025) and CEO (as of March 2, 2026), adopted a new stock trading plan pursuant to Rule 10b5-1 of the Exchange Act, which was intended to satisfy the affirmative defense conditions of Rule 10b5-1(c), and which provided for (1) the sale of 37,300 shares of the Company's common stock on June 11, 2025 and (2) the purchase of 37,300 shares of the Company's common stock from December 15, 2025 through March 11, 2026.

385.    Notably, there were no other Rule 10b5-1 trading arrangements or non-Rule 10b5-1 trading arrangements adopted, terminated, or modified by the Company's directors or executive officers during the three months ended March 31, 2025.

386.    First, a Rule 10b5-1 plan created or adopted during a live fraud is not exonerating, simply because of timing. Further, a Rule 10b5-1 trading plan, such as the one adopted by Mr. Crespo on March 13, 2025, requiring a sale followed by an identical share purchase, raises severe good faith and evasion concerns under SEC regulations. Without an independent, legitimate economic rationale, this symmetrical sale and purchase pattern mimics market manipulation or a sham transaction designed to signal false confidence with minimal or no economic risk.

387.    Rule 10b5-1 establishes an affirmative defense for corporate insiders who enter binding trading plans to buy or sell securities *before* becoming aware of material nonpublic information. This allows executives to demonstrate that their trading decisions were made before they possessed inside information, effectively creating a safe harbor for planned transactions.

388.    The rule emerged from a regulatory environment that recognized the challenges faced by corporate insiders who legitimately needed to diversify their holdings but were constantly exposed to material nonpublic information. Offsetting transactions that maintain a neutral net position (like here) fail to demonstrate genuine risk-mitigation or diversification, which are the core policy justifications protecting 10b5-1 trading plans.

389.    On June 11, 2025, Defendant Crespo filed a Form 144 noticing his sale of 37,300 shares of Plug common stock for $49,236 in net proceeds. The form indicated that the shares to be sold were exercised shares of common stock underlying Restricted Stock Units acquired by Crespo on September 28, 2021 and August 19, 2022. On June 13, 2025, Crespo filed with the SEC a Form 4 reporting his sale of 37,300 shares of common stock pursuant to the Rule 10b5-1 trading plan adopted on March 13, 2025, representing a 12.14% disposal of his direct holdings.

390.    Then, on December 17, 2025, Defendant Crespo filed with the SEC a Form 4 reporting his purchase of 37,300 shares of common stock pursuant to the Rule 10b5-1 trading plan adopted on March 13, 2025. Crespo purchased these shares on the open market at a price of $2.34 per share on December 15, 2025, for a total purchase price of $87,282. When subtracting the proceeds from his identical pre-determined prior sale ($49,236), the appearance of Crespo's investment in the Company drops to $38,046.

391.    Moreover, as later revealed in Plug's Definitive Proxy Statement filed with the SEC on April 30, 2026, pursuant to Section 14(a) of the Exchange Act (the "Proxy Statement"), Mr.

Crespo's target performance bonus of $470,000 for FY 2025 increased to $784,000 when actualized for the year. When explaining this significant increase, the Company represented that:

> Mr. Crespo's 2025 actual bonus amount was determined based on his base salary in effect at the time of payment, which occurred in 2026. In October 2025, Mr. Crespo was appointed President, and in March 2026, he was appointed Chief Executive Officer, at which time his base salary was increased to $700,000 [up from $400,000 as CRO] to reflect his expanded leadership responsibilities and to align with market compensation levels for chief executive officers. In light of the expansion of Mr. Crespo's responsibilities during 2025 and his appointment as Chief Executive Officer in early 2026, the Compensation Committee determined that applying his base salary at the time of payment was an appropriate method for calculating his 2025 bonus, as it more accurately reflected his role and scope of responsibilities at the time the award was determined. The Compensation Committee considered this approach appropriate given the timing of the leadership transition and its objective of aligning compensation with executive responsibilities.

392.    In addition, as revealed in the Proxy Statement, "Mr. Crespo received a retention award with a total value of $440,000 in connection with the Company's leadership transition and ongoing transformation initiatives. ***Half of Mr. Crespo's retention award was paid in May 2025 and the balance was paid in January 2026***" (emphasis added).

393.    In sum, in addition to Mr. Crespo's $397,471 base salary for 2025, he received an aggregate cash payment of $1,224,000 related to a retention bonus and a bonus for reported "achievement of Company and individual performance goals." Comparatively, in 2024, he received a base salary of $375,607; a retention bonus of $110,000; and stock awards valued at $330,001. In 2023, he received only a base salary of $400,000; no cash bonuses or stock awards.

394.    Likewise, on June 9, 2025, Plug issued a press release touting that Defendant Middleton had purchased 650,000 shares of Plug common stock on the open market and tied this purchase to his purported "confidence in Plug's operational progress, including the ramp-up of hydrogen production plants." Specifically, the press release stated:

> This latest investment follows a previous purchase earlier this month, reinforcing Mr. Middleton's continued belief in Plug's long-term strategy, strong financial

110

trajectory, and leadership in building a vertically integrated hydrogen ecosystem.

'This additional investment reflects my strong conviction in Plug's strategy and long-term value creation. As we execute and gain market traction, I continue to see meaningful upside and believe Plug remains one of the most compelling growth opportunities in the energy sector.'

***Middleton's open-market purchase underscores executive confidence in Plug's operational progress, including the ramp-up of hydrogen production plants***, commercialization of GenEco electrolyzers, and growing demand for GenDrive fuel cell solutions across material handling and industrial markets.

'This is a transformative moment for our business and our industry. I believe deeply in Plug's ability to lead this energy transition—and I'm proud to continue investing in that future,' he added.

395.    According to a Form 4 filed with the SEC on June 9, 2025, Defendant Middleton purchased 650,000 shares of common stock on the open market at a price of $1.0339 per share on June 9, 2025, for a total purchase price of $672,035. According to a Form 4 filed with the SEC on May 19, 2025, Defendant Middleton also purchased 350,000 shares of common stock on the open market at a price of $0.7154 per share on May 16, 2025, for a total purchase price of $250,390. In sum, Middleton's open market purchases cost him $922,425. Or so it appeared.

396.    Notably, as later revealed in the Proxy Statement, in 2025, Mr. Middelton received a $1,500,000 cash payment in lieu of his guaranteed annual equity stock award pursuant to the terms of his employment agreement. According to the Proxy Statement, the employment agreement with Mr. Middleton provides for annual equity awards with a grant date fair value of $1,500,000. However, due to Plug's reported insufficient shares available under the Company's 2021 Stock Option and Incentive Plan during 2025, Mr. Middleton received a cash bonus in lieu of an annual equity award.

397.    Additionally, as revealed in the Proxy Statement, Mr. Middleton also received a $600,000 retention bonus which was paid in full in March 2025. In sum, in addition to his $546,407 base salary for 2025, Mr. Middleton received an aggregate cash payment of $2,772,000 in lieu of

stock awards and related to a retention bonus and a bonus for reported "achievement of Company and individual performance goals."

398.    Likewise, in 2024, Mr. Middleton received a base salary of $444,770; a retention bonus of $110,000; a guaranteed $600,000 annual bonus equal to his target bonus pursuant to the terms of his employment agreement; and stock awards valued at $2,830,002. Comparatively, in 2023, he received only a base salary of $400,000; no additional cash bonuses or stock awards.

399.    In 2025, Defendant Marsh also received a cash bonus of $929,600 for reported "achievement of Company and individual performance goals" in addition to his base salary of $791,878. Comparatively, in 2024, Mr. Marsh only received his base salary of $783,654; no cash bonuses. Similarly, in 2023, he only received his base salary of $750,000.

## XI.    **PRESUMPTION OF RELIANCE**

400.    Plaintiffs and other members of the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established by the U.S. Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1998). Such a presumption is appropriate because, among other things:

(a)    during the Class Period, Defendants made public representations that contained untrue statements of material fact or failed to disclose material facts necessary to make the statements that were made not misleading;

(b)    the misrepresentations and/or omissions were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiffs and other members of the Class purchased or otherwise acquired Plug securities between the time Defendants misrepresented or failed to disclose material facts

112

necessary to make the statements that were made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

401.   At all relevant times, the market for Plug securities was efficient for the following reasons, among others:

(a)   Plug common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Plug filed periodic public reports with the SEC;

(c)   Plug regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d)   Plug was followed by securities analysts employed by brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(e)   Unexpected company-specific news was reflected and incorporated into the price for Plug securities.

402.   As a result of the foregoing, the market for Plug securities promptly digested current information regarding the Company from publicly available sources and reflected such information in Plug's securities prices. Under these circumstances, all purchasers and/or acquirers of Plug securities during the Class Period suffered similar injury through their purchase and/or acquisition of Plug securities at artificially inflated prices, and the presumption of reliance applies.

403.   In addition, a Class-wide presumption of reliance is also appropriate under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims center, in large part, upon Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Plug's business operations and financial prospects—information that Defendants were obligated by law to disclose—positive proof of reliance is not a prerequisite to recovery.

## XII.    NO SAFE HARBOR PROTECTION

404.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

405.    None of the statements alleged herein to be false or misleading are forward-looking statements.  Such statements addressed facts and conditions existing at the time the statements were made.  Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

406.    To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as "forward-looking statements" when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when the risks were not merely hypothetical.  Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.  In addition, Defendants are liable for any forward-looking statements because at the time each statement was made, the speaker had actual knowledge that the forward-looking statement was materially false

or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Plug who had actual knowledge that the statement was materially false or misleading

## XIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

407. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Plug securities at artificially inflated prices during the Class Period and were damaged upon the revelation of Defendants' fraud (the "Class"). Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

408. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Plug securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Plug or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

409. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

115

410.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

411.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Plug;

(c)    whether the Individual Defendants caused Plug to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Plug securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

412.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

116

## XIV.    CLAIMS FOR RELIEF

### COUNT I

### *Violations of Section 10(b) and Rule 10b-5*

### *(Against All Defendants)*

413.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

414.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

415.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Plug securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Plug securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

416.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

117

above, including statements made to securities analysts and the media that were designed to influence the market for Plug securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Plug's finances and business prospects.

417.    By virtue of their positions at Plug, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

418.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Plug, the Individual Defendants had knowledge of the details of Plug's internal affairs.

419.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Plug. As executive officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Plug's businesses, operations, financial condition, and future prospects. As a result of the dissemination

118

of the aforementioned false and misleading reports filed with the SEC, press releases and other public statements, the market price of Plug securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Plug's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Plug securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

420.    During the Class Period, Plug securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Plug securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Plug securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Plug securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

421.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

422.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases,

119

acquisitions and sales of Plug securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Violations of Section 20(a)*

### *(Against the Individual Defendants)*

423.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

424.    This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

425.    During the Class Period, the Individual Defendants participated in the operation and management of Plug, and conducted and participated, directly and indirectly, in the conduct of Plug's business affairs. Because of their senior positions, they knew the adverse non-public information about Plug's misstatement of income and expenses and false financial statements.

426.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Plug's business strategy, financial condition, and results of operations, and to correct promptly any public statement issued by Plug which had become materially false or misleading.

427.    Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Plug disseminated in the marketplace during the Class Period concerning Plug's business strategy, financial condition, and results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Plug to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Plug within the meaning of Section 20(a) of the Exchange

120

Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Plug securities.

428.   Each Individual Defendant, therefore, acted as a controlling person of Plug. By reason of their senior management positions at Plug, each Individual Defendant had the power to direct the actions of, and exercised the same to cause, Plug to engage in the unlawful acts and conduct complained of herein. Each Individual Defendant exercised control over the general operations of Plug and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

429.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by Plug.

## XV.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XVI.   **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

121

Dated: August 10, 2026

LEVI & KORSINSKY, LLP


 *s/ Adam M. Apton*
Adam M. Apton (*pro hac vice*)
Gregory M. Nespole
Devyn R. Glass *(pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel: (212) 363-7500
Email: aapton@zlk.com
      gnespole@zlk.com
      dglass@zlk.com

    *-and-*

POMERANTZ LLP
Jeremy A. Lieberman
J. Alexander Hood II
Matthew L. Tuccillo (*pro hac vice*)
Jennifer Banner Sobers (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Email: ahood@pomlaw.com
      jalieberman@pomlaw.com
      mltuccillo@pomlaw.com
      jbsobers@pomlaw.com

*Co-Lead Counsel for Plaintiffs and the Class*