UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JERRY L. JASKOT, *et al.*, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

PLUG POWER INC., ANDREW J. MARSH, PAUL B. MIDDLETON, and JOSE LUIS CRESPO,

Defendants.

Case No. 1:26-cv-0165 (MAD) (DJS)

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

John J. Clarke, Jr.
Steven M. Rosato
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

*Counsel for Defendant Plug Power Inc.*

George Carpinello
BOIES SCHILLER FLEXNER LLP
30 South Pearl Street, 12th Floor
Albany, New York 12207
(518) 434-0600

*Counsel for Individual Defendants Andrew J. Marsh, Paul B. Middleton, and Jose Luis Crespo*

Dated: October 9, 2026

Table of Contents

Page

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

A. The Parties ..... 3

B. Plug Power's Hydrogen Strategy and the DoE Loan Guaranty Facility ..... 4

C. The New York Green Hydrogen Project ..... 6

D. The "Going Concern" Opinion and Ensuing Developments ..... 7

E. Plaintiffs' Claims ..... 8

LEGAL STANDARDS ..... 9

ARGUMENT ..... 10

I. The Complaint Does Not Allege an Actionable Misstatement ..... 10

A. The Complaint Impermissibly Alleges an "Endless Breach" ..... 10

B. Plaintiffs' Falsity Theories Depend on Mischaracterizations, Inaccurate Assertions, and Allegations Without Foundation ..... 11

1. Plaintiffs Do Not Allege Any Actionable Misstatement Concerning the Availability of DoE Financing for the New York Project ..... 11

2. Plug Power Did Not "Abandon" the New York Project ..... 14

3. The Texas Project Did Not Fail for Lack of Private Financing ..... 16

4. Plug Power Did Not "Secretly" Negotiate a Data Center Deal ..... 18

C. The PSLRA Safe Harbor Requires Dismissal of Claims Based on Challenged Statements That Were Forward-Looking ..... 19

D. The Complaint Fails to Allege Falsity for Any Opinion Statements ..... 22

II. The Complaint Does Not Allege Facts Giving Rise to the Required Strong Inference of Scienter ..... 23

A. There Are No Allegations of Motive and Opportunity to Commit Fraud ..... 24

1. No Unusual or Suspicious Stock Sales ..... 24

2. Allegations Concerning Other Compensation Are Not Sufficient ..... 26

B. Plaintiffs Do Not Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness ........ 27

1. Scienter Cannot Be Inferred From Conclusory Allegations of "Actual Knowledge" or "Access to Information" ........ 27

2. Scienter Cannot Be Inferred From The Defendants' Roles ........ 30

3. Impairment Charges Do Not Support an Inference of Scienter ........ 31

4. Executive Changes Do Not Support an Inference of Scienter ........ 32

C. Plaintiffs Have Not Alleged "Corporate Scienter" ........ 32

D. The Nonfraudulent Inferences Are More Compelling ........ 33

III. The Complaint Does Not Allege a Scheme Claim ........ 34

IV. Plaintiffs Do Not Plausibly Allege Loss Causation ........ 34

CONCLUSION ........ 35

Table of Authorities

Page(s)

Cases

*Abely v. Aeterna Zentaris Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ....................14

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ....................25

*In re Aegon N.V. Sec. Litig.*,
2004 WL 1415973 (S.D.N.Y. June 23, 2004) ....................19

*In re Am. Express Co. Sec. Litig.*,
2004 WL 632750 (S.D.N.Y. Mar. 31, 2004) ....................12

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ....................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................9

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020) ....................16

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ....................3, 9, 11

*In re Bemis Co. Sec. Litig.*,
512 F. Supp. 3d 518 (S.D.N.Y. 2021) ....................26

*Bettis v. Aixtron SE*,
2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ....................28

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005) ....................32

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021) ....................34

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) ....................26

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) ....................25

Page(s)

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ....................30

*Docdeer Found. v. BioNTech SE*,
2025 WL 2781381 (S.D.N.Y. Sep. 30, 2025)....................33

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....................23

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)....................24

*Friedman v. Endo Int'l PLC*,
2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ....................18

*In re FuBoTV Inc. Sec. Litig.*,
2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ....................17

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................28

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................24

*Goldenberg v. NeoGenomics, Inc.*,
2026 WL 709990 (S.D.N.Y. Mar. 13, 2026) ....................17

*Goldschein v. Avangrid, Inc.*,
2025 WL 3707500 (S.D.N.Y. Dec. 22, 2025) ....................18

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020)....................20, 21

*Greco v. Qudian Inc.*,
2022 WL 4226022, at *25 (S.D.N.Y. Sep. 13, 2022)....................23

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018)....................14

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002)....................20

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021)....................14

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)....................26, 30

Page(s)

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007)....................10

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)....................33, 34

*In re Livent Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001)....................12

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010)....................27

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
2004 WL 376442 (S.D.N.Y. Feb. 27, 2004)....................31

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................9

*In re N. Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000)....................24

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)....................20, 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)....................22

*In re Openwave Sys. Sec. Litig.*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007)....................10

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)....................15

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
153 F. Supp. 3d 628 (S.D.N.Y. 2015)....................19

*In re Qiwi plc Sec. Litig.*,
2023 WL 7283619 (E.D.N.Y. Nov. 3, 2023)....................30

*In re Regeneron Pharms., Inc. Sec. Litig.*,
2026 WL 2797861 (S.D.N.Y. Sep. 18, 2026)....................27

*Reilly v. U.S. Physical Therapy, Inc.*,
2018 WL 3559089 (S.D.N.Y. July 23, 2018)....................26

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................9

Page(s)

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996)....................25

*Sarria v. Telus Int'l (CDA) Inc.*,
2026 WL 2323425 (S.D.N.Y. Aug. 11, 2026)....................15, 16

*Scott v. Gen. Motors Co.*,
46 F. Supp. 3d 387 (S.D.N.Y. 2014)....................22

*S.E.C. v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022)....................33

*In re Skechers USA, Inc. Sec. Litig.*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020)....................32

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)....................19, 20

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*,
531 F.3d 190 (2d Cir. 2008)....................29, 32

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
675 F. Supp. 3d 273 (E.D.N.Y. 2023)....................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................4, 23, 32

*In re The Warnaco Grp., Inc. Sec. Litig.*,
388 F. Supp. 2d 307 (S.D.N.Y. 2005)....................10

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)....................3, 22

*Turner v. MagicJack VocalTec, Ltd.*,
2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)....................25

*In re UiPath, Inc. Sec. Litig.*,
2025 WL 2065093 (S.D.N.Y. July 23, 2025)....................27

*In re UiPath, Inc. Sec. Litig.*,
2026 WL 2905997 (S.D.N.Y. Sep. 28, 2026)....................29

*Villare v. Abiomed, Inc.*,
2021 WL 4311749 (S.D.N.Y. Sep. 21, 2021)....................27

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)....................17, 28

Page(s)

*Webb v. Mentor Worldwide LLC*,
453 F. Supp. 3d 550 (N.D.N.Y. 2020) ........ 9

*Wilder v. News Corp.*,
2015 WL 5853763 (S.D.N.Y. Oct. 6, 2015) ........ 10

*Woolgar v. Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020) ........ 32

*Yuson v. Warner Bros. Discovery, Inc.*,
834 F. Supp. 3d 391 (S.D.N.Y. 2026) ........ 10

Statutes, Regulations, and Rules

15 U.S.C. § 78j(b) ........ 9

15 U.S.C. § 78u-4(b) ........ *passim*

15 U.S.C. § 78u-5 ........ *passim*

15 U.S.C. § 78t(a) ........ 9, 34

17 C.F.R. § 240.10b-5 ........ 9

Fed. R. Civ. P. 9(b) ........ *passim*

Fed. R. Civ. P. 12(b)(6) ........ *passim*

Defendants Plug Power Inc. ("Plug Power" or the "Company"), Andrew J. Marsh, Paul B. Middleton, and Jose Luis Crespo respectfully submit this opening memorandum of law in support of their motion to dismiss the first amended complaint [ECF No. 28].

## PRELIMINARY STATEMENT

Plaintiffs assert claims for alleged securities fraud against Plug Power and three of its senior officers on behalf of a putative class of purchasers of Plug Power securities from March 1, 2024 through July 12, 2026. But the complaint begins with extensive discussion of earlier events, as the Company began its work to build a national network of green hydrogen plants that would reduce its exposure to volatile market prices for hydrogen. Compl. ¶¶ 81-83. As a result of those efforts, Plug Power successfully launched plants in Tennessee, Georgia, and Louisiana, ultimately providing production capacity of 40 tonnes per day of clean liquid hydrogen. *Id.* ¶¶ 99, 104, 252, 261, 300.

Those achievements are not the focus of plaintiffs' claims, even though the complaint discusses them at length. Instead, plaintiffs allege that the defendants defrauded investors when they made statements concerning Plug Power's efforts to finance and complete *two more plants*, located in Texas and western New York. The complaint obscures relevant dates and downplays significant developments in a futile attempt to satisfy the heightened pleading standards for those claims under the Private Securities Litigation Reform Act ("PSLRA").

Plaintiffs assert Plug Power allegedly knew throughout the alleged class period that its New York green hydrogen plant never would be built because the project had been "withdrawn" from the Company's application for a $1.6 billion loan guaranty facility from the U.S. Department of Energy ("DoE") in June 2023. *See* Compl. ¶¶ 1, 3. That assertion is false. The New York plant could not be "withdrawn" from the DoE loan application because it was never "in" the application. As the complaint elsewhere acknowledges, the DoE facility offered a "platform structure" under

which federal financing could be arranged for "up to six green hydrogen production facilities," but each project would be considered on its own. *Id.* ¶¶ 1, 14; *see id.* ¶ 173. Plaintiffs mistakenly rely on a February 2024 letter from a DoE official to the Tonawanda Seneca Nation, a neighbor and opponent of the New York project, to allege that Plug Power's New York project had been withdrawn *forever* from possible DoE financing. *Id.* ¶¶ 168-69. But even the DoE letter does not support that contention. *See id.* ¶ 168 (informing Tonawanda tribe that federal financial assistance will not include support for New York project "***at this time***").

In May 2024, the DoE committed to the $1.6 billion lending platform. *Id.* ¶ 192. Then, on January 16, 2025, Plug Power signed a definitive agreement to finance its Texas plant under it. *Id.* ¶ 195. Only days later, the administration changed with the presidential inauguration, and all federal funding for green energy projects was frozen. *Id.* ¶ 205. Plug Power's strategy ultimately changed. In July 2025, the Company announced a long-term hydrogen supply agreement that reduced the need to develop its own hydrogen production capacity, *id.* ¶ 300, and in November 2025, it announced it was suspending efforts associated with the DoE program and was pursuing a plan to monetize assets and release restricted cash through asset sales associated with its hydrogen projects, *id.* ¶ 306. Definitive contracts to sell assets in New York and Texas were announced in February and July 2026. *Id.* ¶¶ 328, 330.

A change in corporate strategy following external events is not fraud. Plaintiffs' claims do not meet the PSLRA's heightened pleading requirements in several different ways, requiring dismissal. *First*, the complaint does not allege an actionably false or misleading statement based on facts at the time of the challenged disclosures. Plaintiffs cannot assert claims of securities fraud based on statements made before their alleged class period, as the complaint attempts to do. *See id.* ¶¶ 2, 183 (alleging defendants failed to correct statements made before the class period).

Even considering only statements made during the class period, the complaint falls well short. Plaintiffs offer mischaracterizations and conclusory allegations sourced to alleged confidential witnesses without any personal knowledge. Those types of allegations cannot support a claim for securities fraud. In addition, many challenged statements are protected by the PSLRA safe harbor for forward-looking statements, 15 U.S.C. § 78u-5(c)(1)(A), or are statements of opinion that are inactionable because the speakers subjectively believed them at the time.

*Second*, plaintiffs do not allege facts giving rise to the required "strong inference" of scienter, that is, that the defendants acted with an intent to defraud in making the challenged statements. 15 U.S.C. § 78u-4(b)(2)(A). There are no plausible allegations of a "motive" to defraud, such as through stock sales that are "suspicious" or "unusual." Nor are there factual allegations supporting an inference that anyone knowingly lied or spoke with a reckless disregard for the truth. Plaintiffs' confidential witness allegations do not offer any facts in conflict with any challenged statement when it was made.

*Finally*, the complaint does not plausibly allege loss causation by, for example, providing a plausible connection between alleged stock price declines and the revelation of any previously undisclosed "truth." For all of these reasons, the complaint should be dismissed in its entirety.

## BACKGROUND[1]

### A. The Parties

Plug Power is a hydrogen energy company. Compl. ¶¶ 73-75. It makes fuel cells used to run equipment with hydrogen; electrolyzers that use energy to produce hydrogen from water; and

[1] Solely for the purpose of this motion to dismiss, well-pleaded factual allegations are assumed to be true. *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016). In evaluating the sufficiency of a securities fraud complaint, the Court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *ATSI Commc'ns Inc. v. Shaar*

hydrogen for sale to its fuel cell customers. *Id*. Individual defendants Andrew J. Marsh, Paul B. Middleton, and Jose Luis Crespo are present or former officers of the Company. *Id.* ¶¶ 36-38. Plaintiffs purport to assert their claims on behalf of a putative class of purchasers of Plug Power securities from March 1, 2024 through July 12, 2026. *Id.* ¶¶ 27, 407.

### B. Plug Power's Hydrogen Strategy and the DoE Loan Guaranty Facility.

Long before the start of the alleged class period, Plug Power embarked on a plan to insulate its business from the fluctuating price of hydrogen by building a network of first-of-their-kind facilities that would produce liquid hydrogen using Plug Power electrolyzers and green energy such as solar, wind, and hydro power. *Id.* ¶¶ 81-91. The plan was technologically challenging, because the production of "green hydrogen as an alternative to traditional carbon-heavy power sources is considered to be in its infancy," *id.* ¶ 78, and it was capital intensive, *id.* ¶¶ 118, 125-28. But within the first years, Plug Power successfully brought several hydrogen plants online – in Georgia, Tennessee, and Louisiana – with capacity to produce 40 tonnes per day of liquid hydrogen. *Id.* ¶¶ 99, 104, 252, 261, 300.

Plug Power saw an opportunity to obtain federal financing to build even more hydrogen capacity early in the Biden administration. *Id.* ¶¶ 60-62, 132-33. In 2021, management said the Company was in the early phase of discussions with the DoE to provide low-cost federal loans for "3 or 4 projects to deploy across North America." *Id.* ¶ 133. In August 2023, the Company disclosed it was discussing a framework with the DoE for "$1 billion project financing facilities," *id.* ¶ 135, but it made clear that "until it's done, it's not done" and that the DoE facility was one of several financing alternatives the Company was exploring. *Id.* ¶ 138.

---

*Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Citations to "Ex." refer to the exhibits attached to the accompanying Declaration of John J. Clarke, Jr. dated October 9, 2026 ("Clarke Decl.").

On May 14, 2024, Plug Power announced a "conditional commitment" from the DoE for a $1.66 billion loan guaranty facility to "finance the development, construction, and ownership of up to six green hydrogen production facilities." *Id.* ¶ 192. It provided a "platform structure" under which financing could be obtained from the federal government for specific green hydrogen projects. *Id.* ¶¶ 14, 173. The conditional commitment set forth "conditions that must be satisfied prior to the issuance and funding of a loan or guarantee," *id.* ¶ 68, including completion of "required environmental permitting for the project," *id.* ¶ 69.

On December 6, 2024, the DoE released a Draft Environmental Assessment ("EA") for Plug Power's green energy project in Texas, which was the first project for which Plug Power sought financing under the DoE platform. In the EA, the DoE concluded that the Texas project would "not have a significant effect on the human environment. Preparation of an environmental impact statement is therefore not required." *Id.* ¶ 157; *see* Ex. 12 (copy of EA). With environmental review addressed, on January 16, 2025, the Company entered into a definitive $387 million note purchase agreement with Federal Financing Bank for the Texas plant, as the first project financed under the $1.66 billion DoE loan guaranty facility. Compl. ¶ 195. As Plug Power explained in a press release, the borrowing under the note purchase agreement was subject to satisfaction of a number of conditions precedent, including evidence of "adequate project funding." *Id.*

But only *four days later*, newly inaugurated President Donald J. Trump placed a hold on any disbursements under the DoE program (including the note purchase agreement for the Texas project), along with other green energy projects. *Id.* ¶ 205. The DoE then "began reviewing the billions of dollars that were approved under the Biden administration, particularly those loans and grants that were approved in the final days (like here)." *Id.* Plug Power never borrowed under the

note purchase agreement for the Texas facility and never signed a similar financing agreement for any other green hydrogen project under the DoE facility.

### C. The New York Green Hydrogen Project

Plaintiffs' claims primarily concern a different planned green hydrogen plant, to be located at a site in Genesee County, New York, referred to as STAMP. *Id.* ¶ 87. Plug Power announced the project years before the alleged class period, in February 2021. *Id.* The New York project would use clean energy from nearby Niagara Falls to produce up to 45 tonnes per day of liquid hydrogen using Plug Power electrolyzers. *Id.*

Plug Power made substantial progress on the New York facility over the following several years. But as the complaint makes clear, the "gating item" for the project was an electrical substation that needed to be built and energized by the New York Power Authority and National Grid. *Id.* ¶¶ 109-12. The substation and utility lines to serve it were opposed by the Tonawanda Seneca Nation, a tribe that owned adjacent ancestral lands it believed Plug Power had "desecrated." *See* Ex. 12; Compl. ¶ 260. In letters to the DoE, the Tonawanda Nation argued that federal environmental and historical preservation reviews were required before the DoE could enter into any agreement with Plug Power. *See* Ex. 12.

In a letter to the leader of the Tonawanda Nation dated February 29, 2024, a DoE official provided assurance that any financial assistance that Plug Power had requested from the DoE would "not include support for its facility planned within the STAMP ***at this time***." Compl. ¶¶ 12, 168 (emphasis added); *see* Ex. 12. The position taken in the letter allowed the DoE to proceed with the Texas transaction based on its conclusion that no environmental impact statement for the New York project would be needed at that time. Compl. ¶¶ 157, 168; *see* Ex. 12.

As the draft EA explained, "Plug Power ha[d] requested [DoE] financing to fund up to six green hydrogen facilities, with one being the Limestone facility in Texas[,]" while "[t]he exact

locations for the remaining facilities and the timing for construction have not been determined" and "are still being evaluated by" Plug Power. Ex. 12 § 1.4.1 at 10. The DoE further explained that each site for which Plug Power might eventually seek federal financing would be "a stand-alone project and will proceed independently," and "the projects [were] not interdependent parts of a larger action or dependent on a larger action for their justification." *Id.* at 11.

### D. The "Going Concern" Opinion and Ensuing Developments.

The complaint alleges that on November 9, 2023, in connection with its disclosure of second quarter results, Plug Power disclosed doubts about its ability to continue as a "going concern," stating: "[i]n light of the Company's projected capital expenditure and operating requirements under its current business plan, the Company is projecting that its existing cash and available for sale and equity securities will not be sufficient to fund its operations through the next twelve months[.]" Compl. ¶ 128.

In January 2024, the Company entered into an at-the-market agreement with an investment bank to sell up to $1 billion in its common stock. The facility allowed the "going concern" opinion to be lifted. Ex. 1 at 48-49. Soon thereafter, during an analyst call on January 23, 2024, Mr. Marsh said that "[a]ddressing the critical issue of cash management and resolving our going concern is now our foremost priority." Compl. ¶ 143. Mr. Middleton then reported that, now that its Georgia plant was operating at capacity of 15 tonnes per day of liquid hydrogen, "[w]e've slowed investment in the [follow-on] hydrogen facilities in Texas and New York until we find the right financing solution." *Id.* ¶ 144. That meant only limited capital spending for those two projects during 2024, just "to continue moving those forward." *Id.* ¶ 147.[2]

[2] The Company accessed the capital markets several more times during the alleged class period. On November 12, 2024, the Company announced a $200 million convertible securities transaction. Compl. ¶ 269. On March 19, 2025, it announced an underwritten stock offering raising another $280 million. *Id.* ¶¶ 214-15. It also entered into "a $525 million structured

On March 1, 2024, the first day of the alleged class period, the Company further elaborated on the changes it was making on capital spending: "We know we must significantly improve margin and cash flow," and the Company's near-term capital strategy therefore would be focused on "driv[ing] significant improvement in the cash burn by reducing CapEx." *Id.* ¶ 252.

On July 9, 2025, Plug Power announced a "new multi-year enhanced supply agreement with a leading U.S.-based industrial gas company and longtime hydrogen partner through 2030." *Id.* ¶ 237. Then, on November 10, 2025, it announced a preliminary agreement "to monetize its electricity rights in New York and one other location and collaborate with a U.S. data center developer" and, in the same announcement, that it was suspending "activities related to the Department of Energy loan program" in order to "reallocate capital toward higher-return opportunities across its hydrogen network." *Id.* ¶ 234.

On February 26, 2026, Plug Power announced an agreement with Stream Data Centers to sell real estate and associated assets associated with the New York project. *Id.* ¶ 244. Then, on July 13, 2026, the Company reported "two additional transactions with Stream," for sale of assets associated with its Texas hydrogen project. *Id.* ¶ 247.

**E. Plaintiffs' Claims**

Plaintiffs challenge certain public statements between March 1, 2024 and July 12, 2026 as allegedly false or misleading. *Id*. ¶¶ 251-315. The challenged statements concern the following topics: the DoE loan application and Plug Power's hydrogen production plans, *id.* ¶¶ 252, 255, 259, 261, 265, 267, 270-72, 275, 277, 279, 282-83, 288, 290, 292-93; the progress of development at the New York site, *id.* ¶¶ 252, 255, 261; and the eventual business decision to enter into a hydrogen supply agreement and divest the New York and Texas assets, *id.* ¶¶ 285, 296, 298, 300-

---

financing facility, part of which was used to retire convertible debt." *Id.* ¶ 292. By the end of Q1 2025, the Company held $300 million in unrestricted cash. *Id.*

01, 303-04, 306-09, 311, 314. A list of the challenged statements and falsity allegations is attached as Appendix A.

On behalf of a putative class of all persons who purchased or otherwise acquired Plug Power securities during the "class period," from March 1, 2024 through July 12, 2026, *id.* ¶¶ 27, 407, the complaint asserts a claim for securities fraud against all defendants under section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, Compl. ¶¶ 413-22, and a "controlling person" claim against the individual defendants under section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a), Compl. ¶¶ 423-29.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). That requires "more than a sheer possibility that a defendant has acted unlawfully." *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550, 555 (N.D.N.Y. 2020) (D'Agostino, J.). "[W]here a plaintiff has not nudged its claims across the line from conceivable to plausible, the complaint must be dismissed." *Id.* at 555-56. Securities fraud claims also must meet the particularity requirements of Rule 9(b). *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004).

A securities fraud plaintiff must establish: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 37-38 (2011); *see* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. These elements must be pleaded with the particularity required by the PSLRA. 15 U.S.C. § 78u-4(b); *see ATSI Commc'ns*, 493 F.3d at 99.

## ARGUMENT

### I. THE COMPLAINT DOES NOT ALLEGE AN ACTIONABLE MISSTATEMENT.

#### A. The Complaint Impermissibly Alleges an "Endless Breach."

The complaint impermissibly relies on statements from as long as three years before the start of the alleged class period to claim that statements during the class period about Plug Power's planned green hydrogen plants and federal financing efforts were false or misleading. Compl. ¶¶ 85-149; *see id.* ¶ 150-51 ("during the months *leading up to the Class Period*, Defendants presented an image to investors" that was false and misleading) (emphasis added). The Second Circuit recognizes this type of claim as an "endless breach argument," and it rejects that approach because it "circumvent[s] the well-settled rule that defendants are liable 'only for those statements made during the class period.'" *Wilder v. News Corp.*, 2015 WL 5853763, at *3 (S.D.N.Y. Oct. 6, 2015) (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007)).

"Endless breach" claims contend that statements "made before the class period, which remain uncorrected, would be actionable within the class period on an omission theory." *Lattanzio*, 476 F.3d at 154 (quoting *In re The Warnaco Group, Inc. Sec. Litig.*, 388 F. Supp. 2d 307, 315 (S.D.N.Y. 2005)); *see In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 254 (S.D.N.Y. 2007) (dismissing claim that would require the court to hold defendants "liable on the theory that they are in 'endless breach' of some duty to correct").

Plaintiffs explicitly rely on that argument, alleging that Plug Power "did not correct" pre-class period statements concerning its New York project and the DoE loan guaranty facilities and failing to do so rendered challenged class period statements false or misleading. Compl. ¶¶ 2, 183; *see id.* ¶¶ 253, 256, 257, 260, 262, 266. But the defendants had no duty to correct statements from before the alleged class period, requiring dismissal of the claims premised on such allegations. *See Yuson v. Warner Bros. Discovery, Inc.*, 834 F. Supp. 3d 391, 409 n.5 (S.D.N.Y.

2026) ("Plaintiffs recite another statement . . . made in November 2022 . . . apparently in furtherance of their argument that Defendants downplayed the significance of the NBA Rights. But this statement does not support a claim under Count I because it predates the Class Period."). Moreover, contrary to plaintiffs' contention, Plug Power did accurately update their statements during the class period. *See generally* Compl. ¶¶ 251-315.

### B. Plaintiffs' Falsity Theories Depend on Mischaracterizations, Inaccurate Assertions, and Allegations Without Foundation.

The principal theories of falsity alleged in the complaint depend on mischaracterizations of defendants' public statements, allegations of "fact" that are demonstrably inaccurate, and conclusory allegations from confidential witnesses who had no relevant knowledge of the matters they allegedly expressed opinions about. The Court is not required to accept such allegations as true and should not do so. *See ATSI Commc'ns*, 493 F.3d at 99 (securities plaintiffs do not meet their pleading burden with "[a]llegations that are conclusory or unsupported by factual assertions").

#### 1. Plaintiffs Do Not Allege Any Actionable Misstatement Concerning the Availability of DoE Financing for the New York Project.

Plaintiffs' primary theory of falsity is that challenged statements concerning Plug Power's project in western New York misleadingly "failed to disclose that the New York Plant had already been removed from the Company's DOE loan application in or around June 2023." Compl. ¶ 256; *see id.* ¶¶ 1, 252-53, 255, 259-62, 265. But there are no allegations concerning this alleged "application" or how Plug Power allegedly "withdrew" the New York project from it.

Instead, no facility other than Texas was specifically tied to the DoE loan guaranty facility in any class period statement, and Plug Power consistently described the facility as a lending "platform" that provided possible financing for "up to six green hydrogen production facilities" without identifying which ones they might be. Compl. ¶¶ 1, 14, 173, 192, 195. A DoE report

incorporated by reference in the complaint further makes it clear that Plug Power was still considering the "exact locations" of the projects to be financed, that each site would be "a ***stand-alone project and*** . . . ***proceed independently***," and that none were "interdependent parts of a larger" program. Ex. 12 § 1.4.1 at 10, 11 (emphasis added).

Courts are not required to credit allegations "contradicted either by statements in the complaint itself or by documents upon which its pleadings rely[.]" *In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). Nor do "plaintiffs' interpretations" of challenged statements control. *In re Am. Express Co. Sec. Litig.*, 2004 WL 632750, at *14 (S.D.N.Y. Mar. 31, 2004).

There are no challenged statements *during the alleged class period* linking the New York project to the DoE loan guaranty facility. For example, during an earnings call on March 1, 2024, the start of the class period, the complaint alleges Mr. Middleton said "we've slowed investment in the [follow-on] hydrogen facilities in Texas and New York until we find the right financing solution." Compl. ¶¶ 252-53. Far from suggesting DoE financing for the New York project, Mr. Middleton's statement said the opposite – that Plug Power was seeking "the right financing solution" for it. Nor did Mr. Marsh connect the New York project to the DoE loan facility during the same call; his alleged response to analyst questions focused only on Texas. *Id.* ¶ 255.

Similarly, challenged statements in March and May of 2024 did not address the New York project, much less imply it would be financed by the DoE facility. *See id.* ¶¶ 259, 261, 265. On an earnings call held on November 12, 2024, Mr. Middleton allegedly said the DoE facility was "postured . . . to provide incredibly low-cost capital ***for the majority of*** [Plug Power's hydrogen production] pipeline," *id.* ¶ 272, but he made no mention of New York, and his statement expressly indicated that some projects would not be covered. Plaintiffs do not challenge any statement made

after that date based on their allegations that the New York project had been "withdrawn" from the DoE application. *See id.* ¶¶ 271-73, 275, 277-78, 279-80.

The complaint relies heavily on pre-class period correspondence between the Tonawanda Seneca Nation and the DoE, but those letters do not support plaintiffs' claims of securities fraud. Compl. ¶ 162; *see id.* ¶¶ 2, 253, 256, 260, 262, 266. The Tonawanda Nation held lands adjacent to the Plug Power project in New York; the tribe opposed the project and claimed Plug Power already had "desecrated" its lands. Compl. ¶ 260 (alleging "increasing protests by local Native American tribes" to New York project); *see* Ex. 12 (letter to DoE). As a result, the tribe objected to the DoE moving ahead with financing for *any* Plug Power projects. *Id.* On February 29, 2024, a DoE official responded, making it clear that federal financing would "not include support for [Plug Power's western New York] facility . . . ***at this time***." Compl. ¶ 168 (emphasis added); *see* Ex. 12 (letter).

The DoE letter was attached as one of many exhibits to the DoE's draft EA for the Texas project, which the agency made public on December 6, 2024. Compl. ¶¶ 157, 160. In the EA, the DoE explained that an environmental assessment of the New York site was not required to move forward with financing of the Texas project, specifically addressing the Tonawanda Nation's objections. Compl. ¶¶ 157, 160, 168; *see* Ex. 12 (draft EA). The DoE wrote that its program would finance "up to six green hydrogen facilities," but "[t]he exact locations for the remaining facilities and the timing for construction have not been determined" and "the options [were] still being evaluated by the Applicant [Plug Power]." Ex. 12 at 10 (§ 1.4.1) (emphasis added).

Neither Plug Power nor anyone else "concealed" the publicly available EA, including the correspondence with the Tonawanda Nation, as plaintiffs misleadingly assert. Compl. ¶ 27. "[T]he Court is not required to blink reality and accept as true a plaintiff's claim of non-

disclosure." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 410-11 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *see Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *13-14 (S.D.N.Y. May 29, 2013) (complaint failed to plead misstatement or omission where information was disclosed "publicly" on government website).

Moreover, the allegation that Plug Power engaged in fraud because it did not disclose the New York project could *never* be financed under the DoE facility does not square with "reality." *Gregory*, 297 F. Supp. 3d at 410-11. The DoE informed the Tonawanda Nation only that financing for the New York project was not under consideration "at this time." Compl. ¶ 168. That did not mean the conditions to financing could not be met later, and Plug Power had no duty to state otherwise.

**2. Plug Power Did Not "Abandon" the New York Project.**

Plaintiffs' second falsity theory is that Plug Power "had affirmatively abandoned its construction commitments at the New York site" by the beginning of the alleged class period, thereby rendering false challenged statements that it had "slowed" or "tempered" its investments there. Compl. ¶¶ 252, 255; *see id.* ¶¶ 2-4, 152, 217, 254, 257. Plaintiffs' own allegations undermine this claim and show challenged statements were true when made. *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 306 (S.D.N.Y. 2021).

The complaint does not include factual allegations specifying when, exactly, plaintiffs contend Plug Power "affirmatively abandoned" work on its New York facility. Compl. ¶ 152. It alleges that before the class period work at the site was proceeding. In May 2023, for example, the Company allegedly "reported it had identified" a construction company for the project, "allowing for construction to commence." *Id.* ¶ 108. In August 2023, it allegedly confirmed that "[p]rogress in New York continues." *Id.* ¶ 109. In November 2023, it allegedly "reported that it continued to work . . . to energize the substation." *Id.* ¶ 112. Then, in the analyst call on

January 23, 2024, in the wake of its "going concern" opinion, management said Plug Power had "slowed investment" in Texas and New York and was working on "scheduling" completion of those projects. *Id.* ¶¶ 142-44.

Other than a wholly conclusory allegation, there are no allegations that work at the New York site had been abandoned when the class period began on March 1, 2024. *Id.* ¶ 152. It was not until October 30, 2024, nine months after Plug Power said it would "slow" its investments, that Genesee County described the substation work as having been "abandoned." *Id.* ¶ 182. Even still, according to CW5, Plug Power continued to "spend[] a significant amount of money to store and maintain equipment" at the New York project through June 2025. *Id.* ¶ 186. That allegation does not support plaintiffs' assertion of falsity concerning statements about "slowed" investment in New York made more than a year earlier. *See Sarria v. Telus Int'l (CDA) Inc.*, 2026 WL 2323425, at *16 (S.D.N.Y. Aug. 11, 2026) (internally inconsistent CW allegations "discredit[ed]" the complaint's falsity theory).

CW5 also allegedly said it was "company-wide employee consensus" by June 2025 "that the New York Plant was not going to happen." Compl. ¶ 186. But an alleged "consensus" reached by June 2025 (even if such speculation could be credited) does not support plaintiffs' challenge to statements made in March 2024, even if such a speculative opinion could be credited. *Id.* ¶¶ 152, 186. This is exactly the kind of "backwards" pleading courts reject. *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008), *aff'd in relevant part*, 347 F. App'x 617 (2d Cir. 2009).

### 3. The Texas Project Did Not Fail for Lack of Private Financing.

Plaintiffs' third theory of falsity is that the defendants failed to disclose that DoE funding for the Texas facility was dependent on private financing that the Company "did not have and could not obtain." Compl. ¶ 3. That allegation also disregards plaintiffs' own allegations,

including that Plug Power itself disclosed that "adequate project funding" was an express condition to closing the federal loan, *id.* ¶ 195, and that immediately after the note purchase agreement for the Texas project was signed, the Trump administration froze funding and subjected it to further review, *id.* ¶ 205.

The only plausible inference to be drawn from these allegations is that the federal government was the obstacle in Texas, not the Company's alleged inability to line up private investment. Plaintiffs' only allegations to the contrary are from confidential witnesses who do not allege any specific facts and were not alleged to have been in a position to know. *See id.* ¶¶ 258, 263, 266, 268, 273, 278, 280, 284, 286, 291, 294-95, 299.

For example, one of those alleged sources, CW1, allegedly left Plug Power in February 2024 – nearly *a year* before the government signed the definitive agreement to finance the Texas project. *Id.* ¶¶ 195, 263. Whatever circumstances existed in early 2024 were different than those a year later. *See Sarria*, 2026 WL 2323425, at *15 (confidential witness left before class period began and would not have had "relevant insight" concerning business at the time of challenged statements); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 525 (S.D.N.Y. 2020) (a "sweeping and conclusory claim" by confidential witness did not support falsity where "basis" for it was "unknown").

Plaintiffs next offer allegations sourced to CW6, who left in June 2025 and was not involved in development of the Texas facility. Compl. ¶¶ 58-59. Plaintiffs cite CW6 for their claim that statements about the Texas facility were false because Plug Power needed an additional $800 million to $1 billion to complete the project. *Id.* ¶¶ 278, 280, 291, 294. But plaintiffs' own allegations show CW6 had no personal knowledge of these matters, who allegedly told plaintiffs that the economics of the Texas project "did not *appear* viable." *Id.* ¶ 199. Such unfounded

opinions are not entitled to any deference. *See Goldenberg v. NeoGenomics, Inc.*, 2026 WL 709990, at *5 (S.D.N.Y. Mar. 13, 2026) (mere employment during the class period "cannot alone transform generalized and undated testimony about 'ongoing' 'problems' and 'issues' . . . into corroboration for Plaintiff's allegations" of falsity). Nor do plaintiffs explain how these allegations would render Plug Power's statements false at the time they were made.

Plaintiffs' reliance on CW6 to challenge statements about the Texas project made during an earnings call on July 7, 2025, is an even greater stretch. *Id.* ¶¶ 298-99. CW6 no longer worked for the Company by then, and he never allegedly worked in finance there. *Id.* ¶¶ 58-59. He would not have been in a position to "confirm" where Plug Power stood in its efforts to arrange financing for the project. *Id.* ¶ 299; *see In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 n.17 (S.D.N.Y. 2011) (complaint could not establish "the falsity of a Class Period statement based on the allegations of a CW who was not employed . . . at the time of the alleged misstatement").

Finally, the complaint relies on CW5 to challenge statements made by Mr. Marsh during a May 12, 2025 earnings call about Plug Power's efforts to bolster liquidity through a $280 million stock offering. Plaintiffs allege the remarks were false or misleading because CW5 allegedly "confirmed that Plug's March 2025 Offering was the result of its depleted cash reserves and because it was struggling to fund payroll and was not paying vendors, not for the funding for the Texas Plant." Compl. ¶ 294. But Mr. Marsh never stated otherwise. He allegedly said the offering was one of several "steps to ensure financial flexibility," which when "[c]ombined with" the DoE loan facility, would "provide a strong foundation to support our infrastructure goals." *Id.* ¶ 215. The CW5 allegations do not demonstrate falsity. *See In re FuBoTV Inc. Sec. Litig.*, 2023 WL 2711826, at *13 (S.D.N.Y. Mar. 30, 2023) ("even if the Court were to consider" CW allegations, "it is unclear how they would render the challenged statements false or misleading").

**4. Plug Power Did Not "Secretly" Negotiate A Data Center Deal.**

The final falsity theory asserted in the complaint is that statements about Plug Power's hydrogen plant plans and its "growth strategy" were false and misleading because it was exploring alternative options for, and ultimately agreed to sell, real property and other assets associated with the New York and Texas projects to a data center developer. *See* Compl. ¶¶ 4, 282-86, 292, 294, 296-312. This theory of falsity fails for two reasons.

*First*, the theory of "secret" negotiations depends entirely on allegations sourced from CW6, who asserts that starting in "early 2025," they worked to develop "a proposed strategic pivot for the Company to sell off the Texas and New York land." *Id.* ¶ 218; *see also id.* ¶¶ 219-223, 286, 294, 297, 299, 302, 305, 310, 312, 315. CW6 does not identify a specific date for when the so-called "secret" proposal began other than "early 2025." But according to the complaint, it was no secret either: articles as early as February 2025 reported the same. *See* Compl. ¶¶ 227, 230. The first statement alleged to be false or misleading on this basis was not made until March 4, 2025, *id.* ¶¶ 282-84, after the first article, *id.* ¶ 227. During the Company's earnings call on March 4, 2025, a securities analyst even asked management about the issue. *See id.* ¶ 285. This alone defeats plaintiffs' falsity theory. *See Goldschein v. Avangrid, Inc.*, 2025 WL 3707500, at *6 (S.D.N.Y. Dec. 22, 2025) (information "publicly available" through "news reports" defeated falsity claim).

*Second*, and in any event, there was no obligation to disclose consideration of alternative strategies, because Plug Power never said it planned to "adhere exclusively to" its strategy of building hydrogen plants with DoE support. *Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018). To this point, Plug Power disclosed on November 10, 2025, that it was exploring asset sales and other transactions with a data center developer and was suspending its efforts in connection with the DoE program. Compl. ¶ 234. Plug Power's "ultimate adoption

of an alternative strategy does not render its prior statements misleading." *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 652 (S.D.N.Y. 2015).

### C. The PSLRA Safe Harbor Requires Dismissal of Claims Based on Challenged Statements That Were Forward-Looking.

Virtually all of the challenged statements concerning the Company's efforts to secure financing through the DoE or other sources are forward-looking statements that are protected against liability by the PSLRA safe harbor. The safe harbor precludes liability for forward-looking statements that are "accompanied by meaningful cautionary statements" or that are made without "actual knowledge" that a statement "was false or misleading." 15 U.S.C. § 78u-5(c)(1)-(2); *see Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Many of the challenged statements concerning the DoE program and exploration of sources of financing fall squarely within the safe harbor. A list of all the forward-looking statements challenged in the complaint is attached as Appendix B-1. They include:

- **March 1, 2024:** "We *will*, once the DOE loan is finalized, move ahead more aggressively, especially in our Texas activity . . ." Compl. ¶ 255;
- **March 14, 2024:** "We *expect* the conditional approval" from DoE and the first project "*will* be Texas." *Id.* ¶ 259;
- **May 9, 2024:** "[W]e are *planning* the development of up to 6 additional hydrogen plants across [the] United States.... This program is *expected* to bolster the build-out of Plug's liquid hydrogen facilities ...." *Id.* ¶ 261;
- **November 13, 2024:** "[W]e're extremely *confident* about the DOE loan funding the majority of" the Texas site. *Id.* ¶ 275.

(All emphasis added.) These statements are forward-looking and either concern "the plans and objectives of management for future operations" or state "the assumptions underlying or relating to" the forward-looking statements. 15 U.S.C. §§ 78u-5(i)(1)(B), (D); *see In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *12 (S.D.N.Y. June 23, 2004) (statements "whose truth cannot be ascertained until some time after the time they are made are forward-looking") (cleaned up).

They also were expressly identified as forward-looking and were accompanied by meaningful cautionary language that "expressly" warned of and "directly" related to the risk that the Company might not be able to obtain financing from external sources, including the DoE. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002). Appendix B-2 collects the applicable risk factor disclosures. Among other things, Plug Power warned that:

- "There can be no assurance that we will have access to the capital we need on favorable terms . . . Sufficient sources of external financing may not be available to us on cost effective terms." Ex. 1 (Form 10-K Mar. 1, 2024) at 22.
- "[C]ertain technical, legal, environmental and financial conditions, including negotiation of definitive financing documents, must be satisfied before funding of the loan guarantee." Ex. 6 (May 14, 2024 press release).
- **"*The funding of the loan guarantee from the Department of Energy may be delayed, and we may not be able to satisfy all of the technical, legal, environmental or financial conditions acceptable to the Department of Energy to receive the loan guarantee.*"** Ex. 9 (Form 10-Q dated Nov. 12, 2024) at 61 (emphasis in original); *see also* Ex. 7 (Form 10-Q dated Aug. 8, 2024) at 61-62.

Throughout 2024, investors were cautioned expressly that Plug Power might not be able to secure funding under the DoE program or arrange financing from any other external source. The safe harbor requires dismissal of claims based on challenged statements addressing plans and expectations for such financing. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392-95 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).

Nor are there well-pleaded allegations to support an inference that any defendant had "actual knowledge" of the falsity of any of these statements when it was made. *Wesco Aircraft*, 454 F. Supp. 3d at 395; *see Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 568 (S.D.N.Y. 2018) (actual knowledge requirement is "stricter than for statements of current fact" because liability requires "proof of knowing falsity") (quoting *Slayton*, 604 F.3d at 773). That is made apparent by plaintiffs' admission that the DoE granted a conditional commitment to Plug Power on May 14, 2024 and that the federal government signed a definitive

note purchase agreement for the Texas project on January 16, 2025. Compl. ¶¶ 193, 203. The fact that the Company successfully arranged the DoE financing defeats any inference, much less a compelling one, of any knowing misstatement about its prospects for doing so.

Similarly, most of the challenged statements made after January 2025 are forward-looking. *See id.* ¶¶ 279-315. For example, Mr. Middleton provided "estimates" of "additional required investment" to complete the Texas plant on March 3, 2025 and emphasized that the project was "an important project for the future and is expected to benefit the Company and the U.S. market once completed." *Id.* ¶ 279. Mr. Marsh echoed Mr. Middleton's sentiments, stating that "we're looking to build" the Texas plant and that Plug Power was making efforts "to make sure that this loan is executed on the deal we came to." *Id.* ¶ 282; *see also* App'x. B-1 (identifying the statements protected by the PSLRA safe harbor in Compl. ¶¶ 283, 285, 288, 290, 292-93, 296, 298, 300-01, 303-04, 306-07, 309, 311, 314).

As with the challenged statements made in 2024, these statements were identified as forward-looking and were accompanied by meaningful cautionary language, including:

- "***The DOE funding of the loan may be delayed, and we may not able to satisfy all of the technical, legal, environmental or financial conditions acceptable to the DOE to receive the loan guarantee***." Ex. 14 (Form 10-K Mar. 3, 2025) at 22 (emphasis in original); *see also* Ex. 17 (Form 10-Q May 12, 2025) at 32; Ex. 24 (Form 10-Q Nov. 10, 2025) at 36, 60.

- "Whether and when our DOE loan guarantee will be funded is subject to a number of factors outside of our control, including political administration changes, legislative enactments, administrative actions." Ex. 14 (Form 10-K Mar. 3, 2025) at 31.

- "[A]pproval and funding of any disbursements of the Guaranteed Loan will be subject to the satisfaction of conditions precedent ...." Ex. 13 (Form 8-K Jan. 23, 2025).

As a matter of law, the safe harbor renders all of the challenged statements about Plug Power's financing expectations and planning inactionable. *Wesco Aircraft*, 454 F. Supp. 3d

at 395. There is no basis to infer that any defendant made any of those statements with "actual knowledge" of falsity. *See infra* at 27-30; *Xerox Corp.*, 300 F. Supp. 3d at 568.

**D. The Complaint Fails to Allege Falsity for Any Opinion Statements.**

Many challenged statements are opinions or other statements of subjective belief. *See* Compl. ¶¶ 259, 271, 275, 283, 292, 303. The complaint fails to plead that any of those statements were actionable, because it does not plausibly allege the speaker did not hold the stated opinion or belief; that an opinion statement conveyed an embedded statement of fact that was false or misleading; or that an opinion statement omitted facts needed for it to fairly align with other material information available at the time. *Tongue*, 816 F.3d at 210; *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-89 (2015).

Alleged statements by Mr. Middleton on March 14, 2024 and November 13, 2024, and by Mr. Marsh on August 11, 2025, that they were "confident" in the DoE application process and the prospects for construction of the Texas facility are classic statements of opinion or belief. Compl. ¶¶ 259, 275, 303; *see Tongue*, 816 F.3d at 210. Similarly, Mr. Marsh's statements on November 12, 2024, that Plug Power's search for equity partners was "not tied to the DOE loan" and "we don't see any tall pole in the tent" with respect to finalizing the DoE loan were statements of his subjective belief at the time. *Id.* ¶ 271. Finally, Mr. Marsh's alleged statement on May 12, 2025 that the "underlying program" with the federal government was "contracted, obligated and we believe secure" was expressly framed as a statement of belief. *Id.* ¶ 292.

All of these statements expressed subjective beliefs, not objective facts, and there are no well-pleaded allegations in the complaint supporting an inference that the speaker either did not believe the opinions or that they did not "fairly align[]" with information available at the time. *Tongue*, 816 F.3d at 212 (quoting *Omnicare*, 575 U.S. at 189); *see Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014), *aff'd,* 605 F. App'x 52 (2d Cir. 2015) (truth or falsity

must be "assessed in light of the information available at the time [it was] published") (cleaned up). Allegations attributed to CW5 speculating that management knew "Plug had no shot at getting the funds" in a future Trump administration are unsupported speculation. *Id.* ¶ 213.

## II. THE COMPLAINT DOES NOT ALLEGE FACTS GIVING RISE TO THE REQUIRED STRONG INFERENCE OF SCIENTER.

A second and independent reason for dismissal of the complaint is plaintiffs' failure to allege facts that would support a "strong inference" that any defendant acted with the intention to defraud in making the challenged statements, another pleading requirement imposed by the PSLRA. 15 U.S.C. § 78u-4(b)(2)(A). To be "strong," the required inference of fraudulent intent must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

The Second Circuit recognizes that an inference of scienter may be based on allegations of "motive and opportunity to commit fraud" or, in the absence of any alleged motive, "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The complaint here does not plead either.

### A. There Are No Allegations of Motive and Opportunity to Commit Fraud.

To raise a strong inference of scienter through "motive and opportunity," a complaint must allege that defendants "benefitted in some *concrete and personal way* from the purported fraud." *JP Morgan Chase*, 553 F.3d at 198 (cleaned up) (emphasis added). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable" or "the desire to keep stock prices high to increase officer compensation," are not sufficient. *Id.* "Motive" generally requires allegations that corporate insiders "ma[de] a misrepresentation in order to sell their own shares at a profit." *Id.*

**1. No Unusual or Suspicious Stock Sales.**

"As a general matter, '[t]he absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders.'" *Greco v. Qudian Inc.*, 2022 WL 4226022, at *25 (S.D.N.Y. Sep. 13, 2022) (quoting *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000)). Even where sales are alleged, only trades that are "suspicious" or "unusual" can support an inference of scienter. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (cleaned up).

"Whether trading was unusual or suspicious turns on factors including (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant[s'] sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Id*. The complaint here does not allege unusual or suspicious stock sales by any individual defendant. Plaintiffs allege that two of the three individual defendants *purchased* stock during the alleged class period; the only sale alleged was made pursuant to a Rule 10b5-1 plan.

Mr. Middleton is not alleged to have sold any Plug Power stock during the class period, which "undermines plaintiffs' motive allegations" against him. *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006). Instead, Mr. Middleton allegedly *purchased* 1,000,000 shares in May and June 2025, at a cost of over $922,000. Compl. ¶¶ 394-95. Plaintiffs attempt to draw the sting of this inconvenient fact by alleging Mr. Middleton purchased shares because he received a cash payment in 2025 due to a shortage in the relevant plan of shares to fulfill an annual equity award. *Id.* ¶ 396. But that does not change the facts. Even if Mr. Middleton used a cash

bonus to purchase his shares, his acquisition of one million shares during the class period negates any inference of fraudulent intent.

Mr. Crespo also made a purchase of 37,300 shares of Plug Power common stock, between December 2025 and March 2026, which he did to replace shares he had sold in June 2025 under a Rule 10b5-1 trading plan adopted earlier that year. The two transactions resulted in a net loss to Mr. Crespo of nearly $50,000. *Id.* ¶¶ 384, 389-90. Further, the lone stock sale was not "unusual" or "suspicious": it was made pursuant to a Rule 10b5-1 trading plan, *id.* ¶ 389; it occurred four months before the first alleged corrective disclosure, *id.* ¶¶ 318, 389; and it resulted in a net loss for Mr. Crespo when he repurchased the same number of shares after three alleged corrective disclosures in October and November 2025, *id.* ¶¶ 318, 390. These circumstances all weigh heavily against any inference of scienter. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 n.4 (2d Cir. 2022) (sales pursuant to Rule 10b5-1 plan not suspicious where complaint failed to demonstrate that the purpose of the plan was to take advantage of an inflated stock price); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 412 (S.D.N.Y. 2020) (courts are "frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure"); *Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("'[A] strategy of repurchasing stock at a knowingly inflated price would be economically irrational.'")

Mr. Marsh, in turn, is not alleged to have sold any shares during the class period. Together with the other defendants' purchases, that strongly "undermines plaintiffs' claim regarding motive." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996); *see Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (same); *Turner*, 2014 WL 406917, at *11 (similar).

**2. Allegations Concerning Other Compensation Are Not Sufficient.**

Salaries and other standard compensation do not provide the type of "concrete and personal benefit" required to support an inference of scienter. *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001); *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561-62 (S.D.N.Y. 2004) (noting need for particularized facts to depart from general rule).

The complaint alleges that Mr. Middleton received a bonus of $1.5 million in cash-in-lieu-of-equity but also alleges that the cash bonus was required by contract because the relevant plan did not have enough shares available to deliver that award in equity. Compl. ¶ 396. Similarly, it alleges that Messrs. Crespo and Middleton were paid retention bonuses, but those are typical corporate transition compensation. *Id.* ¶¶ 392, 397-98; *see In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 535 (S.D.N.Y. 2021) (retention bonuses did not raise an inference of scienter). The complaint also alleges that the individual defendants were paid performance bonuses, but there are no facts alleged to support an inference that those bonuses were unusual or were even remotely connected to any alleged misstatements. *See Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *13 (S.D.N.Y. July 23, 2018).

**B. Plaintiffs Do Not Allege Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.**

Given plaintiffs' failure to plausibly allege a motive to commit fraud, their allegations of "conscious misbehavior or recklessness . . . must be correspondingly greater." *JP Morgan Chase*, 553 F.3d at 198-99. But their boilerplate scienter theories do not meet that demanding standard.

**1. Scienter Cannot Be Inferred From Conclusory Allegations of "Actual Knowledge" or "Access to Information."**

The complaint alleges in conclusory terms that the individual defendants knew or should have known that their challenged statements were false based on their supposed access to unspecified internal reports. Compl. ¶¶ 336, 342-47. Plaintiffs also rely on allegations attributed

to alleged confidential witnesses, but none of those allegations support these unfounded conclusions. *See id.* ¶¶ 337-41.

**The CW Allegations.** The complaint first relies on allegations from CW2, CW3, CW4, and CW5 about statements made by the individual defendants in "all-hands" meetings attended by all Company employees. *See id.* ¶¶ 337, 339-40. These allegations are entitled to no weight. *See In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *15 (S.D.N.Y. July 23, 2025) (allegations about all-hands meetings did not identify specific information contradicting defendants' statements). CW2's characterizations of updates given during these meetings are "subjective assessments" that do not reflect "the mental states" of the individual defendants. *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *23 (S.D.N.Y. Sep. 21, 2021); *see also Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2010) ("anecdotes and conclusory statements of belief" from rank-and-file CWs did not support scienter).

CW3 allegedly recalls Mr. Marsh saying during an all-hands meeting that the incoming Trump administration "was not friendly to hydrogen." Compl. ¶ 339. But that undated observation, even if credited, does not support an inference that Mr. Marsh knew his challenged statements were false. To the contrary, it shows Mr. Marsh was transparent about the need to finalize federal financing for the Texas project before the administrations changed in January 2025, which it did. *See In re Regeneron Pharms., Inc. Sec. Litig.*, 2026 WL 2797861, at *14 (S.D.N.Y. Sep. 18, 2026) (CW allegations supported innocent explanation).

Plaintiffs allege, according to CW5, that actions were "being taken" that would suggest the defendants knew that the Company "had no shot at getting the funds" if federal financing were not locked up by the presidential transition. Compl. ¶ 339. But the complaint does not allege what those alleged "actions" were and admits that Plug Power entered into a definitive note purchase

agreement with the Federal Financing Bank for the Texas project before the inauguration. *Id.* ¶ 195. Such generalized allegations cannot support any inference of actual or constructive knowledge of falsity, much less a strong one. *See Bettis v. Aixtron SE*, 2016 WL 7468194, at *9-10 (S.D.N.Y. Dec. 20, 2016) (conclusory CW allegations did not support scienter).

Similarly, CW4 allegedly recalled an all-hands meeting "at the end of 2024 or early 2025" in which Mr. Middleton mentioned a "missed deadline," and "verbiage or something being said" "around" March 2025 about the federal loan being "in jeopardy." Compl. ¶ 340. Neither allegation is connected to specific challenged statements, and the vague phrase "verbiage or something" demonstrates uncertainty about what was said and by whom. *See Wachovia*, 753 F. Supp. 2d at 352 (CW allegations without a specific time period could not "supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement") (emphasis original). CW4 had no direct contact with any individual defendant, Compl. ¶ 52, and their role was unrelated to the federal funding or development of the hydrogen plants, *id.* ¶ 54.

Other CW allegations fall similarly short of supporting any inference of a motive to commit fraud. As previously discussed, CW1 allegedly asserted that Plug Power's ability to secure additional project financing was a "known obstacle to receiving funding under the DOE loan," *id.* ¶ 338, but CW1 left the Company even before the class period began and a year before Plug Power signed a definitive agreement to finance the Texas plant and did not have any alleged contact with any individual defendant, *id.* ¶¶ 44-47. CW1 cannot support an inference of scienter for any individual defendant, much less so as to "all relevant times." *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013) (allegations from CWs who had no direct contact with executives did not support scienter).

Plaintiffs allege that CW6 had direct contact with an individual defendant – one presentation to Mr. Crespo before he was promoted to CEO "in or before May 2025." Compl. ¶¶ 223, 341. But that sole contact does not support an inference of scienter for Mr. Crespo or any other defendant. There are no challenged statements by Mr. Crespo concerning an alleged strategic "pivot" to data centers, *id.* ¶¶ 223, 286, 341, and an alleged presentation to Mr. Crespo does not say anything about the knowledge of Mr. Marsh or Mr. Middleton. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (scienter analysis must be individualized).

CW6's alleged opinions that Plug Power "did not have enough money" and Texas "did not have enough demand" say nothing about what any individual defendant knew. Compl. ¶¶ 220, 341; *see In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 297 (E.D.N.Y. 2023) (rejecting CW allegations that did not demonstrate knowledge on the part of the individual defendants). Further, CW6 left Plug Power in June 2025 and could shed no light on any defendants' state of mind after that time.

**Unspecified "Internal Reports and Data."** Perhaps plaintiffs' flimsiest scienter allegation is that "the Individual Defendants were directly provided with and/or had access to numerous internal reports and data" about Plug Power's "existing capital and capital expenditures." Compl. ¶ 342. To "plead scienter under an access-to-information theory, a plaintiff must allege 'defendants' knowledge of facts or access to information *contradicting their public statements*.'" *In re UiPath, Inc. Sec. Litig.*, 2026 WL 2905997, at *10 (S.D.N.Y. Sep. 28, 2026) (cleaned up). The complaint does not even attempt to provide that kind of specificity.

Plaintiffs allege that in 2022, Plug Power adopted a structure under which its CEO, as the chief operating decision-maker, received information about the Company's different categories of

revenue. Compl. ¶¶ 343-47. But alleged receipt of revenue information says nothing about when and whether Mr. Marsh or any other individual defendant received information that contradicted their public statements challenged in the complaint. No scienter can be inferred. *See City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *9 (S.D.N.Y. Jan. 21, 2021) (failure to demonstrate access to "specific information" revealing falsity of the challenged statements was fatal to scienter allegations).

**2. Scienter Cannot Be Inferred From the Defendants' Roles.**

The complaint next asserts, in conclusory terms, that an inference of an intention to defraud can be drawn from the fact that the individual defendants spoke with authority on Plug Power's business. *See* Compl. ¶¶ 350-58. But that allegation is circular: plaintiffs still were required to plead internal facts in conflict with challenged statements. Without such facts, "defendants' having made statements on the topics that plaintiff points to does not permit the inference that defendants acted in a 'highly unreasonable' way that 'represents an extreme departure from the standards of ordinary care.'" *In re Qiwi plc Sec. Litig.*, 2023 WL 7283619, at *18 (E.D.N.Y. Nov. 3, 2023) (quoting *Kalnit*, 264 F.3d at 138).

**3. Impairment Charges Do Not Support an Inference of Scienter.**

The complaint separately alleges that Plug Power reported asset impairment charges in Q4 2024 and Q3 2025, but those disclosed charges do not support an inference of scienter as plaintiffs allege. Compl. ¶¶ 359-78. In its Form 10-K filed on March 3, 2025, Plug Power allegedly disclosed that it took an impairment charge because it had "paused certain hydrogen production plant projects during the fourth quarter of 2024." *Id.* ¶ 368. But that disclosure, and the impairment charge itself, do not conflict with earlier statements. *See id.*

In January 2024, the Company told analysts that it had "slowed" its investments in the Texas and Georgia projects, and it repeated that disclosure on March 1, 2024. *Id.* ¶¶ 144, 171. It

did not state that it had "paused" the projects at either time; indeed, in the earlier call Mr. Middleton explained that during 2024 Plug Power would continue to make reduced capital expenditures for both "Texas and New York to continue moving those forward." *Id.* ¶ 147. Those earlier statements are entirely consistent with the decision at year-end 2024 to take an impairment charge because "certain hydrogen production plant projects" had been "paused." *Id.* ¶¶ 368.

Alleged impairment charges taken in late 2025, *id.* ¶¶ 373-77, cannot support any inference of scienter either because they were consistent with the Company's disclosure, on November 10, 2025, that it had signed a letter of intent to sell its electricity rights at the New York site; that it was "suspend[ing] activities related to the Department of Energy loan program;" and that it was working with a data center developer on future collaborations. *Id.* ¶¶ 306-09.

If anything, the Company's impairment charges defeat any reasonable inference of scienter. If Plug Power had been trying to conceal an alleged "strategic pivot" away from developing green hydrogen production capacity because it knew in "early 2025" that its Texas and New York projects would never be completed, *id.* ¶¶ 217-18, a decision to take significant impairment charges at the end of 2024 and late in 2025 would have revealed it. Contrary to plaintiffs' illogical assertions, however, the Company timely recorded and disclosed asset impairments as the facts unfolded. The charges do not support an inference of scienter. *Cf. In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *16-17 (S.D.N.Y. Feb. 27, 2004).

**4. Executive Changes Do Not Support an Inference of Scienter.**

The complaint alleges that Plug Power announced in October 2025 that Mr. Crespo would succeed Mr. Marsh as its chief executive officer in March 2026, when the Company filed its annual report on Form 10-K, and that Mr. Shrestha would step down as president effective October 10, 2025. Compl. ¶ 382; *see* Ex. 23 (10/7/25 press release). The announcement explained that Mr. Marsh would continue to serve as executive chairman following the transition. Ex. 23.

Plaintiffs contend that this supports an inference of scienter, but they do not allege any facts, as opposed to unfounded conjecture, suggesting the change in leadership reflected anything other than normal executive succession. *See* Compl. ¶¶ 379-82. There are no alleged "facts linking" those changes to any alleged fraud. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005); *see also Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 240 (S.D.N.Y. 2020) (rejecting alleged "sudden resignation" as indicative of scienter).

### C. Plaintiffs Have Not Alleged "Corporate Scienter."

The complaint similarly fails to plead the requisite "strong inference" of scienter as to Plug Power itself – what courts refer to as "corporate scienter." To plead corporate scienter, plaintiffs were required to allege facts sufficient to "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" or that the statements "would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Dynex Cap.*, 531 F.3d at 195-96 (cleaned up). The complaint does not do so.

As already shown, plaintiffs have not alleged the required "strong inference" of scienter for any of the individual defendants. No fraudulent intent can be imputed from those three senior executives to Plug Power. *See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 529 (S.D.N.Y. 2020). But for the same reasons, the complaint does not otherwise allege "sufficient facts showing that anyone" at Plug Power "had knowledge" of the purported falsehood of the challenged statements "for any specific point of time in any level of specificity." *Id.*

### D. The Nonfraudulent Inferences Are More Compelling.

Even if there were plausible basis to infer scienter for any defendant, the competing inference that the defendants were acting without any intention to commit fraud is more compelling from the allegations in the complaint. *Tellabs*, 551 U.S. at 314. The complaint

describes a Company navigating a challenging period in which it pursued the promising opportunity of DoE financing for a groundbreaking strategy, successfully managed a crisis brought about by doubts concerning its ability to continue as a "going concern," and worked through a tumultuous change in federal policy brought about by a national election.

During that time, Plug Power successfully obtained a conditional commitment for a $1.66 billion lending platform from the DoE on May 14, 2024, Compl. ¶ 192, and entered into a definitive loan agreement with Federal Financing Bank under that program for its Texas project on January 16, 2025, *id.* ¶ 195. It "defies economic reason" to infer that Plug Power or its executives always knew the loan would not be funded given those achievements. *See JP Morgan Chase*, 553 F.3d at 203 (cleaned up). More plausibly, the defendants believed in the opportunity presented by the DoE program and continued to press forward even in the face of challenges presented by a new administration. The pattern the complaint alleges of keeping investors informed demonstrates an intention to comply with disclosure duties, not an intention to defraud. *See Docdeer Found. v. BioNTech SE*, 2025 WL 2781381, at *15 (S.D.N.Y. Sep. 30, 2025).

## III. THE COMPLAINT DOES NOT ALLEGE A SCHEME CLAIM.

To the extent the complaint purports to assert a "scheme" claim under Rules 10b-5(a) and (c), that claim also should be dismissed. *See* Compl. ¶¶ 348-49. "[M]isstatements and omissions alone are not enough for scheme liability." *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022). But the complaint offers only Mr. Marsh's alleged misstatement during the March 4, 2025 earnings call as the purported "scheme." *See* Compl. ¶¶ 285, 348. That is not enough to avoid dismissal.

## IV. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE LOSS CAUSATION.

Finally, the complaint also should be dismissed for failure to plausibly allege loss causation, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005), another PSLRA requirement, *see* 15 U.S.C. § 78u-4(b)(4). Pleading loss causation requires plausible allegations

of a "corrective disclosure," *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 494 (S.D.N.Y. 2021), and when such a disclosure "contain[s] no information that even remotely suggests that . . . prior statements . . . were false or misleading," dismissal is required. *Id.* (citing *Lentell*, 396 F.3d at 175 n.4). That is the case here. *See* Compl. ¶ 318 (conclusory allegations of various allegedly corrective disclosures).[3]

Disclosures on October 10, 2025, concerning a change in leadership at Plug Power cannot be considered a corrective disclosure, because they said nothing whatsoever about any prior alleged misstatement. *Id.* ¶ 320. Similarly, the Company's press release on November 10, 2025, disclosing it was suspending activities relating to the DoE loan program and had signed a letter of intent to monetize electrification assets associated with the New York project disclosed new information; it was not the correction of any prior misstatement. *Id.* ¶ 324. Later disclosures on November 13, 2025, February 26, 2026, and July 13, 2026, also did not reveal any previous misstatement or omission but instead reflected accurate updates of further developments, including definitive asset sale agreements that were in line with the change in strategic direction announced on November 10, 2025. *Id.* ¶¶ 326, 328, 330. Simply alleging that an issuer provided updates concerning developments in its business followed by "concomitant market dissatisfaction" is "not enough" to plausibly allege loss causation. *Born*, 521 F. Supp. 3d at 494.

[3] Because plaintiffs do not allege any primary violation under section 10(b), their controlling person claim against the individual defendants also must be dismissed. 15 U.S.C. § 78t(a); *JP Morgan Chase*, 553 F.3d at 206-07.

## **CONCLUSION**

For all of the foregoing reasons, the complaint should be dismissed in its entirety.

Dated: October 9, 2026

DLA PIPER LLP (US)

By: */s/ John J. Clarke, Jr.*
John J. Clarke, Jr. (Bar Roll No. 705346)
john.clarke@us.dlapiper.com
Steven M. Rosato (Bar Roll No. 703375)
steven.rosato@us.dlapiper.com

1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 335-4500

*Counsel for Plug Power Inc.*

BOIES SCHILLER FLEXNER LLP

By: */s/ George F. Carpinello*
George F. Carpinello (Bar Roll No. 103750)
gcarpinello@bsfllp.com

30 South Pearl Street
Albany, New York 12207
Tel: (518) 434-0600

*Counsel for Individual Defendants Andrew J. Marsh, Paul B. Middleton, and Jose Luis Crespo*